IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 5:19-CR-50079-001 |
| | ) | |
| PAUL PETERSEN | ) | |

## PLEA AGREEMENT

Pursuant to Rule 11(c)(1) of the Federal Rules of Criminal Procedure, the parties hereto acknowledge that they have entered into negotiations which have resulted in this agreement. The agreement of the parties is as follows:

### COUNT OF CONVICTION AND DISMISSAL

1.     The defendant, **PAUL PETERSEN**, hereby agrees to plead guilty to Count One of the Superseding Indictment. Count One of the Superseding Indictment charges the defendant with the offense of conspiracy to smuggle illegal aliens for private financial gain, in violation of Title 8, United States Code, Sections 1324 (a)(1)(A)(ii), 1324(a)(1)(A)(v)(I), and 1324(a)(1)(B)(i). If the court accepts this plea agreement, once the court has pronounced sentence, the government will move to dismiss the remaining counts on the Superseding Indictment pending against the defendant.

### CONSENT TO PROCEED BEFORE THE MAGISTRATE JUDGE

2.     The defendant acknowledges that he has been advised and understands that he has a right to have a United States District Judge presiding when he enters a guilty plea and that he can exercise that right without concern or reservation. The defendant and the United States hereby consent to have the proceedings required by Rule 11 of the Federal Rules of Criminal Procedure incident to the making of the plea to be conducted by the United States Magistrate Judge. If, after conducting such proceedings, the Magistrate Judge recommends that the plea of guilty be accepted,

a presentence investigation and report will be ordered pursuant to Federal Rule of Criminal Procedure 32. The defendant acknowledges that his plea of guilty is subject to approval and acceptance by the District Judge and that sentencing will be conducted by the District Judge.

## WAIVER OF OBJECTIONS TO MAGISTRATE'S
## REPORT AND RECOMMENDATION

3.      The parties acknowledge that pursuant to 28 U.S.C. § 636(b)(1)(B), the failure to file objections to the Report and Recommendation within fourteen (14) days bars them from objecting to the District Court's acceptance of the guilty plea as recommended by the Magistrate Judge.  Having been advised of the right to object to the Report and Recommendation, the parties wish to waive that right for the purpose of expediting acceptance of the guilty plea in this matter. Accordingly, evidenced by their signatures appearing below, the parties hereby waive the right to object to the Magistrate Judge's Report and Recommendation Concerning Plea of Guilty, and consent to acceptance of the same by the United States District Judge so that acceptance of the guilty plea may proceed forthwith.

## ADMISSION OF FACTUAL BASIS IN SUPPORT OF GUILTY PLEA

4.      The defendant has fully discussed with defense counsel the facts of this case and the elements of the crime to which the defendant is pleading guilty. The defendant has committed each of the elements of the crimes to which the defendant is pleading guilty, and admits that there is a factual basis for this guilty plea.  The following facts are true and undisputed:

a.      The Federal Bureau of Investigation ("FBI") along with assistance from the United States State Department Diplomatic Security Service ("DSS") and local law enforcement, have been actively investigating the criminal activities of **PAUL PETERSEN** for several years. During the course of the investigation, law enforcement determined that the defendant, **PAUL**

**PETERSEN**, among other things, orchestrated the travel of several pregnant women from the Republic of the Marshall Islands to the Western District of Arkansas. The purpose of this travel was for **PAUL PETERSEN** to arrange adoption of their children by families living in the United States.

      b.      The Republic of the Marshall Islands (RMI) is an island country near the equator in the Pacific Ocean, slightly west of the International Date Line. In 1983, the United States entered into a Compact of Free Association (hereinafter, the "Compact") with the RMI government. The United States and the RMI signed an Amended Compact in 2003, which Congress codified at Public Law 108-188. Section 141 of the Compact grants RMI citizens the ability to freely enter and take up employment within the United States. Section 141(b) prohibits RMI citizens from entering the United States under the Compact agreement if their travel is for the purpose of adoption. In pertinent part, the Compact states, "(b) Notwithstanding subsection (a) of this section, a person who is coming to the United States pursuant to an adoption outside the United States, or of adoption in the United States, is *ineligible* for admission under the Compact and the Compact as amended."

      c.      The Defendant, **PAUL PETERSEN**, is a licensed attorney who practices law in Arizona, Utah, and Arkansas. During the course of the investigation, agents from the FBI and DSS discovered that **PETERSEN** used credit card accounts that he controlled to purchase airline tickets for four women, R.M.J., A.T., R.J., and D.J., all citizens of the RMI who do not have official authorization to enter or reside in the United States, to travel from the RMI to the Western District of Arkansas.

      d.      Specifically, with regard to R.M.J., agents discovered through a review of financial records, records from United Airlines, and records from United States Customs and Border Patrol (CBP) that **PETERSEN** used a Bank of America Credit Card with the last four digits of 3668 to purchase a United Airlines ticket that R.M.J. used to travel from the RMI to Northwest Arkansas Regional Airport (XNA) on April 21, 2014.  Agents also discovered that R.M.J. gave birth to a baby boy at Willow Creek Women's Hospital in Johnson, Arkansas, on July 2, 2014.  According to records from the Washington County Circuit Clerk's Office, a family from the United States adopted R.M.J.'s baby boy on July 8, 2014 during an adoption proceeding that **PETERSEN** caused to be filed in his capacity as a licensed attorney.  Finally, the agents also discovered that **PETERSEN** paid for R.M.J.'s return ticket to the RMI using the same Bank of America Credit Card account that he controlled with the last four digits of 3668.  This airline ticket allowed R.M.J. to travel from XNA back to the RMI on August 10, 2014.  The timeline of R.M.J.'s travel from the RMI to the United States on April 21, 2014, giving birth on July 2, 2014 and then consenting to adoption, and returning to the RMI on August 10, 2014 demonstrates that the purpose of R.M.J.'s travel to the United States was for her to give birth to the baby in the United States and to consent to an adoption of her baby in the Western District of Arkansas.  This travel was in violation of the Immigration and Nationality Act as R.M.J. was not eligible for admission to the United States under the Compact for the purpose of adoption.  R.M.J. is a citizen of RMI and did not have official authorization to enter the United States outside the terms of the Compact. Finally, agents also reviewed documents from the Washington County Circuit Clerk's Office that showed that **PETERSEN** reported to the Washington County Circuit Court that the family who adopted R.M.J.'s baby boy paid him $13,300.00 for his work in arranging the adoption.  The Washington County records refer to **PETERSEN**'s role in the adoption as a "legal facilitator."  Through

witness interviews, the agents were able to discover that Maki Takehisa and other co-conspirators recruited R.M.J. while she was pregnant to travel to the United States to have her baby and consent to an adoption in the United States.  The interviews also revealed that Maki Takehisa offered to pay R.M.J. $10,000.00 for her to travel to the United States and consent to an adoption.

      e.      With regard to A.T., agents discovered through a review of financial records, records from United Airlines, and records from United States Customs and Border Patrol (CBP) that **PETERSEN** used a Bank of America Credit Card with the last four digits of 3668 to purchase a United Airlines ticket that A.T. used to travel from the RMI to Northwest Arkansas Regional Airport (XNA) on October 1, 2014.  Agents also discovered that A.T. gave birth to a baby boy at a Mena Regional Health System facility in Mena, Arkansas, on December 29, 2014.  According to records from the Polk County Circuit Clerk's Office, a family from the United States adopted A.T.'s baby boy on January 7, 2015 during an adoption proceeding that **PETERSEN** caused to be filed in his capacity as a licensed attorney.  The agents also discovered that **PETERSEN** paid for A.T.'s return ticket to the RMI using a Chase Bank Credit Card account that he controlled with the last four digits of 2171.  This airline ticket allowed A.T. to travel from XNA back to the RMI on April 6, 2015.  The timeline of A.T.'s travel from the RMI to the United States on October 1, 2014, giving birth on December 29, 2014 and then consenting to adoption, and returning to the RMI on April 6, 2015 demonstrates that the purpose of A.T.'s travel to the United States was for her to give birth to the baby in the United States and to consent to an adoption of her baby in the Western District of Arkansas.  This travel was in violation of the Immigration and Nationality Act as A.T. was not eligible for admission to the United States under the Compact for the purpose of adoption.  A.T. is a citizen of RMI and did not have official authorization to enter the United States outside the terms of the Compact. Finally, agents also reviewed documents from the Washington

County Circuit Clerk's Office that showed that **PETERSEN** reported to the Polk County Circuit Court that the family who adopted A.T.'s baby boy paid him $27,000.00 for his work in arranging the adoption. The Polk County records refer to **PETERSEN**'s role in the adoption as a "legal facilitator." The Polk County records also include an affidavit signed by **PETERSEN** in which he itemized the expenses for the adoption. This itemized list includes "Assistants and Fee: $13,500.00." The list also includes a statement from **PETERSEN** that he paid A.T. $7,300.00 during the course of the adoption. Through witness interviews, the agents learned that A.T. stayed at a residence controlled by **PETERSEN** and Maki Takehisa's co-conspirators. The agents learned that this was a small residence in Dequeen, Arkansas, and that nine other pregnant women from the RMI lived there at the same time A.T. resided there. The agents discovered that **PETERSEN** and Maki Takehisa's co-conspirators offered to pay A.T. $10,000 for her to travel to the United States while she was pregnant and consent to an adoption.

f.      With regard to R.J., agents discovered through a review of financial records, records from United Airlines, and records from United States Customs and Border Patrol (CBP) that **PETERSEN** used an American Express Credit Card with the last four digits of 2005 to purchase a United Airlines ticket that R.J. used to travel from the RMI to Northwest Arkansas Regional Airport (XNA) on February 20, 2015. Agents also discovered that R.J. gave birth to a baby girl at UAMS in Little Rock, Arkansas, on July 23, 2015. According to records from the Pulaski County Circuit Clerk's Office, a family from the United States adopted R.J.'s baby girl on August 14, 2015 during an adoption proceeding that **PETERSEN** caused to be filed in his capacity as a licensed attorney. The agents also discovered that **PETERSEN** paid for R.J.'s return ticket to the RMI using an American Express Credit Card account that he controlled with the last four digits of 2005. This airline ticket allowed R.J. to travel from XNA back to the RMI on August 25,

2015. The timeline of R.J.'s travel from the RMI to the United States on February 20, 2015, giving birth on July 23, 2015 and then consenting to adoption, and returning to the RMI on August 25, 2015 demonstrates that the purpose of her travel to the United States was for her to give birth to the baby in the United States and to consent to an adoption of her baby in Arkansas. This travel was in violation of the Immigration and Nationality Act as R.J. was not eligible for admission to the United States under the Compact for the purpose of adoption. R.J. is a citizen of RMI and did not have official authorization to enter the United States outside the terms of the Compact. Finally, agents also reviewed documents from the Pulaski County Circuit Clerk's Office that showed that **PETERSEN** reported to the Pulaski County Circuit Court that the family who adopted R.J.'s baby girl paid him $30,000.00 for his work in arranging the adoption. The Pulaski County records refer to **PETERSEN**'s role in the adoption as a "legal facilitator." The Pulaski County records also include an affidavit signed by **PETERSEN** in which he itemized the expenses for the adoption. This itemized list includes "Assistants and Fee: $14,000.00." The list also includes a statement from **PETERSEN** that he paid R.J. $10,300.00 during the course of the adoption. Through witness interviews, the agents were able to determine that R.J. lived in a small residence in Dequeen, Arkansas, that was controlled by **PETERSEN** and Maki Takehisa's co-conspirators. R.J. lived in the residence with several other pregnant women. The agents were also able to determine that **PETERSEN** and Maki Takehisa's co-conspirators offered to pay R.J. $10,000.00 while she was pregnant to travel to the United States and consent to an adoption of her baby.

g.      With regard to D.J., agents discovered through a review of financial records, records from United Airlines, and records from United States Customs and Border Patrol (CBP) that **PETERSEN** used an American Express Credit Card with the last four digits of 2005 to purchase a United Airlines ticket that D.J. used to travel from the RMI to Northwest Arkansas

Regional Airport (XNA) on March 2, 2015.  Agents also discovered that D.J. gave birth to a baby boy at Willow Creek Women's Hospital in Johnson, Arkansas, on May 22, 2015.  According to records from the Washington County Circuit Clerk's Office, a family from the United States adopted D.J.'s baby boy on May 28, 2015 during an adoption proceeding that **PETERSEN** caused to be filed in his capacity as a licensed attorney.  The agents also discovered that **PETERSEN** directed his co-conspirator, Maki Takehisa, to purchase D.J.'s return ticket to the RMI using a Bank of America account that she controlled with the last four digits of 3726.  This airline ticket allowed D.J. to travel from XNA back to the RMI on June 9, 2015.  The timeline of D.J.'s travel from the RMI to the United States on March 2, 2015, giving birth on May 22, 2015 and then consenting to adoption, and returning to the RMI on June 9, 2015 demonstrates that the purpose of her travel to the United States was for her to give birth to the baby in the United States and to consent to an adoption of her baby in the Western District of Arkansas.  This travel was in violation of the Immigration and Nationality Act as D.J. was not eligible for admission to the United States for the purpose of adoption. D.J. is a citizen of RMI and did not have official authorization to enter the United States outside the terms of the Compact. Finally, agents also reviewed documents from the Washington County Circuit Clerk's Office that showed that **PETERSEN** reported to the Washington County Circuit Court that the family who adopted D.J.'s baby boy paid him $32,000.00 for his work in arranging the adoption.  The Washington County records refer to **PETERSEN**'s role in the adoption as a "legal facilitator."  The Washington County records also include an affidavit signed by **PETERSEN** in which he itemized the expenses for the adoption. This itemized list includes "Assistants and Fee: $13,455.00."  The list also includes a statement from **PETERSEN** that he paid D.J. $10,800.00 during the course of the adoption.  Through witness interviews, the agents were able to discover that Maki Takehisa recruited D.J. to come to

the United States while she was pregnant and to consent to an adoption of her baby. These interviews also revealed that Maki Takehisa offered to pay D.J. $10,000.00 for her to travel to the United States and consent to the adoption. These interviews revealed that D.J. stayed in a residence owned by Maki Takehisa's relatives in Springdale, Arkansas, until she returned to the RMI.

      h.    Also, during the course of the investigation, the agents discovered that **PETERSEN** conspired with Maki Takehisa and others to arrange the illegal travel described previously. The agents discovered that Maki Takehisa, a citizen of the RMI, assisted **PETERSEN** by arranging R.M.J. and D.J.'s recruitment assisting with their travel and lodging during their brief time in the United States.

      i.    Based on all of the evidence recovered during the course of this investigation, the United States can prove beyond a reasonable doubt that beginning on an unknown date but at least as early as April 21, 2014, and continuing to on or about March 2, 2015, in the Western District of Arkansas and elsewhere, the defendant, **PAUL PETERSEN**, knowingly and intentionally conspired, with Maki Takehisa and others to transport and move within the United States, R.M.J., A.T., R.J., and D.J., aliens who had come to, entered, and remained in the United States in violation of law, within the United States by means of transportation or otherwise, in furtherance of such violation of law, for the purpose of private financial gain, all in violation of Title 8, United States Code, Sections 1324(a)(1)(A)(ii), 1324(a)(1)(A)(v)(I) and 1324(a)(1)(B)(i). The United States can prove these violations through the records and witness interviews described above. This investigation shows that **PETERSEN** and Maki Takehisa knowingly facilitated the transportation of the illegal aliens referenced above from the RMI to the United States for the purpose of adoption in violation of the Compact and Immigration and Nationality Act. Finally, the investigation also shows that **PETERSEN** and Maki Takehisa arranged this illegal travel for their own private

financial gain.  The Court records described above show that adoptive families paid **PETERSEN** large sums of United States currency for facilitating the adoptions.

## ADVICE OF RIGHTS

5.      The defendant hereby acknowledges that he has been advised of his constitutional and statutory rights.  Further, the defendant agrees that he fully understands his right:

        a.  To have an attorney and if he cannot afford an attorney, to have one provided to him and paid for at government expense;

        b.  To persist in his plea of not guilty;

        c.  To have a speedy and public trial by jury;

        d.  To be presumed innocent until proven guilty beyond a reasonable doubt;

        e.  To confront and examine witnesses who testify against him;

        f.  To call witnesses on his behalf;

        g.  To choose to testify or not testify and that no one could force him to testify; and,

        h.  To have at least 30 days to prepare for trial.

## WAIVER OF RIGHTS

6.      The defendant hereby acknowledges that he understands with respect to the count to which he pleads guilty, he thereby <u>WAIVES</u> all of the rights listed in (b) through (h) of the above paragraph.

## WAIVER OF ACCESS TO RECORDS

7.      The defendant hereby waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act of 1974, 5 U.S.C. § 552a.

## WAIVER OF "HYDE" CLAIM

8.     The defendant hereby waives any claim under the Hyde Amendment, 18 U.S.C. § 3006A (Statutory Note), for attorney fees and other litigation expenses arising out of the investigation or prosecution of this matter.

## EFFECTS OF BREACH OF
## THIS AGREEMENT BY DEFENDANT

9.     Defendant agrees that if after signing this plea agreement the defendant commits any crimes, violates any conditions of release, or fails to appear for sentencing, or if the defendant provides information to the Probation Office or the Court that is intentionally misleading, incomplete, or untruthful, or if the defendant violates any term of this plea agreement, takes a position at sentencing which is contrary to the terms of this plea agreement or attempts to withdraw from this plea agreement, this shall constitute a breach of this plea agreement which shall release the United States from any and all restrictions or obligations placed upon it under the terms of this agreement and the United States shall be free to reinstate dismissed charges or pursue additional charges against the defendant.  The defendant shall, however, remain bound by the terms of the agreement, and will not be allowed to withdraw this plea of guilty.

10.     The defendant further agrees that a breach of any provision of this plea agreement shall operate as a WAIVER of defendant's rights under Rule 11(f) of the Federal Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence and the government shall be allowed to use and to introduce into evidence any one or more of the following:

        a.   admissions against interest, both oral and written, made by defendant to any person;

        b.   statements made by the defendant during his change of plea hearing;

        c.   the factual basis used at the change of plea hearing;

    d.  any testimony given under oath to a grand jury or petit jury;

    e.  any and all physical evidence of any kind which the defendant has provided to the government; and,

    f.  any and all information provided by the defendant to the government's attorneys, or to federal, state, county, and/or local law enforcement officers.

**STIPULATION ON NUMBER OF UNLAWFUL ALIENS TRANSPORTED**

11.    The United States and the defendant agree that the most readily provable number of unlawful aliens transported by the defendant for which the defendant should be held accountable in this case is more than 25 and less than 100. Pursuant to U.S.S.G. § 2L1.1, this equates to an increase of 6 offense levels. The parties acknowledge that the court is not bound by this stipulation.

**MAXIMUM PENALTIES**

12.    The defendant hereby acknowledges that he has been advised of the maximum penalties for the counts to which he is pleading guilty. By entering a plea of guilty to Count One of the Indictment filed against him, the defendant agrees that he faces:

    a.  a maximum term of imprisonment of ten years;

    b.  a maximum fine of $250,000.00;

    c.  both imprisonment and a fine;

    d.  a term of supervised release for not more than 3 years which begins after release from prison;

    e.  a possibility of going back to prison if the defendant violates the conditions of supervised release; and,

    f.  a special assessment of $100.00.

**CONDITIONS OF SUPERVISED RELEASE**

13.    The Defendant acknowledges that if a term of supervised release is imposed as part of the sentence, the defendant will be subject to the standard conditions of supervised release as recommended by the United States Sentencing Commission and may be subject to other special conditions of supervised release as determined by the court. The standard conditions of supervised release are as follows:

    a.    The defendant shall report to the probation office in the federal judicial district where he is authorized to reside within 72 hours of release from imprisonment, unless the probation officer instructs the defendant to report to a different probation office or within a different time frame.

    b.    After initially reporting to the probation office, the defendant will receive instructions from the court or the probation officer about how and when to report to the probation officer, and the defendant shall report to the probation officer as instructed.

    c.    The defendant shall not knowingly leave the federal judicial district where he is authorized to reside without first getting permission from the court or the probation officer.

    d.    The defendant shall answer truthfully the questions asked by the probation officer.

    e.    The defendant shall live at a place approved by the probation officer. If the defendant plans to change where he lives or anything about his living arrangements (such as the people the defendant lives with), the defendant shall notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, the defendant shall notify the probation officer within 72 hours of becoming aware of a change or expected change.

    f.    The defendant shall allow the probation officer to visit the defendant at any time at his residence or elsewhere, and the defendant shall permit the probation officer to take any items prohibited by the conditions of the defendant's supervision that he or she observes in plain view.

    g.    The defendant shall work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses the defendant from doing so. If the defendant does not have full-time employment he shall try to find full-time employment, unless the probation officer excuses the defendant from

doing so. If the defendant plans to change where the defendant works or anything about his work (such as the position or the job responsibilities), the defendant shall notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, the defendant shall notify the probation officer within 72 hours of becoming aware of a change or expected change.

h.  The defendant shall not communicate or interact with someone the defendant knows is engaged in criminal activity. If the defendant knows someone has been convicted of a felony, the defendant shall not knowingly communicate or interact with that person without first getting the permission of the probation officer.

i.  If the defendant is arrested or questioned by a law enforcement officer, the defendant shall notify the probation officer within 72 hours.

j.  The defendant shall not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person, such as nunchakus or Tasers).

k.  The defendant shall not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

l.  If the probation officer determines that the defendant poses a risk to another person (including an organization), the probation officer may require the defendant to notify the person about the risk and the defendant shall comply with that instruction. The probation officer may contact the person and confirm that the defendant has notified the person about the risk.

m.  The defendant shall follow the instructions of the probation officer related to the conditions of supervision.

## PAYMENT OF MONETARY PENALTIES

14.     The Defendant agrees that monetary penalties to include special assessments, fine, and/or restitution imposed by the Court will be (i) subject to immediate enforcement as provided in 18 U.S.C. § 3613c, and (ii), submitted to the Treasury Offset Program so that any federal payment such as an income tax refund or transfer of returned property the defendant receives may be offset and applied to federal debt without affecting the periodic payment schedule

ordered by the Court.

## NO OTHER CHARGES

15.     The government agrees that no other federal charges, which stem from activities described in the Indictment, will be brought against the defendant in the Western District of Arkansas.

## SENTENCING GUIDELINES ARE ADVISORY BUT NOT MANDATORY

16.     The parties acknowledge that the Court shall consult and take into account the United States Sentencing Commission Guidelines in determining the sentence, but that the Court is not bound by the Guidelines and may sentence the defendant to any sentence within the statutory range.

## AGREEMENT DOES NOT PROMISE A SPECIFIC SENTENCE

17.     The defendant acknowledges that discussions have taken place concerning the possible guideline range which might be applicable to this case.  The defendant agrees that any discussions merely attempt to guess at what appears to be the correct guideline range and do not bind the District Court.  Further, the defendant acknowledges that the actual range may be greater than contemplated by the parties.  In the event that the actual guideline range is greater than the parties expected, the defendant agrees that this does not give him the right to withdraw his plea of guilty.

## RELEVANT CONDUCT CONSIDERED

18.     At the sentencing hearing, the government will be permitted to bring to the Court's attention, and the Court will be permitted to consider, all relevant information with respect to defendant's background, character and conduct, including the conduct that is the subject of this investigation for which he has not been charged up to the date of the Agreement, and/or which is

the basis for any of the counts which will be dismissed pursuant to this agreement, as provided by § 1B1.3 of the Sentencing Guidelines.

## PERJURY

19.     In the event that it is determined that the defendant has not been truthful with the Court as to any statements made while under oath, this plea agreement shall not be construed to protect the defendant from prosecution for perjury or false statement.

## CONCESSIONS BY THE GOVERNMENT

20.     The government agrees not to object to a finding by the probation office or a ruling of the court which awards the defendant an appropriate-level decrease in the base offense level for acceptance of responsibility.  If the offense level in the Presentence Report is 16 or greater, and the Presentence Report awards two points for acceptance of responsibility, the United States agrees to move for an additional one-point reduction for acceptance of responsibility for a total of three points. However, the Government will not be obligated to move for an additional one-point reduction or recommend any adjustment for acceptance of responsibility if defendant engages in conduct inconsistent with acceptance of responsibility including, but not limited to, the following a) falsely denies, or makes a statement inconsistent with, the factual basis set forth in this agreement, b) falsely denies additional relevant conduct in the offense, or gives conflicting statements about that involvement, c) is untruthful with the Government, the Court or probation officer, or d) materially breaches this plea agreement in any way.

21.     The United States agrees to recommend that the defendant's sentence in this case run concurrently with sentences imposed on the defendant in the related state court prosecutions of the defendant in Arizona and Utah, specifically case numbers CR2019-006302-001 and

CR2020-006290-001 in Arizona State Court, and case number 191910049 in Utah State Court. The defendant acknowledges that this concession does not in any way bind the court.

## GOVERNMENT'S RESERVATION OF RIGHTS

22.     Although the government agrees not to object to certain findings by the probation office or to rulings of the court, it reserves the right to:

      a.   make all facts known to the probation office and to the court;

      b.   call witnesses and introduce evidence in support of the Presentence Report;

      c.   contest and appeal any finding of fact or application of the Sentencing Guidelines;

      d.   contest and appeal any departure from the appropriate Guideline range; and,

      e.   defend the rulings of the District Court on appeal, even those for factors on which the government has agreed to make no recommendations, not to object, and/or to make recommendations.

## NO RIGHT TO WITHDRAW THE GUILTY PLEA

23.     The government's concessions on sentencing options are non-binding and made pursuant to Rule 11(c)(1) of the Federal Rules of Criminal Procedure.  As a result, if the Court should reject the defendant's requests or recommendations for certain findings of fact or applications of the Guidelines, the defendant acknowledges that there is no right to withdraw the guilty plea.

## DISMISSAL OF COUNTS

24.     The government's agreement to dismiss certain counts of the Indictment is made pursuant to Rule 11(c)(1)(A) of the Federal Rules of Criminal Procedure.  As a result, if the court should reject the government's motion to dismiss the agreed counts in the Indictment, the

defendant shall be afforded the right to withdraw his plea pursuant to Rule 11(c)(5)(B) of the Federal Rules of Criminal Procedure.

### AGREEMENT NOT BINDING ON THE COURT

25.   The parties agree that nothing in this agreement binds the District Court to:

    a.   make any specific finding of fact;

    b.   make any particular application of the Sentencing Guidelines;

    c.   hand down any specific sentence;

    d.   accept this plea agreement.

26.   The government and the defendant acknowledge that the Court has an obligation to review the Presentence Report before it accepts or rejects this plea agreement.

### AGREEMENT DOES NOT BIND ANY OTHER ENTITY

27.   The parties agree that this plea agreement does not bind any governmental entity other than the United States Attorney's Office for the Western District of Arkansas.

### SPECIAL ASSESMENT

28.   The defendant agrees to pay $100.00 as the special assessment in this case. Upon conviction, an additional mandatory special assessment of $5,000 must also be imposed unless the defendant induced, assisted, abetted, or aided only a spouse, parent, or child at the time of such action or the Sentencing Court finds the defendant to be indigent.  *See* 18 U.S.C. § 3014(a)(5).

### REPRESENTATIONS BY THE DEFENDANT

27.   By signing this plea agreement the defendant acknowledges that:

    a.   The defendant has read this agreement carefully (or it was read to him) and reviewed every part of it with defense counsel.

    b.   The defendant fully understands this plea agreement and is not under the influence of anything that could impede the defendant's ability to fully understand this plea agreement.

c.  No promises, agreements, understandings, or conditions have been made or entered into in connection with the decision to plead guilty except those set forth in this plea agreement.

d.  The defendant is satisfied with the legal services provided by defense counsel in connection with this plea agreement and matters related to it.

e.  The defendant has entered into this plea agreement freely, voluntarily, and without reservation and the defendant's desire to enter a plea of guilty is not the result of threats or coercion directed at the defendant or anyone connected with the defendant.

## REPRESENTATIONS BY DEFENSE COUNSEL

28.  By signing this plea agreement, counsel for the defendant acknowledges that:

a.  Counsel has carefully reviewed every part of this agreement with the defendant and this agreement accurately and completely sets forth the entire agreement between the United States and the defendant.

b.  Counsel has explained the ramifications of the plea agreement to the defendant, and believes that the defendant understands this plea agreement, what rights are being lost by pleading guilty, and what the government has agreed to do in exchange for the plea of guilty.

c.  The defendant's decision to enter into this agreement is an informed and voluntary one.

## PLEA AGREEMENT CONSTITUTES THE ENTIRE AGREEMENT

29.  The defendant and his attorney both acknowledge that this plea agreement constitutes the entire agreement of the parties.  Further, all parties agree that there are no oral agreements or promises which have been made to induce the defendant to change his plea to guilty.

Dated this 19ᵀᴴ day of _____, 2020.

_____
Raul Petersen
Defendant


_____
Kurt Altman
Attorney for the Defendant

_____
David Clay Fowlkes
Acting United States Attorney