1  Kurt M. Altman
   Arizona Bar Number 015603
2  **KURT M. ALTMAN, P.L.C.**
   4848 East Cactus Road, Suite 505-102
3  Scottsdale, Arizona 85254
   attorneykaltman@yahoo.com
4  Phone: (602) 689-5100
   Fax:   (602) 368-4512
5  Attorney for Defendant

6  **SCOTT C. WILLIAMS (6687)**
   43 East 400 South
7  Salt Lake City, Utah 84111
   Telephone: (801) 220-0700
8  Fax: (801) 364-3232
   scwlegal@gmail.com
9  Attorney for Defendant

10 Raymond L. Niblock, PA
   The Niblock Law Firm, PLC
11 324 N. College Ave.
   Fayetteville, AR 72704
12 479-521-5510 (voice)
   479-444-7608 (facsimile)
13 Raymond@niblocklawfirm.com
14 Attorney for Defendant

15

16                    **IN THE UNITED STATES DISTRICT COURT**
17                   **FOR THE WESTERN DISTRICT OF ARKANSAS**
                              **FAYETTEVILLE DIVISION**
18
19 UNITED STATES OF AMERICA,          Case No: CR2019-50079-TLB

20                     Plaintiff,     **DEFENDANT'S SENTENCING**
                                      **MEMORANDUM**
21        v.

22 PAUL PETERSEN,

23                     Defendant.

24                                    Assigned to Honorable Timothy L. Brooks

25        Defendant Paul Petersen, by and through his counsel, Kurt M. Altman, Scott C. Williams, and

26
27 Raymond Niblock, respectfully submit this Sentencing Memorandum and requests that this Court

**KURT M. ALTMAN, P.L.C.**
4848 EAST CACTUS ROAD,
SUITE 505-102
(602) 689-5100

sentence Mr. Petersen to no more than the low-end of the advisory sentencing guideline range. A sentence on the low-end of the range is a reasonable sentence based on the sentencing guidelines and based on Mr. Petersen's history and characteristics. Mr. Petersen's personal and professional body of work has resulted in good that far outweighs the actions and decisions that led him to stand before this Court.

The reasons supporting this request are described in the attached Memorandum of Points and Authorities and will be discussed during his sentencing hearing on December 1, 2020.

RESPECTFULLY SUBMITTED this 16th day of November 2020.

**KURT M. ALTMAN, P.L.C.**

*s/ Kurt M. Altman*

KURT M. ALTMAN
SCOTT C. WILLIAMS
RAYMOND L. NIBLOCK
Attorneys for Defendant

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on November 16, 2020, I electronically filed this Sentencing Memorandum with the Clerk of the Court, to be served by operation of the Court's electronic filing system on the attorneys of record.

*s/ Kurt M. Altman*

///

///

///

///

///

///

**KURT M. ALTMAN, P.L.C.**
4848 EAST CACTUS ROAD,
SUITE 505-102
(602) 689-5100

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.      FACTS**

After a lengthy investigation by the Federal Government, as well as the state governments of Arizona and Utah, on October 8, 2019 Mr. Petersen was arrested by Arizona authorities while traveling on Interstate 8.  Mr. Petersen was with his wife and young children and they were returning to their family home in Mesa, Arizona after a trip to California.  Mr. Petersen was swiftly removed from the car, arrested, and taken away—leaving his wife and four children on the side of the interstate to fend for themselves.

Mr. Petersen was booked on charges stemming from the state of Arizona and was admitted to the Maricopa County Jail.  There, with the assistance of close friends, he was able to post a $500,000 cash bond.  However, upon its posting, he was not released, but was immediately transferred to Federal custody—where he remained until his release from the Western District of Arkansas on October 29, 2019.

Mr. Petersen's arrest was based on a 19-count Superseding Indictment from the Western District of Arkansas, a 32-count Indictment from the State of Arizona, and a 11-count Information from the State of Utah.  The charges in all three jurisdictions stemmed from both their joint and separate investigations into Mr. Petersen's adoption law practice.  Notably, there was no attempt by authorities to engage in pre-indictment discussions with Mr. Petersen.  In fact, during the many years that Mr. Petersen engaged in the open and notorious activities of his adoption practice, including during the years that the active investigation was aware of such practices, he was never so much as *asked* to modify or cease his practice—by regulators, law enforcement authorities, or prosecuting agencies.

KURT M. ALTMAN, P.L.C.
4848 EAST CACTUS ROAD,
SUITE 505-102
(602) 689-5100

Nonetheless, as detailed in the Pre-Sentence Report (PSR) in this matter, Mr. Petersen, now recognizing the wrongfulness of actions, has reached agreements by plea in each of the respective jurisdictions. His first sentencing is scheduled in this Court on December 1, 2020.

## II. DISCUSSION

When imposing a sentence, the Court is to consider the United States Sentencing Guideline (U.S.S.G.) calculation. Once the guidelines have been considered, a court can then consider statutory sentencing factors.

### A. Other Sentencing Factors

Title 18 U.S.C. § 3553 outlines factors to be considered by the Court at sentencing:

. . .The court, in determining the particular sentence to be imposed, shall consider---

(1)  the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)  the need for the sentence imposed---

   (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
   (B)  to afford adequate deterrence to criminal conduct;
   (C)  to protect the public from further crimes of the defendant; and
   (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)  the kinds of sentences available;

(4)  the kinds of sentence and the sentencing range established for---. . .;

(5)  any pertinent policy statement---. . .;

(6)  the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; . . .

*Title 18 U.S.C. § 3553.*

In addition to § 3553, in *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court recognized the importance of the Sixth Amendment guarantee to only sentence defendants based

KURT M. ALTMAN, P.L.C.
4848 EAST CACTUS ROAD,
SUITE 505-102
(602) 689-5100

upon the jury's factual findings or a defendant's sworn factual admissions at a guilty plea, *id.* at 244, but retained the validity of the Sentencing Guidelines system by making it advisory. *Id.* at 258-65. *Booker* also determined that on appeal, sentences were to be reviewed for "reasonableness." *Id.* In *Booker*, the Court did not spell out the contours of a "reasonableness" review. *See id* at 260-61; *see also id.* at 311 (Scalia, J., dissenting in part). Subsequently, the Supreme Court decided *Cunningham v. California,* 549 U.S. 270, 127 S. Ct. 856 (2007) and *Rita v. United States,* 551 U.S. 338, 127 S. Ct 2456 (2007), and then *Gall v. United States,* 552 U.S. 38, 128 S. Ct. 586 (2007).

In *Cunningham,* the Supreme Court invalidated California's determinate sentencing scheme because it failed to comply with the Sixth Amendment right requiring that any fact that exposes a defendant to a greater potential sentence must be found by a jury, not a judge, and established beyond a reasonable doubt, not merely by a preponderance of the evidence. 127 S. Ct. at 863-64. *Cunningham* reiterated the principles set forth in *Apprendi v. New Jersey,* 530 U.S. 466 (2000) and *Blakely v. Washington,* 542 U.S. 296 (2004), reaffirming that the statutory maximum sentence was only authorized by a jury's verdict or the defendant's admissions at the guilty plea. 127 S. Ct. at 868.

In *Rita,* the Court decided that in a case where there were no judicial findings which enhanced the defendant's *within*-Guidelines sentence, that appellate courts could apply a presumption of reasonableness to a "sentence that reflects a proper application of the Sentencing Guidelines." *Id.* at 2479. In keeping with its decision in *Booker,* the Court applied an appellate standard which required a substantive reasonableness review of sentencing decisions. *Id.; see also id.* at 2473 (Stevens, J. concurring) (*Booker* "plainly contemplated that reasonableness review would have a substantive component.").

Based on the foregoing law as it applies to sentencing, this Court is charged with fashioning a reasonable sentence. Mr. Petersen has admitted under oath to facts relating to Count 1 of the

superseding indictment in this matter—conspiracy to smuggle illegal aliens for private financial gain. The conviction arises from Mr. Petersen's longstanding adoption practice. As described in the PSR, Mr. Petersen operated an adoption practice for many years. A significant portion of his practice involved Marshallese children born to Marshallese birth mothers. Mr. Petersen never tried to hide his practice; in fact, each successful adoption was sanctioned by a state court. Make no mistake, while running his practice Mr. Petersen ran afoul of the Compact of Free Association, a quasi-treaty, that prohibits Marshallese citizens from traveling to the United States if that travel is for the "purposes of adoption." He did not set out to violate a quasi-treaty but fully realizes that he did.

Mr. Petersen has readily accepted responsibility for his actions, not only in this Court, but in the two other jurisdictions. He has paid back the State of Arizona for the entire loss that his conduct caused. He is eager to accept his consequences in this Court, in Arizona, and in the State of Utah and put this episode behind him. As further described below, Mr. Petersen has a great deal to offer society and looks forward to the day he will once again be a contributing member of it.

**B. Title 18 U.S.C § 3553 factors that apply to Paul Petersen.**

When analyzing the § 3553 sentencing factors, it becomes apparent that a sentence at the low-end of the recommended guideline range is appropriate.

*1. Nature and Circumstances of the Offense and History and Characteristics of Defendant; § 3553(a)(1).*

Defendant has accepted responsibility for his actions in this case and does not deny the facts set forth in his plea agreement. The PSR, in paragraphs 100 through 119, accurately describes Mr. Petersen's history and characteristics. Incredibly, only 20 paragraphs are dedicated to Mr. Petersen's life and background, while 46 paragraphs detail the offense conduct in this matter. The description of offense conduct described in a presentence report is almost entirely from the point of view of

investigators and their reports of only specific witness interviews and materials. These descriptions therefore can be incomplete, focused only on certain conduct. Because Mr. Petersen settled all three of his cases very early, there has been no vetting of the evidence by cross examination or any other formal court process. By foregoing the potential for hearings and trial, Mr. Petersen has saved witnesses from having to testify and be cross examined. He has also saved the Government and the other States hundreds of thousands of dollars that would have been associated with pretrial hearings and/or trials. Fortunately, 18 U.S.C. § 3553 requires consideration of *the person as a whole*, along with the conduct.

It is impossible to fully convey the entirety of Paul Petersen in a memorandum. Therefore, Mr. Petersen asks this Court to consider the exhibits to this memo. Exhibit A is a personal narrative from Mr. Petersen, describing his life in his own words. It is a compelling and honest reflection that provides an unprecedented look inside the person who will soon stand before this Court for sentencing.

Exhibits B, C and D provide a look into the character of Mr. Petersen through the eyes of others. It contains numerous letters from people from various walks of life who know and have known Mr. Petersen during the many chapters in his life. While Exhibit A is an internal view of Mr. Petersen, these letters are outsider's views of him—what he does for people, what he means to people, and what kind of person Paul Petersen is when no one is watching.

Any skilled attorney advocating for a client can present his client's history and characteristics in a favorable light. Rather than make an extensive work in that regard, present counsel would like to refer this Court to the broad, detailed and sincere descriptions provided in the many letters in these Exhibits. Exhibit B contains the testimonials of many families that engaged Mr. Petersen and his

KURT M. ALTMAN, P.L.C.
4848 EAST CACTUS ROAD,
SUITE 505-102
(602) 689-5100

business in successful adoptions. Exhibit C contains testimonials by many of his friends and colleagues. And Exhibit D contains letters from family members.

Adoptive families have taken the time and effort to describe their adoption experiences with Mr. Petersen, they way he treated them in the process, the way he treated the birthmothers and others from the Republic of the Marshall Islands, and the way he fostered a continuing relationship among everyone in the process. As the letters provided to this Court consistently relate, Mr. Petersen treated their adoption experiences—in many cases, multiple adoptions—with professionalism, respect and care. The testimonials are replete with the theme of the care with which Mr. Petersen attended to the needs of the birthmothers, and the relationships between the adoptive families and the birthmothers.

The letters in Exhibit C demonstrate the impacts that Mr. Petersen has had on the friends and professionals with whom he has engaged and worked through his life. Friends relate character traits that any of us would want persons among us in society to have and to emulate. Professionals relate a work ethic and level of respect to co-workers that are admirable.

And letters in Exhibit D express the deep commitment that Mr. Petersen has had to his family. He has been loyal and loving. The present case has devastated his family and upended its structure. But it remains fully intact in love and appreciation, and Mr. Petersen's commitment to maintaining his family with love and support and companionship during and after he endures his sentence.

A sentence at the low-end of the guideline range would adequately take into account the nature and circumstances of this offense and would reflect an appropriate recognition of Mr. Petersen's history and characteristics as enumerated in § 3553(a)(2)(A). The facts surrounding this case show only a small piece of Paul Petersen. It is a part he is not proud of and regrets greatly. His actions have hurt not only those involved—like his co-defendants, but also his family and others who care for him. He is facing those consequences and eager to make amends. It will always be a part of

who he is, but he is more than this case and will serve whatever sentence is imposed with his eyes on the future, ready to do good work again. His body of life work thus far tells us this. As such, he is worthy of significant consideration for a low-end sentence.

> 2. *Reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; § 3553(a)(2)(A).*

A sentence at the low-end of the sentencing guideline range would satisfy the considerations of § 3553(a)(2)(A). The offense in this matter is very serious; however, a sentence greater than the low-end of the guideline range will not instill a greater respect for the law in this particular defendant. Mr. Petersen is devastated by his actions. He understands that being a lawyer as well as an elected public official, fair or not, means that he is held to a higher standard. Failing to live up to that standard will haunt him for the rest of his life. This Court has many options when it comes to imposing a sentence: prison, home detention, and probation, to name a few. But what this Court cannot do is punish him in the way he has punished himself through his actions.

Mr. Petersen has lost everything.

His family is broken. He loves his family beyond comprehension and yet will undoubtedly be away from them. He understands the pain he has caused them and can only hope that his good works moving forward will help heal those relationships.

He has hurt his employees. Megan Wolfe, Lynwood Jennet, Maki Takehisa and others have all been drawn into this case in some way. Mr. Petersen could not have imagined that his actions could cause such pain to those who worked so closely with him.

He is terrified that many of the loving families he helped create over the years fear they may be in jeopardy because of his conduct, or that their families will somehow be stigmatized because of

him. This devastates him and he is dedicated to doing whatever he can to make it right, or as right as possible for all who have been impacted by his mess.

His career as a lawyer and elected public official is over. He will no longer have a license to practice law in any state. He has lost his reputation and so much more. No sentence imposed by the Court will punish Mr. Petersen to the extent that he has punished himself through his deeds. Regardless of the sentence imposed on December 1, 2020, it will eventually come to an end. But what he has done to himself, his loved ones, his employees, and the many people who trusted and relied on him, because of his actions, is a life sentence that will forever burden him.

A sentence at the low-end of the guideline range is appropriate. Any prison sentence will provide just punishment. Mr. Petersen respects the law and will never reoffend. This Court and the others involved will never see him again. As shown in Exhibits to this memorandum, he has the support he will need upon his release and is determined to move forward and do good. A sentence greater than the low-end of the guideline range will not promote the objectives outlined by 18 U.S.C. § 3553. As such, a sentence at the low-end of the guideline range would adequately reflect the consideration enumerated in § 3553(a)(2)(A).

*3.  To afford adequate deterrence of criminal conduct; § 3553(a)(2)(B).*

There is no need for any further deterrence for Mr. Petersen. As stated, Mr. Petersen has lost everything he has worked his entire life to achieve. The ramifications of this case decimate any desire to re-offend now that he realizes that he was violating the law, and also takes away any ability to re-offend. Mr. Petersen will never be in a position to commit an offense such as this again. A sentence fashioned in the manner requested would provide the needed opportunity to rebuild and improve his life, while still holding him accountable for his actions. A prison sentence greater than the low-end of the guidelines will not create any greater deterrence.

KURT M. ALTMAN, P.L.C.
4848 EAST CACTUS ROAD,
SUITE 505-102
(602) 689-5100

*4.  Protect the public from further crimes of defendant; § 3553(a)(2)(C).*

The public needs no protection from Mr. Petersen.  He poses no threat.  In fact, to the contrary, he has always contributed to society and been a respected member of it.  Adoptive parents and families have spoken to the incredible work he did to facilitate happy families.  Although he will never practice law again, a sentence at the low-end of the guideline range will allow him to pay his debt to society and move on to use his skills and intelligence to contribute in some other manner.

*5.  To provide defendant with needed educational and or vocational training; §*
*3553(a)(2)(D).*

Mr. Petersen is a highly educated individual.  Although education or technical training is likely unnecessary, a sentence at the low-end of the guideline range will allow him to more quicky turn his intelligence and talents towards being a productive, contributing member of society.  He now finds himself with nothing, facing a prison sentence, but knows that each day he will work to make amends for his mistakes and to give back.

When applying the statutory sentencing factors as a whole to Mr. Petersen it becomes clear that a sentence at the low-end of the guideline range is not only an appropriate sentence but likely the best sentence to meet the goals of sentencing pursuant to 18 U.S.C. § 3553.

///

///

///

///

///

///

///

KURT M. ALTMAN, P.L.C.
4848 EAST CACTUS ROAD,
SUITE 505-102
(602) 689-5100

**III.    CONCLUSION**

For the reasons stated herein, Defendant Paul Petersen respectfully requests that this Court impose a sentence at the low-end of the recommended sentencing guideline range.

RESPECTFULLY SUBMITTED this 16th day of November 2020.

**KURT M. ALTMAN, P.L.C.**

*s/ Kurt M. Altman*

KURT M. ALTMAN
SCOTT C. WILLIAMS
RAYMOND L. NIBLOCK
Attorneys for Defendant

**CERTIFICATE OF SERVICE**

I certify that, on November 16, 2020, I electronically filed this Sentencing Memorandum with the Clerk of the Court, to be served by operation of the Court's electronic filing system on the attorneys of record.

*s/ Kurt M. Altman*

# EXHIBIT A

Paul Petersen
634 North Miramar
Mesa, AZ 85201

October 9, 2020

Honorable Timothy L. Brooks
United States District Court
Western District of Arkansas
John Paul Hammerschmidt Federal Building
35 East Mountain, Room 559
Fayetteville, AR 72701

Dear Judge Brooks,

I submit this letter to you feeling like a broken man. While working as an adoption attorney, I arranged for four Marshallese birth mothers to travel to the United States, in violation of a treaty between the two countries which prohibited a Marshallese person entry into this country if their primary purpose for coming here was for an adoption. I believed I was following the rules and the law, but I was wrong. This part of the treaty was presumably written to protect vulnerable women and children from exploitation, which I fully support. To that end, I accept full responsibility for my actions in this case. Especially as an elected public official, it was my absolute duty to obey both the letter and the spirit of the law. I failed and I am sorry.

I developed a deep bond with the Marshallese people during my Mormon mission twenty-five years ago. Many of my happiest memories and closest friendships are connected to people I met in Marshall Islands. Over the years, I facilitated 500 legal adoptions, joining Marshallese (and other) babies with wonderful families in the United States. This was my life's work and I loved it. It has been devastating to recognize my failures. To anyone who had a negative experience with me or my associates, I apologize and ask for forgiveness.

With all the blessings I have received from the United States of America, and in light of my position as a member of the state bars of Arizona, Arkansas, and Utah, as well as the public trust invested in me as an elected official, I had an even greater obligation to ensure full legal compliance at all times. I am committed to making amends and prepared to accept my punishment with humility.

To prepare for sentencing, I reflected on how this case fit into the broader context of my life story. I thought about how I got here, where I went wrong, and what I've learned from this

experience. I hope this personal narrative will provide a more complete framework and help the court determine the appropriate sentence to hand down in my case. A few poor decisions led to the demise of my career and reputation, but they do not reflect who I am, how I think, or my respect for the duties and responsibilities of good citizenship.

## Background

I was born on August 16, 1975, in Mesa, Arizona, as the oldest of eight siblings. My mother stayed home with the children while my father worked various commission-based jobs, like selling long-term healthcare policies. Both sets of grandparents plus my large extended family lived nearby. We lived in a safe neighborhood where my material needs were met. I enjoyed an active, healthy childhood and was surrounded by love and friendships.

My parents raised us according to the traditions of my parent's Christian faith. We prayed together as a family each morning and attended church services regularly. My parents led scripture study at home in the evenings. I participated in Boy Scouts through my church, developing strong social bonds with other young people in my community. My parents loved each other very much and provided me with a supportive, orderly, peaceful home.

From age ten, I worked a paper route alongside my father. We woke up early to fold and distribute the papers every single day. I started mowing lawns at a young age then cleaned up foreclosed homes with my best friend as our high school summer job. During my formative years, my father frequently changed companies, resulting in periodic financial instability. Once, I remember him coming home to announce that he'd been fired. This shock taught me to stay focused, be prepared, and have faith in difficult times.

I attended Westwood High School where I earned good grades. I played on the varsity basketball team in addition to the church team. I was also an Eagle Scout and the editor of my high school paper. I discovered my interest in city government while serving on the Mayor's Youth Committee. Thankfully, I thrived in these structured activities and stayed out of trouble.

In 1993, I graduated from high school, then took a full-time job at Harkins Movie Theater as an usher and shift supervisor. I enrolled at Arizona State University with an eye towards earning a journalism degree. Around that time, my father brought me to my first political candidate forum. Then, he ran for a seat in the Arizona State Senate and won. I was delighted to see my father find his true calling. He loved using his God-given talents to serve the public. More personally, I discovered that I enjoyed politics while working on his campaign, and decided then and there that my goal was to attend law school and eventually serve the public in some way, via the law and politics.

Your Honor, I was blessed with extraordinary parents, mentors, coaches, and teachers. They taught me to work hard, value education, serve others, and obey the law. I was raised to respect authority and treat all people with kindness and respect. To find myself in this

position now, is almost unfathomable considering my upbringing. While I believed what I was doing was legal, ultimately I was wrong, and since I was the one responsible for the decisions that lead me, and others here, I have no one else to blame but myself.

**Marshall Islands Mission, Higher Education, and First Adoptions**

After completing my freshman year at Arizona State University, I submitted my papers to begin my church mission. I completed my training in Provo, Utah, where I received my assignment to the Micronesia Guam Mission. Upon arrival, I was sent to Majuro, the capital of the Marshall Islands. Majuro is a thirty-mile-long, densely-populated, coral atoll only three feet above sea level.

Majuro was first settled 2000 years ago by the Austronesian ancestors of the Marshallese people. In 1885, the Marshall Islands were annexed by the German Empire to become a trading post. Majuro has also been under Japanese and American administration. After the Marshall Islands broke away from the Federated States of Micronesian in 1978 to form the Republic of the Marshall Islands, Majuro became the new country's capital.

While serving on my mission, I worked six days a week, then used the seventh day to prepare for the following week. Our living quarters were behind the church where we boiled our drinking water for safety and had little access to our families back home. It took me around three months to learn the Marshallese language, to where I felt comfortable conversing with them in their native language, without assistance from a senior companion. Soon thereafter, I was appointed as Zone Leader and reported back to the Mission President in Guam. My team constructed ping pong tables and played basketball with our neighbors; this was done as a way to connect with them and let them know we were there for more than just proselyting --- we were there to connect with them on a more basic level as brothers and sisters of an eternal Father in Heaven.

I spent two years on Majuro sharing Christ's message of hope, forgiveness, and universal love. I made lifelong friendships with local residents, as well as my fellow missionaries, who hailed from all over the globe. The Marshallese culture is open, generous, and kind. The Marshallese people have a saying that essentially means that the poorest person will give a hungry neighbor/visitor anything if asked. I enjoyed every single day of my mission and remain proud of my achievements there.

In 1996, I returned to ASU where I was elected as a student senator and student body vice-president. I helped write a new student government constitution that is still in use today. Then, in 1998, I responded to an internet post looking for a Marshallese language speaker. It was from Children's House International, a Hague-accredited adoption agency. They were starting a new program on the Marshall Islands and needed a translator. I was a perfect match to work with their program coordinator.

I immediately loved working on Marshallese adoptions. I spoke the language and understood the culture. As a missionary, I learned that there is a high birth rate among the young population. Marriage is uncommon and abortion is taboo. Suddenly, I saw a path open for my unique viewpoint and set of life experiences. I found my niche helping vulnerable Marshallese babies find permanent homes, as well as assisting needy Marshallese birth mothers who wanted a more permanent and stable family situation for their children.

In 1999, I graduated with a B.A. in Journalism with an emphasis in Public Relations. I proceeded to earn my J.D. from ASU's Sandra Day O'Connor College of Law. For the first few years of law school, I stayed busy with student government while working with Children's House International. I graduated in May 2002, passed the Arizona Bar Exam, then received my license in October. Simultaneously, I worked on my father's successful campaign for Arizona State Treasurer.

I was fortunate to have many fine opportunities for education and personal growth. My mission opened my heart to the Marshallese people and changed my life forever. Arizona State University was an exciting place to learn and serve in student government. Plus, I took pride in my father's accomplishments on behalf of the people of Arizona. This case is a complete departure from my positive record of hard work and service. I regret any of my illegal actions and am prepared to pay my debt to society.

**Family and Early Career**

In March 2003, I worked for a civil litigation firm that specialized in forcible detainers. We represented large residential management companies on eviction cases. While I got valuable courtroom experience, it was painful to work on cases that involved such vulnerable families. The stress led me to drink alcohol to excess to medicate the negative feelings. I stepped away from the church, isolated myself, and drank heavily. My alcohol abuse affected my work and people noticed. After a year, I was out.

Feeling disoriented, I opened my own practice. I took whatever work came my way including divorce, DUI's, and child custody cases. I was unfocused, unsuccessful, and unhappy. Then, I rediscovered my passion for adoptions. It truly is the one area of the law where all parties involved enjoy a positive result. For many families, it is an answer to their prayers. It was joyous work and I loved it. More importantly during this time, I rediscovered a relationship with someone who had been a profound influence on my life, someone who I loved, someone who I had drifted away from for a time. My now ex-wife Raquel re-entered my life and encouraged me to re-engage with my positive relationships, cast off the negative influences, and work on those things that made the two us of work when we initially met. Without her positive influence and love, I would not have seen the turnaround and sustained success that accompanied her renewed presence in my life.

In 2005, I took a job at the Maricopa County Assessor's office as the Assessor Representative and Public Information Officer. My duties included reviewing legislation that affected tax

policy and speaking to the media. This steady job allowed me to continue my freelance adoption practice on the side. Securely employed, I stopped drinking excessively and resumed my church activities. Then, in 2006, I married my former wife, Raquel, in the Mormon Temple in Mesa, Arizona.

Raquel and I welcomed our daughter, Presley, on April 8, 2008. My small adoption practice continued while I fulfilled my duties to the County Assessor. Then, in 2009, I started working with Maki Takehisa, my co-defendant in this case. I first met Maki as a birth mother through my practice. She lived in Springdale, Arkansas, the home of the largest Marshallese community outside of the Marshall Islands.

Maki served as a community liaison to coordinate with other Marshallese birth mothers in Springdale. Similar to my work with Children's House International, I had a natural affinity for arranging these adoptions. I had experience and I spoke the language. Also, I understood that adoptions are ideal outcomes for unplanned Marshallese pregnancies. When I started working with Maki, I was optimistic that we could make a positive impact on many lives and grow my adoption practice far beyond what I had been able to do previously.

**Public Office and Legal Trouble**

On February 19, 2010, Raquel and I welcomed our son, Brock. Meanwhile, my adoption practice grew. We enjoyed a good reputation in Arkansas and among potential adoptive families. I subleased office space in Arizona and hired a legal assistant. At first, we arranged approximately twenty-five adoptions each year. I could easily do this work in addition to my government duties while raising my children.

Next, I hired other team members like Maki to coordinate with the birth mothers. One of those team members was my legal assistant Megan Wolfe, who turned out to be invaluable to my adoption practice overall, as she had a wealth of experience working for an adoption attorney prior to working for me. My team made sure the mothers were safely housed and that they attended their scheduled doctors' appointments. I trusted these coordinators to serve as responsible caregivers and offer help when needed. During my current legal case(s), I learned about some inexcusable conduct for the first time, on the part of some of the Marshallese coordinators. It is clear that some of my team took advantage of their position in certain cases. I certainly never condoned, or in many respects, knew of their bad behavior. However, I am deeply embarrassed by what I learned. The last thing I would have wanted as an adoption attorney, particularly one working with the Marshallese community, would be for any birth mother to feel that they had been misled in some way. To any mother who was treated poorly, I apologize.

In 2013, I became the Maricopa County Assessor when my boss stepped down to become a judge. Suddenly, I was in charge of 300 employees and an annual budget of $25million. Under my direction, we made property tax law more transparent to the public. For the first

time in decades, my office canvassed the entire county using aerial footage. I served as the liaison with the Board of Supervisors and continued as the public face of the office.

I was excited to bring the County Assessor's Office into the 21st Century, fulfilling our constitutionally-mandated duties using cutting-edge technology. Our work was honored by the Arizona Association of Counties, National Association of Counties, and International Association of Assessing Officers. In 2014, I was elected to complete the term, then won reelection in 2016. I remain proud of my accomplishments in office and thankful to the hard-working public servants who made it possible.  Also during this time period, my two youngest daughters, Paige and Pearl, were born.

In 2015, my adoption practice saw a significant increase in cases. I hired additional staff, including, a few years later, a licensed social worker to conduct post-partem interviews. We purchased residential properties for birth mothers who lacked stable housing.

I am grateful that, after detailed scrutiny, every single one of my practice's five hundred adoptions were deemed legal and legitimate. My legal violations did not suggest any harm to mothers. Looking back, however, I recognize that I made unwise decisions as I grew my practice. Specifically, knowledge that a treaty prohibited individuals leaving the Marshall Islands for the purposes of adoption. Unfortunately, I crossed that line and must accept the consequences of my actions.

In addition, I took advantage of Arizona's state healthcare system.  It was not appropriate to pass along labor and delivery costs to the Arizona taxpayers. I arranged for these births to occur in Arizona then benefitted from the adoption process. As a fiscal conservative, I am ashamed of myself for exploiting the system this way. I prided myself, as an elected official, in returning millions of dollars of taxpayer money to the Board of Supervisors every year I was in office. In light of this, I was mortified to discover that the Arizona Attorney's Generals Office was accusing me of fraud and theft of taxpayer money. I have already reimbursed the Arizona taxpayers the full $670K cost of this medical care, and I was happy to do it.

Your Honor, I was too cavalier and failed to see the potential for harm in my practice. I should have been much more careful from the very beginning. In my mind, my team and I were serving a noble purpose. Plus, I have a lifelong, deep connection to the Marshallese people, who genuinely feel like my extended family. Upon reflection, these feelings produced a casual attitude, not unlike the free-spirited Marshallese culture. When I needed to be rigorously attentive to detail, I lacked the wisdom to make proper judgments. For this, I feel regret, and I am sorry.

## Reflections

In 2006, my father was investigated while serving in public office. The initial suggestion of misconduct was eventually reduced to a misdemeanor relating to $3600 of misstated income on a financial disclosure form. My father resigned his office and took responsibility

for his errors. That painful experience had a profound effect on me and my family. I learned the importance of strict legal compliance. I also saw my father endure the pain of negative public attention.

When this legal case began, I fell into a depression. I resigned as County Assessor in disgrace. My wife divorced me and took our four children with her. I lost my professional licenses and forfeited my assets. National media reported my case in the most lurid possible terms. Much of the reported was misleading and false. Unable to alter the course of events, I drank alcohol daily and to excess.

As always, my father serves as my role model for resilience and adaptation. He is an energetic, optimistic, tenacious businessman who loves me very much. My dad inspires me to stay focused on finding new purpose in the years again. Thankfully, my former wife and I separated peacefully. We are working well as a team to raise our four children, who want nothing more than for our family to be intact. We are finding our way forward amidst such dramatic changes. This is not easy, but it is what propels me forward and will guide my life's decisions moving forward.

I hope my story serves as a warning to anyone involved in a sensitive matter like adoption. Despite my best intentions, I failed to follow the letter of the law. I failed to consider how my practice might appear to a skeptical observer. I should have done more to supervise the actions of my coordinators on the ground. For my failures, I will accept my punishment and serve my sentence in peace.

In the years ahead, I hope I can use what I've learned to be of service to others. I will not repeat the mistakes of my past and never return to any courtroom as a criminal defendant. I also understand that I have a drinking problem and must abstain from alcohol. I owe my children a future of peace, sobriety, and wise decision-making.

Your Honor, I hope my case does not discourage anyone from seeking out a Marshallese adoption. Given their unique culture, there are many beautiful Marshallese babies in need of safe, loving homes. I pray that each and every child finds a family who will raise and cherish them. I regret that any adoption I was a part of might be deemed tainted because of the way my case was reported in the media. I am proud of every adoption I was a part of, and I hope the myriad birthmothers, adoptive parents, and other parties involved in my cases will also be proud, and not ashamed, of their respective adoption experiences. Because, at the end of all this, what matter most is that happy families were formed and positive relationships between those families and their Marshallese families continue on.

As you consider my sentence, I respectfully request that you consider the weight of the good that exists because of my work, my positive professional career, including public service, and finally, but most importantly, the many family and friends that can attest to my good character. Every one of these people I know will support and assist me on my path back to a

productive member of society.  I therefore, ask you, Your Honor, to show mercy when you decide your sentence.


Sincerely,

s/ *Paul Petersen*

Paul Petersen

# EXHIBIT B

8 November 2020

The Honorable Thomas Fink
La Paz County Superior Court
2150 N. Congress Drive
Nogales, AZ 85621

Your Honor,

We adopted our daughter utilizing Paul Petersen's services almost 4 years ago, and worked closely with Paul throughout the process. We are extremely grateful to Paul for not only helping to facilitate the adoption, but also communicating the importance of open adoptions, and how beneficial it is for the child and the birth family. Our experience with Paul and our daughter's birth parents has been a blessing in so many ways.

Her birth parents lived in the US for several years prior to her adoption.
They were married and both parents expressed their desire for an open adoption. Through the years we formed a strong bond with her birth family and have had annual visits. One of the unique aspects of their culture is the importance they put on open adoptions, and how the adoptive parents become family. Paul did an exemplary job of explaining this to us prior to our adoption, and it has made the experience so much more meaningful.

We've had the opportunity to spend time with Paul, Raquel and his children. His children adore their dad and he is an exceptional father. We know that family and community are everything to Paul, and respectfully ask the court to take this into consideration.


Very respectfully,


Lt. Col Kevin and Marisa Kelly

The Honorable Timothy L. Brooks                    November 10, 2020
United State District Court
Western District of Arkansas
35 East Mountain, Room 559
Fayetteville, AR 72701

Your Honor,

I am writing in regard to my families experience adopting our son through the services of Paul Peterson. This letter has taken me some time to write because, truth be told, when the news of the allegations against Mr. Peterson came out, I was scared. I was scared I had led my family down a horrible path and even more scared we may lose our son. After all, we had never adopted before nor did we ever foresee anything like this coming to past and how it would impact us.

As time has past and I have had time to reflect on our experience with Mr. Peterson, I felt it appropriate to share and hope you find it in your heart to consider our experience when sentencing Mr. Peterson.

After nearly a decade of deep thought and prayer my wife and I decided it was time to add to our family. Adoption was always something we considered so when we finally felt it was time, we did our research on different agencies. Mr. Peterson was referred to us by some very dear friends of ours who had a wonderful experience using his services.

My initial phone call to Mr. Peterson was beautiful. I remember feeling strongly he was the person we wanted on our side as we began this journey. He was kind, personable and honest. I felt zero pressure. I felt like I was speaking to a friend who was there to guide and assist our family through the journey of adoption. We understood things don't always go smooth during the adoption process so it was comforting to know we had Paul in our corner. He was honest, forthcoming and transparent.

I will never forget the phone call we received from Paul letting us know we had been chosen by an expectant Mother. I was driving home from work late one night when my phone rang and it was Paul. Tears ran down my face as we spoke about the prospect of this connection and discussed what to expect in the months to come as our Birth Mother was still several months from her due date.

My wife and I felt it would be best to fly to Arizona and meet with Paul in person. We wanted to learn more about what to expect moving forward. We took our three older children with us as we wanted Paul to meet our entire family. We had a wonderful meeting. As I mentioned before, it was like we were speaking to a friend. He showed great interest in our entire family and shared our excitement for the journey we were on.

While in Arizona we were able to meet our Birth Mother, her Mother as well and some of her friends. We were nervous and did not know what to expect. However, from the moment we met this family, the feelings of love we shared, assured us we knew this was all meant to be. As we shared meals and time together it was obvious this was a journey foreordained for all of us.

Months went by and our family prepared for our new addition. We received a call that our Birth Mother was going into labor so my wife and I caught a last minute flight to Phoenix and arrived in time to share a few moments in the hospital with our Birth Mother as well as her Mother. There was a love in that room that I will never forget. No amount of allegations or accusations will ever be able to take the feelings we shared that day away from us.

During the next several days/months as we finalized the adoption process, Mr. Peterson was professional and continued to be transparent. He made time for us and made sure we understood the proper steps to take as we moved on from his services to choosing our own representation to finalize the adoption here in Utah.

As months passed, Mr. Peterson continued to check in on our family. He continued to show genuine love and concern for the process and our families well being. It was obvious he wanted us to be comfortable and confident in his services.

Our son, Will is now 2 1/2 years old. He is a fun, loving, energetic, happy, healthy boy. Watching him interact with his older siblings has been one of the greatest joys I have experienced as a Father. There is no doubt in our minds Will was meant to be part of our family.

We continue to keep in touch with Will's Birth Mother and her Mother. We share pictures and memorable moments often. We want Will to be proud of the decision his Birth Mother made, in her words, "to provide a better life" for him. We are doing all we can to provide Will a life his Birth Mother would be proud of. Our family has never been more complete.

Your Honor, I do not know what the future holds for Mr. Peterson. I do not know the ins and outs of this case nor do I ever expect to. Our hearts ache for Paul and his family. We believe he is a good man who had good intentions. He has brought families together from across the world. He has helped complete families through the miracle of adoption. If there has been wrong done, all I ask is you take into consideration the good he did for some many. As a Father of four, it also pains me to know Mr. Peterson is at risk of missing precious years away from his children. I pray you will find mercy in your heart for a Father who's children need him as you make the difficult decision in the sentencing for Mr. Peterson.

Regards,

Brock Kassing

11/12/2020

The Honorable Timothy L. Brooks
United States District Court
Western District of Arkansas
35 East Mountain, Room 559
Fayetteville, AR 72701

**Honorable Timothy L. Brooks:**

We are writing to provide feedback on our experience with Paul Petersen. Paul was our adoption attorney for both of our children (Jacob 10 & Abigail 11). Prior to working with Paul, we had pursued multiple avenues for adoption over a span of several years and had nearly given up hope on becoming parents. Our experiences prior to working with Paul had left us feeling discouraged about our likelihood of being selected to adopt.

We were referred to Paul by someone who had a successful and positive adoption experience with him. Our experience with Paul was positive from our first introduction. He explained the process, the cost and gave us hope that we would be matched. Paul explained that any adoptions he was involved in were open adoptions and an ongoing relationship with the birth family would be expected and important. He also had provided information about how the US view of adoption (transactional) and the Marshallese view of adoption (expanding your circle and long term connections) were different. He set the expectation that we would have an ongoing relationship with our birth families and the nature of that was up to us and our birth families to define. Paul also made a point to express that he wasn't there to force anyone (us or our birth mothers) to do anything that didn't work for us. He brought us together and encouraged us to get to know one another and figure how our families would fit together going forward. Paul was transparent about the process and throughout our interactions. He answered questions we had about culture (i.e. kemem – traditional 1st birthday, language, norms) even after the adoption was complete. He demonstrated a deep appreciation for the Marshallese culture and people. We met our birth family on numerous occasions prior to the birth of our daughter Abigail. We maintain a relationship with them to this day.

One year later we decided that we were interested in adopting our second child. We reached out to Paul. He was able to match us with a birth family that was friends with Abigail's birth mother. We found the process for adopting our second child, Jacob, just as positive as it was for Abigail's adoption. When we went to Arkansas to meet Jacob – we spent time with both families together. We met their other children and got to interact and spend time together. We also have a continued relationship with Jacob's birth families to this day.

Our kids are beautiful and deeply loved. Our family exists because of Paul. Our families are connected to one another because of Paul. He has been a positive force in our lives.

Paul was more than just an attorney to us. He was sincere and caring. He took a personal interest in the adoptions and believed in the good he was doing to bring families together. He was caring and helpful throughout the process and after as well. He certainly has been a huge blessing to our family. We will be forever grateful to him for bringing our families together.

Sincerely,

Glen and Pamela Bachmann
602-708-0285
azbachmann@yahoo.com

Honorable Timothy L. Brooks,

My name is Faith Lowe and I am an adoptive mother of a set of two biological brothers, Kemp (age 4.5) and Kash (age 3.5) who are Marshallese. Paul Petersen was our adoption attorney, and I am writing you this letter to offer some insight into Paul's practice and how he conducted himself, not only with adoptive families like mine, but also with birth families.

To give you some of my background, I was originally referred to Paul Petersen 5 years ago, when my husband Landon & I were exploring adoption due to several years of battling secondary infertility. We had originally started our journey with the state route since my background is in social work and the state process was familiar to me. We started taking the required trainings and began our home study, but, in meeting with our case manager, decided it was not a good fit for us after all.

Soon after this, we were referred to Paul Petersen through my sister-in-law, who at the time had just been placed on his waiting list to be matched. We were also referred, a 2nd time, through a family friend who had already completed the adoption process with Paul. Today, my sister-in-law has 3 children adopted through Paul, and our friend, 2 children.

Paul's adoption route was attractive to us because we had heard he made the process easy, that we would get matched a birth family fairly quick, and that Paul did a spectacular job of taking care of everything with little stress or burden to the adoptive family. This was a relief to hear, having feeling lost within the adoption world, with so many options to explore, yet no solid leads on which way to go. We liked that he was local to us as well, since, we too, live in the Phoenix Valley. It felt comfortable knowing he would be close by if we were to choose to adopt through his practice.

My first interaction with Paul was a phone conversation, discussing how his process worked. He was very friendly and enthusiastic, and answered every question I had in detail. I felt really good about the things he said to me. It was as if the stars were finally aligning for my family. He explained that a home study was required before anything, and then we could be put on his waiting list to be matched with a birth mother.

Much this initial conversation was about the Marshallese people, their culture, and how he loved building families through adoption. Paul served his church mission in the Marshall Islands, which was also something that we liked about him, since we are members of his same church. He knew their language very well and had developed great rapport with them. His tone lit up with every question I asked about the Marshallese people and I could hear the love he had for them in his voice. He took great care to make sure I (the pending adoptive mother) knew the importance of getting to know the Marshallese culture if I were to adopt through his firm.

Paul was very professional in nature, mixed with charismatic zeal. I could tell he loved this adoption business of his. His official job at the time was the Maricopa County Assessor here in Arizona, but, I personally think he felt more happiness and joy in building families through adoption. Something I respect about Paul, is that he cared a lot about each adoption being an open one. Meaning, adoptive families having a relationship with birth families. It was one of his

requirements for getting on his list, actually, was the agreement that our adoption would be an open one. Something that has bothered me about the media pertaining to Paul's allegations is the portrayal that birth mothers were coerced or forced to adopt out their babies and were afraid they would never hear from them again. This is far from the truth. Paul assured birth mothers that they would have contact with their birth children, and he made sure adoptive families knew that.

Upon Paul's arrest, I reached out to our sons' birth parents and asked them if they ever felt mistreated by Paul, or ever felt like he was dishonest with them. They said, "absolutely not". I also asked if they were okay with our adoption agreements and they said "yes, we're good".

I have found this to be the same story among many of my fellow adoptive families and their birth families, whom I am in close contact with. There is a large group of us who have adopted through Paul and we have great comradery. Many of us agree that Paul was very particular about this, that it was incredibly important to keep adoptions open. I can't speak for every adoptive family, but I can speak for mine, that ours was an honest one, that our birth family is grateful, and that we would have done it 10 times over for the same result. We are in frequent contact with our sons' birth family, and plan to keep it that way throughout their lives. Having an "extension of family" is one of the most beautiful things I have ever experienced, thanks to Paul.

This route of adoption is expensive, but Paul made it clear what the funds were being used for. He broke down the costs for us, and after seeing the breakdown, it seemed to make a lot of sense. He took care of the whole process and made it a smooth one. It is rare in the adoption world to be matched with a birth family as quickly as we did. For us, we were matched within 5 days of sending Paul our home study, and then our first son, Kemp, was born 9 weeks later. That was less than 3 months of waiting to grow our family after 6 years of battling infertility. This is unheard of in the adoption world and made the experience all the more wonderful. Not only was matching quick, but, we loved that we were able to adopt a newborn.

It was nice to have an open adoption that didn't seem to come with the massive aches and pains that we as Americans imagine and see in the movies when it comes to adoption. The Marshallese people, like many islander cultures, view family as just one big community of people working together. It is quite common for grandparents, aunts, uncles, and friends, to raise the children. It is the true execution of the phrase of "it takes a village". At the end of the day, they just want to see their kids grow up well taken care of, whatever the circumstance.

To further exemplify this, take our sons' birth family for instance. Kemp and Kash are 2 out of a total of 8 children from their birth parents. The Marshallese culture does not believe in contraceptives, so they often have a lot of children. Our boys' 3 oldest siblings still live in the Marshall Islands with their grandparents. Their 4th child, a daughter, migrated to the US with them 5 years ago. I have children number 5 & 6 (their only boys). Child number 7 they chose to parent (though, they did originally offer for us to adopt this one. But our hands were full), and child number 8 was adopted to another family last year. This is common within many Marshallese families. This is not something that came from trickery or persuasion. It is what they

wanted, it is what they chose. They love getting updates on the boys & seeing them thrive in our family. We LOVE our Marshallese family!

I am a believer in God and His timing. I also believe God has a plan for each person on this planet. For my family, I know that Paul was a key player in the growing of my family. Not just a key player, but *vital*. I feel and know that my two adopted boys were always meant for my family, that I was always meant to be their mother. God led me to them, through Paul. I know the building of families was special to him. I know it brought him great joy & fulfillment to see families grow in such a beautiful yet unique way. I know the Marshallese people are very special to him, and, that the Marshallese people love him back. He cares very much for both the adoptive families AND the birth families. He has even hosted get-togethers in his home for us to all come be together as adoptive families and birth families. It was such a wonderful experience when we attended one. He loved what he did. It makes me sad to see his reputation destroyed. It bothers me that the media likes to twist stories in their favor. It breaks my heart this has been such a burden for *his* family, when he spent so many years building of ours.

My hope for Paul is that he will be able to find his zeal again. I hope he can salvage some of his reputation that was crushed by the media and government. If anything, I hope he can be free and happy with his family again as soon as possible. Because, that's what this was all about, was family. Family is the core of happiness. My happy family, built through Paul, is proof of that. That's all we want for Paul in return.

Thank you for your time and God bless.

*Faith Lowe*

Faith Lowe

**Amber and Michael Brinson**
**2832 East Downing Circle**
**Mesa, AZ  85213**

November 12, 2020

Honorable Timothy L. Brooks
United States District Court
Western District of Arkansas
John Paul Hammerschmidt Federal Building
35 East Mountain, Room 559
Fayetteville, AR 72701

Dear Judge Brooks,

Thank you for taking the time to review this character reference letter for Paul Petersen.

My husband attended the same church meetings and activities with Paul as he was growing up in Mesa, Arizona. I first spoke to Paul in 2016 to discuss my family's desire to adopt a child. I enjoyed Paul's outgoing, optimistic, kind personality in addition to valuing his long-term connection to my husband. I had tried other organizations and pathways to adoption in the years prior to speaking with Paul. I can attest that Paul did a wonderful job handling the adoption of our two daughters, especially compared to our previous unsuccessful attempts. I greatly admired Paul's caring and careful approach to such a delicate, emotional process.

After the initial match, my husband and I personally met both biological parents. We had long conversations and learned how much they valued and appreciated Paul. They trusted him and were thankful for how well he treated them. They even contacted us after Paul's legal case was made public. They wanted to know how he was doing and expressed their sadness about the news. They did not believe the allegations and felt that Paul was being unfairly targeted and mistreated by the media and the legal system. We agree with them and feel the same way. We treasure our relationship with our daughters' birth parents. They love their birth children and we know that they have placed them in our care out of a selfless desire to give them the greatest chance for success and happiness in their lives. We send photographs and stay in contact through regular video calls. Our unique bond is a credit to Paul's open-hearted adoption philosophy.

We are acquainted with four other families who adopted Marshallese children with Paul. Paul made special efforts to keep biological siblings geographically close to one another. They all had good experiences and appreciated Paul's integrity as we did. During a health scare for our second adopted daughter Kaylee, Paul reached out to us to send his support and good wishes. When there was a glitch at the hospital, Paul immediately cleared up the problem. Paul clearly loves the Marshallese people and taught us a great deal about their culture. This work was a labor of love for Paul. His kind spirit will always be part of our family's story.

My husband and I had a detailed conversation with Paul when his case began. We asked pointed questions and expressed our concerns. We came away from that conversation with renewed faith and trust in Paul's integrity and innocence. Paul answered transparently and completely. He addressed our concerns and helped us understand the legal underpinnings of the charges against him. He also informed us that he accepted responsibility for his actions by entering a plea.

The case as reported in the media bore no resemblance to the experience that we have had in working with Paul. The negative portrayal he has received from the media is so contrary to his character as to be laughable if it weren't so serious and sad. This case against Paul has not changed our view of him in a negative way. On the contrary, it has solidified our confidence in his good character to see how well he has handled the targeted abuse that has been heaped upon him by the media and our legal system. He is a decent, compassionate, upstanding citizen who we are proud to support today.

Please consider showing Paul Petersen a generous amount of leniency at sentencing.

Sincerely,

Amber and Michael Brinson

Natasha Taylor
525 W 37 S
Blackfoot, ID 83221

November 11, 2020

The Honorable Timothy L. Brooks
United State District Court
Western District of Arkansas
35 East Mountain, Room 559
Fayetteville, AR 72701

Re: Paul Petersen

Dear Honorable Brooks,

My name is Natasha Taylor and I am writing to you in regards to my friend, Paul Petersen. I was both saddened and surprised to hear of his recent charges as I have always known him to be an outstanding person. For this reason, I am happy to be writing this letter on his behalf. I understand the seriousness of this matter, but hope and pray that the court will see the man that I see.

I have had the pleasure of knowing Paul for nine years. My husband and I were wanting to expand our family by adoption and happened to stumble across his name on an adoption blog. After getting his contact information, we instantly felt a connection with him. He was so kind, knowledgeable, honest and deeply cared for the potential birth mothers that he worked with. We also admired how much he loved the Marshallese people and their culture.

When we first met and talked with Josephine, our son's birth mom, we fell so in love with her. She was fun and energetic. She was Marshallese but spent most of her life living in Hawaii and various other states on the mainland. Because of that, she spoke perfect English. It has been eight years since our son was born and we talk with Josephine often. She continually expresses how lucky she was to find Paul and how wonderful he was to her. He made her feel safe and taken care of in one of the hardest times of her life. I have always been so appreciative of that, his compassion and love for her at that time.

Because of the wonderful experience that we had with our first adoption; we were confident in pursuing another adoption with Paul. Our daughter's birth mom, Bonta, was shy, reserved, and spoke little English. With these circumstances, Paul was quick to provide us with all the necessary tools so we could have efficient communication with her. Having an interpreter played a huge role in our connection with Bonta. Even with these communication challenges, we still felt a strong bond with her and her family. We have kept in close contact with her ever since and we only have Paul to thank for that.

I hope and pray that the court will take my sincere letter in consideration of Paul Petersen's sentencing. Paul is a man of great character and wisdom. The love that he shows to his potential birth moms and future adoptive families is comparable to the love he has for his own family. Despite what the media has concluded about Paul Petersen, I along with many others, believe him to be an exceptional friend, father, and individual.

Sincerely,

Natasha Taylor

Patrick and Rachel Olsen
71 W 100 N
Blackfoot, ID 83221

Honorable Timothy L. Brooks
United State District Court
Western District of Arkansas
35 East Mountain, Room 559
Fayetteville, AR 72701

Re: Paul Petersen

Dear Honorable Timothy L. Brooks,

We are Patrick and Rachel Olsen, writing this letter on behalf of Paul Peterson. As friends of Paul, we have come to know and love him as an honorable, kind, and professional man. With that being said, we understand the circumstances and seriousness of these charges. We hope that we can portray his true character through our experience.

When coming into contact with Paul through trustworthy acquaintances, we felt confident in the decision to work with him. We had the privilege of him assisting us with both of our sons' adoptions. Paul was always very kind and professional to us through our processes. He was always honest and upfront about the risks involved in any adoption. With this, he also encouraged us to form open adoptions with our birth families.

We were first matched with an expectant mother through Paul. After the baby was born, the birth mother decided to place the baby with another family, through a different agency. We had previously paid the expectant mother's expenses in the amount of $10,000. Paul, being the generous man he is, willingly chose to take these expenses upon himself. Paul went above and beyond to console us in our difficult situation. He was there as a friend and as a facilitator. Paul provided us with the time we needed to grieve the loss of this adoption before proceeding with another potential match.

With the adoption of our oldest son through Paul, our experience was nothing short of exceptional. We immediately connected and fell in love with our birth family. This family communicates with us frequently and tells us that Paul was good to them and treated them with respect. As our bond with them was strong, Paul also made personal connections with them and other birth families whom he worked with. Years after placement, Paul was willing to help this family with some outstanding hospital bills. Through his actions, you can see and feel his love for the Marshallese people.

After the positive experience we had with our first adoption, we decided to adopt with him again. Our second birth family is just as amazing and kind as the first. We are so lucky and fortunate to have them all in our lives. After the successful adoption of our son, our birth mom became pregnant again and they were matched with a different family. At the beginning of the third trimester, they decided to parent the baby themselves. Paul was supportive in their decision and helped them move forward.

We hope that the court will consider our letter in support to Paul Petersen, for we have had nothing but good experiences with him.

Yokwe,

Patrick and Rachel Olsen

The Honorable Timothy L. Brooks
United State District Court
Western District of Arkansas
35 East Mountain, Room 559
Fayetteville, AR 72701


To the Honorable Judge Brooks,


Thank you for taking the time to read this letter. I would like to share my family's experience with Paul Peterson and his law firm, specifically relating to the adoption of our four children.

I was first referred to Paul by a mutual acquaintance in 2013. My husband and I had just begun our adoption journey, and were feeling lost and overwhelmed. The mutual acquaintance related her experience with Paul and his firm, giving a glowing review and helping my husband and I become more sure that this was the right path for us. We then contacted Paul directly and he discussed his philosophy and procedure for matching families with prospective birth families. I was immediately comforted by how he spoke about the expectant mothers. His extended experience with the Marshallese people through his mission and other encounters helped me to feel that he truly understood the culture, and respected their practices and traditions. He also explained to us how important it was for most of the expectant mothers to maintain an open relationship with the adoptive families after placement, which was important to us as well. He was very patient in discussing all details, risks, etc. to my husband and I, and we felt comfortable moving forward with seeking a match and possible placement.

Our first match came in the spring of 2014. He gave us the contact information of the expectant mother and father, and encouraged us to begin building a relationship with them. This couple was living in Arkansas at the time, and while the expectant mother didn't speak much English the father was fluent. We spoke on the phone with them several times, sent pictures, and were able to build a close relationship with them while awaiting the arrival of the baby. I was very comforted by the frequent contact we had with the expectant family, knowing that they were happy with us as the adoptive family. Unfortunately this pregnancy ended in a miscarriage at around 16 weeks. This was tragic for our family as well as the expectant family, and Paul and his team were very kind and compassionate to everyone while helping us navigate the expenses and complications regarding this loss.

We were eventually matched again with another expectant mother, who had previously placed a child through Paul's firm with a different family. I was comforted by this fact, helping me to feel that this woman had a good experience with Paul and was comfortable moving forward with the placement. While waiting through her pregnancy we were contacted again by our original matched family, who was expecting again and wanted to place with us through Paul. This resulted in a double placement in our family. Our two sons are four months apart. Paul helped us navigate the complexities of a double match with patience and professionalism, also helping us to minimize costs as much as possible. Both placements were a positive experience, and we were able to spend precious time with the birth families after the birth of the babies and before we traveled home.

Once our boys turned one we decided we would like to grow our family one more time. We liked the idea of our children being close in age, so we contacted Paul and asked him to help us be matched with another expectant mother. We were matched several months later with an expectant mother who ended up delivering a stillborn child due to other medical complications. Paul was extremely compassionate and thoughtful to our family, and made sure the expectant mother received all of the medical attention she needed during this time. Paul and his team also worked with us financially to make sure we could still afford a match and eventual placement. This journey culminated in June 2017 with the match and birth of our first daughter. Again, Paul made sure my husband and I were in close contact with the expectant mother during her pregnancy (it was a late match so there were only a few weeks left). Our family arrived in Arizona before the delivery, so we were able to spend time with the expectant mother and she even invited me to come to her last doctor appointment and hear the heartbeat. After the delivery we were again able to spend time with our daughter's birth mother, facilitate through Paul's team, and parted ways with positive feelings all around.

We thought we were done growing our family at that point, but in the fall of 2018 Paul contacted us with news that our daughter's birth mom was expecting again and had interest in placing the baby (another girl) for adoption. He contacted us first in an effort to honor the birth mother's wish to keep the biological siblings together if possible. Two months later our second daughter was born. Our family traveled to Arkansas and we were able to have a reunion with all three birth families over the next several days. It was such a positive experience to have our kids and their birth families reconnect in person.

We remain in contact with all three birth families. We send messages, pictures, videos, and gifts. We will forever be grateful to Paul, Megan, and his team for the work they put into helping our family grow. In every situation we encountered, we were treated with kindness and respect. More importantly, we felt that our kids' birth families were treated with kindness and respect. The fact that all three families did multiple matches through Paul tells me that they felt comfortable with him and his firm, and that he was able to meet their needs as well.

Again, thank you for taking the time to read this letter. Please feel free to contact me if you have any questions.

Sincerely,

Dr. Lisa McNiven
570 Maple Drive
Rexburg, ID
83440
mcnivenl@byui.edu
(208) 403-6900

Nichole Crawford
7131 Estancia LN
Smithfield, UT 84335

November 12, 2020

The Honorable Thomas Fink
La Paz County Superior Court
2150 N. Congress Drive
Nogales, AZ 85621

Dear Honorable Fink,

I am writing this letter at the request of Mr. Paul Petersen. I am very aware of the charges that have been filed against Paul, and am saddened by these charges. I would like to share the relationship which I have had with Paul, and the kind of man that I have known him to be.

I first spoke with Paul in approximately May 2014, regarding adoptions. I had adopted previously in the year 2000 through a different agency. I was very interested and also nervous about going through the adoption process again. I asked Paul many questions regarding his adoption practices, all of which he answered with what I felt were honest and ethical answers and comparable to my previous adoption experience. As I continued to talk to Paul, I felt a desire to proceed with using him as my adoption attorney with a Marshallese adoption. The first thing that I really appreciated about Paul is his obvious love and respect for the Marshallese people and culture. I had also had some experience on the islands, and had grown to love the islanders and their culture. This was not lost to Paul, and I greatly appreciated and trusted that about him. This truth has become more and more evident to me as the years have progressed, and as I have adopted three Marshallese babies with three different birth mothers, with Paul as the attorney. They have each expressed their confidence, appreciation and friendship that they have with Paul.

With my first adoption with Paul, we were matched with our expectant mom. He gave us her contact information and encouraged us to build a relationship with her, which we began immediately. A short time later, it was discovered that the baby had a congenital heart defect (CHD). At that time, Paul told us that we could pull out of that adoption and he would make sure that expectant mom was still taken care of, and we would get a full refund of monies. He encouraged us to fast and pray to get an answer of what is best for our family. We took his counsel, and felt strongly to continue with the adoption. We spoke with the cardiologist in Arkansas, where expectant mom was living. He counseled us to have the expectant mom move closer to where we resided in Utah, so that baby would be in a hospital closer to us, and have her own team of doctors. Again, Paul was very concerned for our family and for expectant mom. He assured us several times that we were under no obligation to follow through with this adoption if it wasn't in the best interest of our family. We proceeded, and he helped our expectant mom to understand her options and she made the decision to come to Utah and

reside at my neighbors home for the remainder of her pregnancy. He knew that expectant mom would not feel comfortable coming alone, so he arranged to have her cousin come with her at no additional cost to us. He made all of the arrangements for travel. Paul was a huge support to both of us. I don't believe that he was licensed in Utah at the time, so he gave me a recommendation of a credible attorney in Utah to take over our adoption. He waived all of his legal fees up to that point, because he recognized the financial burden this would place on our family. He continued to be a support and friend to both us and our birth mom as the birth, adoption, subsequent hospital stays with many surgeries, and the passing away of our angel baby at 6 months of age. I never felt forgotten or abandoned by Paul, and from conversations I've had with our birth mom, I know that she feels the same. I had five weeks of being with my daughters birth mom every day, and we grew very close. During this time, we were able to have deep and meaningful conversations. During one of these conversations, I asked her some very hard questions about why she was placing her baby for adoption, and if she ever felt like she was being forced by family or by Paul. I was also with her when she relinquished her rights as mom, when similar questions were posed to her. She was adamant that her decisions were hers, and that adoption was what was in the best interest of her baby.

My second experience with adopting through Paul was in 2016, and much less eventful. During that same time, I expressed to Paul that I felt there were two more babies, not just one, but that I couldn't afford to adopt two more times. He told me he thought I must be crazy – all in fun of course. We were matched in 2016 with an expectant couple from Arkansas who had placed before, and had approached Paul with the desire to place again. Again, he gave us each other's contact information and encouraged us to start building a relationship with them. This adoption experience was seamless and we still have a beautiful relationship with this family.

When our second adopted baby was just six days old, Paul called me to tell me that he had a situation that may indeed be the crazy that we were looking for, if we really wanted to adopt two babies so close in age. He shared this experience with me as follows: He had a Marshallese woman approach him asking him if he could help her best friends orphaned daughter, who was 17 years old, pregnant and alone on the islands. This expectant, underaged, orphaned girl wanted to come to the states, place her baby for adoption, and live with her mother's friend in Arkansas. Paul expressed to her that the state of Arkansas had laws that would not allow that since she was a minor and she would need parental consent to place. He told her he was unable to help her. As time passed, and he worried for this expectant mom who was alone, and the memory of our family and the conversation we had about feeling like there were two babies, came to his mind. He looked into Utah law regarding minors and adoption, and found that they did not need parental consent in Utah. He knew that our family was already comfortable with having expectant moms live with us, and that we already knew what to expect. He then approached us with this situation and again asked us to pray about it and make the decision that was best for our family. We readily agreed to take this young girl, and her mom's friend into our home and care for her during her pregnancy and the birth of her baby. We retained an attorney in Utah, and again Paul waived his legal fees for this adoption.

I have had opportunity to spend a lot of time with my birth families, and they have each expressed their trust, respect and love for Paul. I have asked my birth moms about their experiences with Paul, and they only have good things to say. However, they are understandably nervous to be involved and share their experiences. I have witnessed both on the islands and in my home, that the Marshallese culture is very different than American culture in regards to living arrangements, families and adoptions. Paul knows and loves their culture more than most Americans would, which opens the door for the Marshallese people to love and accept him.

I have experienced some of the intimate details that are at play with adoption. I have four birth moms, three of which are Marshallese. These birth families are my family now, with continued communication, visits and friendship. Paul has been an integral part in helping our family to come together. He genuinely cares for his families, both the adoptive family, the birth families, and the adoptees. He has encouraged a continued relationship with our families, and them with us. He went above and beyond anything that was expected of him as legal counsel, for both our family and our birth families.

Thank you for allowing me the opportunity to share my experience with Paul Petersen. I have nothing but highest regards for Paul, as a man, an attorney, and a friend to me and to my birth families.

Sincerely,

Nichole Crawford
Nichole Crawford

November 12, 2020


The Honorable Timothy L. Brooks
United State District Court
Western District of Arkansas
35 East Mountain, Room 559
Fayetteville, AR 72701

To The Honorable Timothy L. Brooks,

First, thank you for taking the time to read this letter. I am writing in regards to Paul D. Petersen.

Paul was our adoption facilitator and assisted us with two different adoptions. Our first adoption was in 2015 and our second adoption was in 2016. Our adoptions were with two different expectant mothers and both of our expectant mothers gave birth in Arkansas. Our adoption in 2015 was finalized in Fayetteville with a different attorney, but Paul was our facilitator throughout the process. Our second adoption we were cleared through ICPC to travel home from Arkansas and finalize with a different attorney in Utah.

I'd feel ashamed if I didn't speak up and share my thoughts regarding Paul and the accusations and charges he is facing in Arkansas, Arizona and Utah. Prior to meeting Paul, we had worked with LDSFS, Heart to Heart Adoption Agency, in Sandy, UT and a private adoption with Paul MacAurthur, Bill Heder of Provo, UT and Kim Perry. With those people, we experienced unethical, unbelievable, and illegal things. This is important to mention because these experiences taught us and helped us know what kind of questions to ask and what kind of research to do as we moved forward with our adoption journey.

When I first met Paul, I asked detailed questions. He shared with me his requirements and procedures for adoptive families and expectant mothers. He shared with me all he knew about the Marshallese culture. He loves the Marshallese people, and they love him. When our expectant mothers chose us, again, we started building a strong open relationship with them [which was a requirement if we worked with Paul] and I asked them hard, straight forward questions. I wanted to know what assistance they would be receiving. I wanted to know what kind of counsel, help and resources they would have. I wanted to know why they were choosing adoption and why they were choosing us.

We were highly encouraged by Paul to build a strong open relationship with our expectant mothers. His procedures, fees, requirements were typical of all the agencies I had interviewed throughout our adoption journey. In fact, a couple months prior to meeting Paul, we had returned from a failed adoption in LA and the adoption fees we lost were more than our total adoption with Paul. If you're familiar with adoptions in the United States, you will know that Paul's adoption fees are comparable to many adoption agencies.

We have the most amazing, beautiful open relationship with our Marshallese families. They are our family, and we are their family. We can learn so much from the Marshallese [Micronesian / Polynesian] culture and people. I believe, they are some of the most loving, giving, caring people in our world. We spend time, in Arkansas, with them every year. We are loved by each of our son's birth families and we love them dearly. Our boys are light. They are happiness. They are loved by many.

They spread their joy and light everywhere they go. Paul helped our family grow and he helped us develop these relationships.

Our experience with Paul Petersen is completely opposite of what the media is sharing. It is completely opposite of the terrible words that are being used to describe Paul. Our beautiful adoption journey is special, it is sacred and there are many, many more families who have had similar experiences working with Paul. I believe Paul has done so much good in our world. He set out with a pure heart and was doing good.

If you are familiar with the adoption world...you will know that there are many agencies, attorneys, social workers, etc. who are practicing in the exact way Paul is being accused of. In Arkansas, Shared Beginnings has basically taken over Marshallese adoptions. They are practicing in the same way. I believe, it is the responsibility of everyone involved in adoption to do their own research. And, remember every successful adoption that Paul facilitated has an official home study, state and federal background checks and each adoption was finalized in court with an attorney [usually not Paul] and a judge. Every adoptive parent[s] was required to follow the laws of the land. If baby was born in a different state from where baby would be living, every adoptive couple was required to clear ICPC.

It is very unfair for all of us, for the media and for the Attorney General to generalize and clump all of the adoptions that Paul has facilitated as a "scheme" or a "baby mill" or "human smuggling." There might be a few upset expectant mothers or upset adoption parents who had negative experiences, but because of a few complaints it doesn't mean Paul is at fault. There are many people involved in the adoption triangle.

I hope you will consider all the positive adoption stories and realize there is more to Paul's story. He is a professional, caring, family man with values. He sincerely cared about helping expectant mothers find the best option for their unborn child. Like I mentioned, we had two positive experiences and we have a strong relationship with both our Marshallese families who live in Arkansas. Paul has helped facilitate many forever families and he has helped strengthen many relationships between expectant mothers and adoptive parents.

If you have further questions, please feel free to email me at: lati97@yahoo.com.

Sincerely,

Andrea Wilcock

Nov 13, 2020

To the Honorable Timothy L. Brooks
United States District Court
Western District of Arkansas
35 East Mountain Room 559
Fayetteville, AR 72701

Judge Brooks,

We are writing this letter on behalf of our attorney, Paul Petersen who facilitated 5 adoptions for our family beginning in 2015. We respectfully ask that you consider our experiences with Mr. Petersen as a measure to assist you in sentencing. To be brief, but to the point, Mr. Petersen conducted himself in a professional manner each step of the way during the adoption process. He was extremely interested in the well being of the biological parents, providing translators and assistants and demonstrated the upmost professionality in his actions and words. We never observed anything that would be a violation of law or ethics. On the contrary, his concern and love for his clients, on both sides were evident through his personal approach making sure both biological parents and adoptive parents were satisfied and felt comfortable. It was made clear to us that these adoptions would be "open adoptions" and the biological parents wanted to maintain involvement with their child's life through the years. This has been a very meaningful and satisfying experience for us as a family, as we have nurtured relationships with all our children's parents, whether it be a birth mother or birth mother and father.

We can not begin to express our gratitude to Mr. Petersen and his staff for bringing these adoption opportunities to us. This has been a dream come true for our family. We have 7 adopted children and each one is a miracle, a treasure to behold. We believe that Mr. Petersen has done his best to preserve the rights and integrity of all those that he has worked with. Kindness, compassion, and the rule of law have been evident to us in each adoption that we've experienced.

We feel so blessed to have found and worked with Mr. Petersen. The happiness that has come into our lives is unmeasurable.

Regards,

Jeff and Marcia Price
_Jeff Price_ 11/13/20
_Marcia Price_ 11/13/20

The Honorable Timothy L. Brooks
United State District Court
Western District of Arkansas
35 East Mountain, Room 559
Fayetteville, AR 72701

The Honorable Timothy L Brooks,

I write this letter in support of Paul Peterson and all he has done for my family.

I met Mr Peterson five years ago when we were beginning the adoption process. He came highly recommended from a friend and colleague who worked with him on three separate adoptions.

From our first interactions, Mr Peterson was genuinely interested in us and in the birth mothers he worked with. He strived to find the perfect fit, and wanted the best for the babies. His integrity and high moral standards were evident from the start. He and his firm walked us through the entire process, and they were always professional, answering all our questions honestly.

We worked with Mr Peterson on the adoption of both of our sons and I could not be happier. We were able to arrange meetings with the birth parents prior to both adoptions. Both families have lived in Arkansas for years. The birth parents were entirely on board and understood exactly what was to entail with each adoption. We continue to keep in touch with them through letters and visits. They are part of our family now too.

Mr Peterson was always courteous and respectful of us and the birth mothers. I would work with him again and highly recommended him to other adoptive families without any reservations.

Sincerely,

Meghan Shayhorn

November 16, 2020

The Honorable Judge Brooks,

We have been a part of the adoption community for over thirteen years. During that time, we have been blessed to adopt three of our five children. Our first adoption in 2009 was through a private adoption agency. In 2013 and 2017, Paul Petersen was our adoption attorney for two private placement adoptions. These two adoptions were very different from each other.

In 2013 we met a struggling, young mother with three children. She had a three-and half-month-old baby boy who had recently been diagnosed with Down Syndrome. He was in the ICU being treated for pneumonia and heart failure due to an AV canal heart defect. She was looking for a family who was open to a biracial child with Down Syndrome. She had no husband, and the father had recently abandoned her. She was unemployed and a member of the Tohono O'odham tribe. By her own admission, her family were all struggling addicts, and she was praying to find a family who would truly love her son as she did. We were blessed to be that family, but before doing so we needed to find a lawyer to proceed with the placement.

We called many different agencies and adoption attorneys, and the name that was highly recommended to us multiple times was Paul Petersen. We contacted him and he was upfront and honest that he had never done a tribal adoption before, and he would need to consult with other ICWA lawyers to know how to proceed. He did so, and within a few days, we had signed papers with the birth mother and were able to go and stay in the hospital with our son.

A major aspect of private adoption is the cost. Anyone who starts down the road of adoption finds out very quickly just how expensive it is and the many different complex factors that make those costs add up. After calling multiple lawyers and agencies before we spoke with Paul, we had been quoted prices almost three times as much as our legal fees ended up being. Paul charged us a $3,500 flat fee for our adoption in 2013 and a $4,000 flat fee for our adoption in 2017. Considering the common private adoption is 30-40k, we were shocked at the relatively low fee he would receive for his services out of the total cost of the adoption.

Our adoption in 2017 was a placement from a young unwed mother. The birth father also supported the placement, as he was soon to be wed to another woman. Each of our adoptions through Paul Petersen, were performed under the strict observance of adoption law. They were thorough, timely, and a tremendous blessing for the children involved, and to us as parents. We are very grateful to him and know he cares about the children he has helped place into loving families.

Our eldest son's birth mother has lost custody of her other two children and has been in and out of jail since he was two. Our youngest son's birth mother just recently had to undergo open heart surgery and is still unsure of her health and future. We have chosen to have open adoptions with the birth parents and have witnessed Paul support this kind of relationship and community among the families he has worked with through the years.

We strongly believe that his intentions are to help mothers and children. He has helped so many in a world, where sadly, the most common option that is presented to most birth mothers, including to one of ours, is abortion. Paul has spent his career helping others and assisting in a fundamental societal need. He has offered to the mothers and children involved a way to change theirs and their child's future. It is imperative that we have different avenues to help these children and birth parents. These women have complex individual needs, ranging from poverty, addiction, medical needs, and often little to no family support. They understand all too well the reality of the potential future for their child. Through great and loving sacrifice, they make a new future for the children they bring into this world. We, and thousands of others, are forever grateful for the contribution of time and dedication Paul has given to these children, and the courageous women who create a brighter future for them.

Sincerely,

Paul and Jessica Egnew



**EXHIBIT C**

Douglas J. Wolf
Assessor

Laura Andonie
Chief Deputy Assessor



# PINAL COUNTY
WIDE OPEN OPPORTUNITY

The Honorable Thomas Fink
La Paz County Superior Court
2150 N. Congress Drive
Nogales, AZ 85621

Honorable Judge Fink,

I am writing today in support of Paul Petersen, in regard to his sentencing.

In my work as County Assessor, I got to know Paul Petersen over the course of several years, after he had been appointed to the Maricopa Assessor's job. During that time, our Assessor association held monthly meetings and other events where I personally interacted with Paul many times formally and informally.

For the record, I have a private sector background of over 30 years duration and have dealt with many people whose honesty and integrity was suspect. I consider myself to have a pretty reliable instinct for charlatans and grifters.

In all those interactions, <u>never once</u> did I detect a hint of guile of deceit regarding any aspects of his business or personal life. Quite the opposite. When the topic of his outside adoption business came up, he was very forthright and transparent as to how the business worked and his role. Never did he mention the fees involved as the prime motive for his activity. Rather, it was presented as a way to serve both his fellow Americans in need and assist the adoptive children as a way to escape a life that would be predictably very difficult. If there was any hint that this business had a seamier aspect or was possibly illegal, was never raised.

Paul was always available to his fellow elected officials regarding assessment issues with an attitude of true interest and concern. The citizens of Maricopa County were getting great service under his administration and the charge that he may have been neglecting his public duties is utter nonsense.

Finally, I am concerned that after 10+ years of running his business in the open, suddenly the entire operation is considered a criminal enterprise. When Paul was appointed, it is my recollection that the Maricopa Board of Supervisors were made aware by Paul of his outside business which is allowed under the Arizona Constitution. So, if the Board or the Maricopa County Attorney or the Arizona Attorney General had any concerns about his business they had ample opportunity to raise the issue at that time. They did not.

ASSESSOR

31 North Pinal Street, Building E. PO Box 709    Florence, AZ 85132    T 520-866-6361    FREE 888-431-1311    F 520-866-6353    www.pinalcountyaz.gov

Judge Fink, your job is to see justice done based on the facts before the bar. Justice involves punishment for crimes and deterrence. In my opinion, the loss of his job, his law license, family, personal and professional reputation and whatever material gain he may have had to this point is punishment enough. Justice will not be served by confining Paul to a prison.

Thank you for taking time to review my letter.

Yours truly

Douglas J. Wolf
Pinal County Assessor

31 North Pinal Street, Building E, PO Box 709    Florence, AZ 85132    T 520-868-6361    FREE 888-431-1311    F 520-866-6353    www.pinalcountyaz.gov

November 12, 2020

The Honorable Timothy L. Brooks
US District Court – Western District of Arkansas
35 E. Mountain, Room 559
Fayetteville, Arkansas 72701

Dear Judge Brooks:

This letter is in support of the Honorable Paul D. Petersen, former elected Assessor of Maricopa County, Arizona.

I have known Mr. Petersen since June of 2006. When I came to the Maricopa Assessor's Office at the request of the former Assessor, Paul was my employee. But when he was appointed Assessor in August of 2013, I became his employee. We had a unique professional relationship to say the least.

Having served at the federal, state and local government levels in my over 35-year career, I can tell you Mr. Petersen is the type of leader that any public servant would want to work for in their career. Mr. Petersen always showed kindness and compassion in his public dealings with the Assessor's staff and with the public for which he served. I can only think of one occasion where he showed overt frustration, but he got over it in a quick minute, and then apologized to me and another direct report who happened to be the bearers of the bad operational news.

When we traveled in the community, Mr. Petersen was always very gracious and accommodating to all the citizens and other elected officials. No question or concern was too small to be answered and when it was a big or major issue, he studied it to come to the right public position and then got back to the individual promptly with his decision.

Mr. Petersen was an asset to the Assessor's Office and we always met our statutory mandates. Every independent audit of the Assessor's office from 2006 to 2020, even three after Mr. Petersen's arrest, confirmed the findings of a well-run office (Maricopa County Internal Audit, County Attorney's Outside Investigation by Mitchell, Stein, Carey, Chapman, and Bill Wiley's Interim Administrator's Final Report to the Maricopa Board of Supervisors). Mr. Petersen should get much of the credit from the public for those reports.

When Mr. Petersen was first in federal custody, I was one of the contacts he called. He first asked how I was doing with the news of his arrest and then asked about the office's operations. It struck me, given what was occurring in his life, how he could be thinking of the office versus the millions of other thoughts he would be having about his situation. It was just another example of his character and the fact he cared about his responsibilities.

I know Mr. Petersen's public service also extended in other facets of his life. Mr. Petersen is a devoted member of his faith and he served in many church capacities, including teaching the Boy Scouts government and civics badge requirements. He especially would like to tell me how the previous Assessor would corner him after church and give him advise on how to handle unique assessment issues we were dealing with at the office.

Although I did not know any of the legal intricacies of how Mr. Petersen went a foul of the law, I am sure the damage that has been done because of the governments legal actions and the plea agreement that has been put forward to you has done more to his personal well-being, his family relations, and his standing in the community and is a punishment far greater than any long sentence in a correctional facility could remediate.

I ask that you use your judicial discretion and find that Mr. Petersen serve the least amount of time in a correctional setting as the law requires. Thank you for your service and consideration.

Sincerely,

Tim Boncoskey

November 11, 2020

The Honorable Timothy L. Brooks
United States District Court
Western District of Arkansas
35 East Mountain, Room 559
Fayetteville, AR 72701

To: The Honorable Timothy L. Brooks

My name is Scott Whitener and I am writing on behalf of my friend, Paul Petersen. I have known Paul my entire life and count him as more a brother and family member than a friend. Paul is a loving, caring and thoughtful individual, who has been there for me throughout my life. We have known each other since we were toddlers and grew up attending the same schools, boy scout troops and church together. As teenagers we achieved the rank of Eagle Scout and served as missionaries for our Church. Afterwards we attended college together, both of us continued through graduate school, met our wives and have raised our families together. We know each others strengths and weaknesses and have a trust and love for one another that only comes from a lifetime of shared experiences. Because of our background, I believe I provide a unique and in depth perspective into the character of Paul Petersen.

From a young age we were taught the importance of family and service to others. As young boy scouts we learned the Scout Law and its principles became part of Paul's character: Trustworthy, Loyal, Helpful, Friendly, Courteous, Kind. Paul is all of these. It was these traits and the desire to serve the Lord and others that led to Paul's decision to volunteer as a missionary for two years. Paul did not receive any pay for this service, instead he payed his own way. As a missionary, Paul learned to love and care for the Marshallese people. He taught the people of the Love God has for them and the importance of family to happiness in this life. Paul learned that he had much in common with the Marshallese who also believed in strong nuclear families. At the same time, I recall Paul telling me of the struggles of many    young single mothers trying to raise children on their own, wishing their children could have more opportunities, away from the limited prospects on their islands.

Paul returned from his mission with a desire to continue to serve the Marshallese people he had come to love. It was this desire and love of families that led Paul to begin facilitating adoptions for Marshallese children, to loving parents, here in the United States. Nearly twenty-five years later, Paul has helped to fulfill the hopes of and dreams of hundreds of parents. Birth moms are grateful for the love given their children and the subsequent opportunities for a better life here in the United States. Adoptive parents are happy and appreciative for the addition of these wonderful children in their lives. I personally know families who have worked with Paul and are eternally thankful for the blessings of family and love he helped them obtain through the process of adoption.

It is important to recognize, that despite the various charges and outlandish claims regarding Paul and his adoption practice, not one of these adoptions has been declared illegal. None of these adopted children were taken away from their adoptive parents and returned to their birth moms. Why? The reason is obvious. The adoptions were legal. All parties were willing and acting of their

own volition and accord.    No individuals were harmed by the actions of Paul Petersen.

Considering this, the injured parties in Paul's case become, the Federal Government and the State Governments of Arizona and Utah. Throughout this case the State of Arizona has put forth every effort to torment Paul and his family.    He was arrested at gunpoint, in front of his wife and children, on the side of the road while driving his family back from vacation.    His family's assets were seized, eliminating Paul's ability to defend himself, or care for his family.    The State of Arizona is fully aware that Paul's family had multiple sources of income, including his fourteen year career in the Maricopa County Assessor's office and his wife's personal business as a realtor.    Yet they made no distinction between the assets, extinguishing his families ability to pay their mortgage, or even put food on their table.    His family had to rely on the charity of others just to eat.    As a result of this stress and in an effort to provide for their children, his wife made the nearly incomprehensible decision to end their marriage.    This allowed their assets to be divided, so she could pay for her family's upkeep.    Paul's assets remained seized by the State of Arizona and he was unable to further defend himself.    Paul was told he was facing 15+ years in prison with the Arizona Attorney General threatening to enact escalation of sentencing laws, notwithsatnding Paul has never been convicted, or even charged with a crime until this time.

Confronted with this prospect and because of the love Paul has for his children and family, Paul made the difficult decision to plead guilty.    He simply could not risk being separated from them the remainder of their childhood.    As part of his guilty plea, Paul agreed to pay restitution to the States of Arizona and Utah.    With his guilty plea the State of Arizona released his assets.    As of this time, Paul has paid in full the monies required to the States of Arizona and Utah per his plea agreement.    Paul has closed his adoption practice and forfeited his Law License.    Further, these charges resulted in his forced resignation from his position as the Maricopa County Assessor.

Through Paul Petersen's efforts hundreds of loving and caring homes have been created. Sadly, his life and family have been torn apart.    Honorable Brooks, as you deliberate Paul's case, I ask that you find mercy on my friend and brother, Paul Petersen.    Observe the retribution that already has been meted, the suffering he and his family have gone through.    Consider his inability to repeat these offenses.    Is further incarceration, much less lengthy incarceration, necessary to punish, or reform Paul?    Is his case a widespread crime, that he needs to be made an example of to deter other offenders? I believe the answer to both of these questions is a resounding NO.    I respectfully ask that you please accept this letter in your deliberation of his case and find leniency in your judgements as you sentence him.

Thank you for your time and consideration,

Scott Whitener, DMD

# Daniel R. Moody

(650) 847-0324          dan@danielrmoody.com 17030 Sonoma Rdg, San Antonio, TX 78255

November 11, 2020

The Honorable Timothy L. Brooks
United State District Court
Western District of Arkansas
35 East Mountain, Room 559
Fayetteville, AR 72701

RE: Paul David Petersen Sentencing

Dear Judge Brooks,

I have known Paul for roughly 20 years. We first met at Arizona State University in 2001 when he was a law student and I was an undergraduate. We both shared an interest in politics and had many interactions through our work in student government and working in Arizona politics. Where I really got to know Paul, however, was working with him closely on his dad's 2002 campaign for Arizona State Treasurer. We spent many days and nights together working on getting his dad elected, including the night before the primaries when we drove around literally all night long to place signs at polling locations for the following day.

Since that time, Paul and his family have been like family to me.

Over the years, I've had many conversations with Paul about life in general and how he and his family were doing. I knew he helped families looking to adopt children and mothers looking to have their babies adopted, but he never brought up the financial aspect of that work with me: in any conversation, he would talk about how great it was to work with these families because everyone wins. In fact, I recall a conversation vividly where Paul said, "You know, a lot of lawyers have to deal in a zero sum world. I'm glad that I get to work in situations where everyone wins in every single case. I never have to share a client's pain of losing."

When I read the first article published about Paul and his adoption business, I was stunned at the allegations. That wasn't at all the Paul I knew, and the next time we met up for lunch, I asked him about it. The way Paul explained it all to me, I know that in his heart of hearts, he didn't view anything he was doing as illegal, certainly not child trafficking. I know Paul simply thought he was helping people.

Paul's an imperfect human; we all are. I'm sure he's made mistakes, and I don't know all the facts of this case to know what mistakes he made here. What I do know is that Paul is not a child trafficker. Paul isn't an evil person; he's a good person: flawed, but good.

# Daniel R. Moody

(650) 847-0324          dan@danielrmoody.com 17030 Sonoma Rdg, San Antonio, TX 78255

Paul has been a great friend over the years. He's helped me with legal matters to set up companies and handle minor legal issues/filings for me. He's been around for advice and support. And I've been able to see him become a father – a great father.

It pains me to think of his children growing up with their father in jail. To think of the taunts they'll likely get from bullies, now and into the future. To know that they'll one day find the articles written about their father and have questions about him the same as I did when I first read them, except they won't be able to have a conversation with him shortly thereafter because he'll be in prison. What thoughts will fester in their minds about their dad that they won't be able to address?

And all of this for what? Because Paul helped place children with parents who love them and helped mothers improve their lives by putting their children up for adoption. Because Paul was doing this while an elected official so it made for a great salacious headline politically-minded prosecutors could use to show they're tough on crime.

This may make great headlines, but this is about a man's life, not headlines.

As you consider sentencing Paul, I ask that you please think of his children. Paul didn't traffic children: he helped pregnant mothers put children who'd otherwise have grown up in rough conditions into homes with parents who love them and have the means to give them a better life than they'd otherwise have had. Is it fair to impose a harsh punishment onto Paul's children for that? Because that's the effect of imposing a harsh sentence on Paul: it's harsh punishment for his children. Punishing one set of children as restitution for improving the lives of dozens of children doesn't seem like a just outcome.

I hope that you will impose the minimum sentence in terms of jail time on Paul. I know he's not a risk to society back on the streets, and the minimum jail time would be justice served.

Sincerely,

November 13, 2020

The Honorable Timothy L. Brooks
United State District Court
Western District of Arkansas
35 East Mountain, Room 559
Fayetteville, AR 72701

Rebecca C. Russell
3535 East Covina Street
Mesa, Arizona 85213

Dear Judge Brooks,

I am sending this letter requesting leniency on behalf of Paul Peterson, who has plead guilty in your court and who will be sentenced on December 1, 2020.

I have watched Paul grow up from an early age and have interacted with him basically his whole life. He like all of us is not perfect, but like all of us he has grown and learned from his experiences. I have watched him with his family, I have watched him in business, and I have watched him run for office and serve the citizens of Maricopa County as their Assessor. I believe he has a good heart and a desire to do the right thing. I understand what he has done to be standing before you in court and I cannot tell you all the reasons for his actions. I understand adoptions can be particularly challenging for the birth parents. However, I have seen some of the families whose lives have been made better thru the adoptions Paul has been involved with and I know of the love that exist in these homes.

Paul has been a family friend and helped us over the years. During my father's final 6-week long illness, Paul stepped up and helped our family manage both personally and professionally during an incredibly challenging time.

I believe Paul regrets his actions and will not repeat them again. I believe he has learned from his legal challenges and will be a better man moving forward. I believe his family, especially his children will be better off if he is able to be there to assist as they grow up and mature. I ask you to be lenient in sentencing Paul and please recognize that the time he may have to serve in prison comes at a cost to not only him, but his family and loved ones. Thank you for taking the time to read my letter. I can be reached at 602-762-6950.

Sincerely,

*Rebecca C Russell*

Rebecca C. Russell

November 11, 2020

The Honorable Timothy L. Brooks
United State District Court
Western District of Arkansas
35 East Mountain, Room 559
Fayetteville, AR 72701

Dear Judge Brooks,

I am writing this letter on behalf of my good friend Paul Petersen. I have known Paul and his family for many years. My wife and I have been good friends with both Paul's and his wife's parents for a good many more years.

I have always supported Paul during his campaigns for public office. I believe he has been an outstanding County Assessor. Until the allegations surfaced regarding his adoption business, one would be hard pressed to find any complaints about his time serving as the Assessor. Usually when one is doing good things in public service, not much shows up for public scrutiny, and that is the way it was with Paul. One would hardly know he was County Assessor because of the great job he was doing.

There were several times when my business was having difficulty ironing out some mis-understandings with his office, so I would reach out to Paul and he would work with his staff to help us come to a reasonable resolution. Things did not always work out exactly the way I wanted, but at least I knew there was effort to try and see things from my perspective. It was nice to have an elected official that would give great customer service.

Because of the type of person I know Paul to be, I find it unbelievable that he would be involved in a dishonest scheme to de-fraud the government and take advantage of these pregnant mothers. It is just not who Paul is, and I firmly believe that he only had the best interests of these mothers and their future babies in trying to secure loving homes for these babies. I am sure I am not the only person who feels this strongly about Paul's character.

Paul has been a great husband and father. He has always been involved in the details of his children's lives. Camping trips. family vacations, all were a big part of the Petersen family. I know the excruciating pain these legal issues have caused the family. I would hope and pray for leniency and justice as you consider the sentence that you will impose on Paul.

May God bless you with infinite wisdom, understanding, and unconditional mercy as you deliberate this important matter. Thanks for your service to our country in your capacity as a judge.

Craig M. Ahlstrom

November 11, 2020

The Honorable Timothy L. Brooks
United State District Court
Western District of Arkansas
35 East Mountain, Room 559
Fayetteville, AR 72701

Re:     Paul Petersen
        Letter in Support of Paul Petersen

Dear Hon. Timothy Brooks,

The purpose of this letter is to provide a character reference for Paul Petersen, whom I have known as a friend and colleague for over 35 years. As you consider what sentence to impose on Paul, I ask you to take my experience and personal knowledge of Paul into consideration.

I first met Paul as a little kid who had moved into the neighborhood and did not know anyone. Paul went out of his way to befriend me and make me feel welcome to the neighborhood. Paul and I were in the same Boy Scout troop, church youth group, and youth sports. My friendship with Paul has lasted through elementary school, junior high, high school, and into our professional careers. Paul has always been a friend and a person for whom I have great admiration and respect.

As Paul was going through law school, we were roommates and I was contemplating applying for law school and becoming an attorney. Paul gave me encouragement and advice on how to approach the process. His advice helped me understand what I needed to do and gave me confidence to pursue my goal. I am now General Counsel at a company and I am licensed to practice law in three states. My life and the life of my family was truly blessed by my decision to become an attorney, and Paul's encouragement and advice played a part.

In my personal life, my wife and I experience infertility problems early in our marriage. We suffered through multiple miscarriages. As you can imagine, when you want to become parents and you think you cannot it creates a great deal of heartache and pain. We began to explore adoption as an option for us to achieve our dream of becoming parents. Paul was a strong advocate for adoption and gave invaluable insight into the benefits of adoption. Paul was able to explain how the lives of the birth mother, child, and adoptive parents were all blessed by adoption. You could tell it was a passion for him to bless the lives of people through adoption. We were in the process of becoming certified for adoption, when my wife became pregnant with our first daughter. We now have three children of our own, but we both strongly believe that adoption is a wonderful option for creating families. Part of that belief comes from seeing Paul's passion for adoption and seeing others benefit from adoption.

Paul is a good person. Since I've known him for decades, I truly believe his actions represent an aberration that he will never repeat. Paul is a great friend, conscientious citizen, and loving father to his children.

Thank you, Your Honor, for taking these thoughts into consideration as you deliberate on the appropriate sentence. I stand ready to offer further support to Paul.

Sincerely,

William W. Fife III, Esq.

November 11, 2020

To: The Honorable Timothy L. Brooks

My name is Scott Whitener and I am writing on behalf of my friend, Paul Petersen.   I have known Paul my entire life and count him as more a brother and family member than a friend.   Paul is a loving, caring and thoughtful individual, who has been there for me throughout my life.   We have known each other since we were toddlers and grew up attending the same schools, boy scout troops and church together.   As teenagers we achieved the rank of Eagle Scout and served as missionaries for our Church.   Afterwards we attended college together, both of us continued through graduate school, met our wives and have raised our families together. We know each others strengths and weaknesses and have a trust and love for one another that only comes from a lifetime of shared experiences.   Because of our background, I believe I provide a unique and in depth perspective into the character of Paul Petersen.

From a young age we were taught the importance of family and service to others.   As young boy scouts we learned the Scout Law and its principles became part of Paul's character: Trustworthy, Loyal, Helpful, Friendly, Courteous, Kind. Paul is all of these.   It was these traits and the desire to serve the Lord and others that led to Paul's decision to volunteer as a missionary for two years.   Paul did not receive any pay for this service, instead he payed his own way.   As a missionary, Paul learned to love and care for the Marshallese people.   He taught the people of the Love God has for them and the importance of family to happiness in this life.   Paul learned that he had much in common with the Marshallese who also believed in strong nuclear families.   At the same time, I recall Paul telling me of the struggles of many    young single mothers trying to raise children on their own, wishing their children could have more opportunities, away from the limited prospects on their islands.

Paul returned from his mission with a desire to continue to serve the Marshallese people he had come to love.   It was this desire and love of families that led Paul to begin facilitating adoptions for Marshallese children, to loving parents, here in the United States.   Nearly twenty-five years later, Paul has helped to fulfill the hopes of and dreams of hundreds of parents.   Birth moms are grateful for the love given their children and the subsequent opportunities for a better life here in the United States. Adoptive parents are happy and appreciative for the addition of these wonderful children in their lives. I personally know families who have worked with Paul and are eternally thankful for the blessings of family and love he helped them obtain through the process of adoption.

It is important to recognize, that despite the various charges and outlandish claims regarding Paul and his adoption practice, not one of these adoptions has been declared illegal.   None of these adopted children were taken away from their adoptive parents and returned to their birth moms. Why? The reason is obvious.   The adoptions were legal.   All parties were willing and acting of their own volition and accord.   No individuals were harmed by the actions of Paul Petersen.

Considering this, the injured parties in Paul's case become, the Federal Government and the State Governments of Arizona and Utah. Throughout this case the State of Arizona has put forth every effort to torment Paul and his family.   He was arrested at gunpoint, in front of his wife and children, on the side of the road while driving his family back from vacation.   His family's assets were seized, eliminating Paul's ability to defend himself, or care for his family.   The State of Arizona is fully aware that Paul's family had multiple sources of income, including his fourteen year career in the Maricopa County Assessor's office and his wife's personal business as a realtor.   Yet they made no distinction between the assets, extinguishing his families ability to pay their mortgage, or even put food on their table.   His family had to rely on the charity of others just to eat.   As a result of this stress and in an effort to provide for their children, his wife made the nearly incomprehensible decision to end their marriage.   This allowed their assets to be divided, so she could pay for her family's upkeep.   Paul's assets remained seized by the State of Arizona and he was unable to further defend himself.   Paul was told he was facing 15+ years in prison with the Arizona Attorney General threatening to enact escalation of sentencing laws, notwithsatnding Paul has never been convicted, or even charged with a crime until this time.

Confronted with this prospect and because of the love Paul has for his children and family, Paul made the difficult decision to plead guilty. He simply could not risk not being separated from them the remainder of their childhood.   As part of his guilty plea, Paul agreed to pay restitution to the States of Arizona and Utah.   With his guilty plea the State of Arizona released his assets.   As of this time, Paul has paid in full the monies required to the States of Arizona and Utah per his plea agreement.   Paul has closed his adoption practice and forfeited his Law License.   Further, these charges resulted in his forced resignation from his position as the Maricopa County Assessor.

Through Paul Petersen's efforts hundreds of loving and caring homes have been created. Sadly, his life and family have been torn apart.   Honorable Brooks, as you deliberate Paul's case, I ask that you find mercy on my friend and brother, Paul Petersen.   Observe the retribution that already has been meted, the suffering he and his family have gone through.   Consider his inability to repeat these offenses.   Is further incarceration, much less lengthy incarceration, necessary to punish, or reform Paul?   Is his case a widespread crime, that he needs to be made an example of to deter other offenders? I believe the answer to both of these questions is a resounding NO.   I respectfully ask that you please accept this letter in your deliberation of his case and find leniency in your judgements as you sentence him.


Thank you for your time and consideration,


Scott Whitener, DMD

November 11, 2020

Honorable Timothy L. Brooks
United States District Court
Western District of Arkansas
John Paul Hammerschmidt Federal Building
35 East Mountain, Room 559
Fayetteville, AR 72701

Dear Judge Brooks,

My name is David Sobieski, and I am the retired Director of the Maricopa County STAR Call Center. I served in this position during Paul Petersen's tenure in the County Assessor's Office which began in 2005. Knowing Paul as I do, I was flabbergasted to hear about his federal case. Paul was always a stickler for following the letter of the law, so this case is certainly out of character for him. Your Honor, I am thankful for this chance to submit a character reference letter in support of leniency for Paul.

My responsibility as Director was to provide all the telephone customer service for four elected officials of Maricopa County. I provided this service from 1996 until I retired in 2017. One of the Departments I served and worked closely with was the Maricopa County Assessor. During my time as Director, I met frequently with Paul Petersen. I worked with Paul first in his capacity as Public Information Officer, and second in his capacity at Maricopa County Assessor. In both positions, I would update Paul on the status of calls into his office.

As PIO, he was engaged in working with the public. He took all media calls, as well as difficult taxpayer calls from the STAR Call Center. I do not recall any time where he refused to take a call when asked. He made sure that, as front line to the public, my team had all the information that we needed. That level of support meant a lot to all of us at the STAR Call Center. In addition, Paul conducted himself in a gentlemanly manner at all times. He was friendly, straight-forward, professional, and never spoke coarsely.

As Assessor, he always made time for me, even if I stopped by unannounced. He wanted to know what his constituents were calling about, and how well his constituents were being served. As Director of his Customer Service, I profiled the calls to his office and sent Paul the details of each one. He looked forward to reading those, and often called to ask about a particular call that caught his attention. It was important to him to serve the public as well as possible.

Paul also understood the importance of our role at the STAR Call Center. If I asked him to stop by and meet all the agents, he would happily come over and thank everyone in person. Paul was very well-regarded by the employees, by the Board of Supervisors, and by the elected officials

who served with him. Plus, Paul graciously stepped up to be the emcee of my retirement party. His enthusiastic presence made the event more fun and meaningful to me after my long career.

On a personal level, it was obvious that Paul loved his family. I watched his family grow during his time at the Assessor's Office. It was clear to me that between all the photographs in his office, and how would smile when I asked about his wife and kids, that his family was the center of his world. If the circumstances were right, I would happily work with Paul again in the future. My experience with Paul was 100% positive. I am certain that he will find new ways to be of service to our country in the future.

Your Honor, please keep my letter in mind as you determine Paul's sentence.

Respectfully,

David Sobieski
P.O Box 878
Carefree, AZ 85377

November 10, 2020

The Honorable Timothy L. Brooks
United States District Court
Western District of Arkansas
35 East Mountain, Room 559
Fayetteville, AR 72701

Dear Honorable Judge Brooks,

I am writing today on behalf of Paul Petersen. Paul is one of the most genuine and sincere people I have ever known. He is man of exceptional character who is hardworking, loyal, and family oriented.

I have worked closely with Paul for over thirteen years (2006-2019) and found him to be principled with a strong sense of values, a concern for others, and a passion for public service. Paul became my trusted friend who would always lend an ear, and I could count on him to be there to share my troubles or my celebrations.

As Paul's assistant for six years, I recognized his commitment to his office and to the community. Paul's cheerful personality and people skills always enabled him to work through the most challenging and difficult situations successfully. His colleagues, staff, and friends would often come to him for professional or personal advice and he would always make time for them.

Paul is a great person, a wonderful friend, a phenomenal father, and an exceptional leader! I am truly grateful to have been able to work with him and call him my friend.

Sincerely,

Dawn Humphrey
3078 W. Abraham Lane
Phoenix, Arizona 85027

Andrew Victor
6249 E Rose Circle Drive
Scottsdale, AZ 85251

November 11, 2020

The Honorable Timothy L. Brooks
United State District Court
Western District of Arkansas
35 East Mountain, Room 559
Fayetteville, AR 72701

Dear Judge Brooks,

[This is a copy of the letter I sent to The Honorable Thomas Fink, La Paz County, Arizona
Superior Court]

I would like to submit this letter to you for two reasons: as a form of character witness for Paul
Petersen, and to express my opinion on what could come during his sentencing. I am not going to
speak on the merits of the case: he has plead guilty to the indictments against him. Having been
in a civil suit myself, I can understand the calculation one takes in the merits of surrendering (or
not) to a process or case because of the negative externalities it may cause to loved ones, assets,
and resources. What I would like to reflect on are three parties to this case: the State (which
represents my interests), Paul, and Paul's close family, especially his four children.

(Having re-read this letter, I must apologize for attempting the role of Polonius from Hamlet.
While I may advise that 'Brevity is the soul of wit', I must admit that my letter is a bit
lengthy. Regardless, I think it worth the read.)

What I have found to be true about Paul's character:
I met Paul through mutual acquaintances in December of 2019 not knowing anything about him,
his arrest, or his case. We were paired up in a round-robin doubles tennis match and connected
immediately. I found Paul to be competitive, supportive, gracious, and endearing - outside of his
backhand - all qualities one would want as a partner on the court. We spent time talking after,
and I felt like we were at the beginning of a lifelong friendship -- and I still do. We made plans to
have lunch a few days later.

At that lunch, Paul let me know what was going on in his life with his legal battles, his marriage,
etc. A couple things really stuck out for me that day when I reflected on that lunch to my
wife. First, Paul's emotional intelligence for being able to navigate what I can only imagine to be
the most trying period one could have in their life; and second, reflected by his sentiments
similar to mine about our developing friendship, his bravery in sharing with me the ugly
elements that were going on in his life.

Since that lunch, I have gotten to know Paul well, as well as his four wonderful children. He, without any doubt, is a thoughtful and caring father. I, myself, am a father of two boys (15 and 22), and I have watched Paul show brilliant patience with his children in the middle of sheer pandemonium. In the last 11 months, observing his relationships with his children, has been an absolute joy.

I think Paul is a good man and a good father.

The second party to this case:

The State: while I cannot represent the entirety of the state, I can speak to a part of that in that I am a citizen, taxpayer, and employer within this great state. For my two cents, I believe that a minimum sentence is just for both accounts in his plea agreement (in Arizona), in that the agreement itself indicates that "These are non-dangerous, non-repetitive offenses under the criminal code." What the State has done for me and justice: arranged a guilty plea for felonious activities conducted in my beloved state and successfully garnered a hefty monetary restitution to the state of Arizona. For that, I sincerely say well done: money saved in court cases; money retrieved for restitution for services that government agencies had provided to people involved (e.g. AHCCCS, the AG's office, etc.); and an efficient conviction.

He plead, he paid, and he WILL serve time. Paul has lost his licenses, his elected position, and his ability to earn income representing the law. For that, justice to me is a minimum sentence in prison. He is not violent. And Justice, for me, is the most important word as it leads to the third party to this case.

The third party to this case: Paul's close family (specifically his four children, Presley, Brock, Paige, and Pearl, ages 12 to 4).

I would like to pivot this thought around the function of time. Time that Paul will serve and how much time merits the word justice vs vengeance. I believe this to be important: I am not focusing the heart of my letter to reduce the amount of time Paul serves for Paul's sake; my focus on the time he serves is from the point of view of what these four children, after his time, will view what this state decides reflected from the mirror called Justice. So I look at what a sentence of 3 years means for Paul vs. that of anything longer (my understanding is that 3 years is the minimum sentence allowed in the State of Arizona to what Paul has plead).

If Paul serves 3 years in prison, what that *could* mean for those four children:
I am a father of a 15- and 22-year old, and I am not so naive to say that there will not be many milestones that Paul's children will miss with their father even if the sentence is only 3 years. Milestones that having a father's wisdom, guidance, oversight, even discipline would not help these children be shaped further down the impressive road they have traveled thus far. They are beautiful children, wise, humorous, endearing beyond their respective years. For them, missing a couple milestones in their lives is something that would potentially not misshape them (birthdays, first day of high school, a driving permit, a sports tournament or two or three, their first lost tooth, a couple Christmases). Being a father, I know that children are resilient – but I

also know that children grow up fast. Paul will miss that and missing 3 years of one of my children's lives would have been unbearable for me.

For me, it feels that 3 years in prison would be a punishment on Paul, with that weight of punishment born mostly by Paul, himself. Shared by his children, but a more exacting punishment on Paul himself. I also feel that the State has a *choice* as to the punishment it can serve... there are minimum sentences for a reason. The state should make that choice.

If the sentence is longer than 3 years, the punishment is more born by Paul's children. That is not justice.

Sincerely and respectfully,

Andrew Victor

The Honorable Timothy L. Brooks
United State District Court
Western District of Arkansas
35 East Mountain, Room 559
Fayetteville, AR 72701

I have had the opportunity to know and be friends with Paul Petersen since 1994. We met while serving as missionaries for The Church of Jesus Christ of Latter-Day Saints in the Marshall Islands. While serving in the Marshall Islands as young men, we had the opportunity to learn the language, understand their customs and culture, and mostly grow into productive members of society. Paul and I had an instant connection as we discussed our passion for sports and love of family and friends at home.

The culture of the Marshallese people has some distinct differences than we had experienced growing up. Specifically, the family unit is much less valued. Marshallese parents would often use the phrase, "I naj man yuk" (translation: I will beat you), when their children were misbehaving (beatings did occur frequently). Typically, an extended family unit would have one wage earner, while others spent their days sleeping and hanging out. Teenage girls were left without options when they were pregnant, as their boyfriends didn't want to be responsible for the child.

When Paul and I spoke about his desire to help Marshallese families with adoptions, it made perfect sense to me. The promise of a much better life in the United States with parents who love and value them, seemed extremely positive. I'm certain that Paul's intentions were motivated by care and concern.

In all the years I have known Paul, I have seen a consistent desire to help others. He gave two years of his life to serve and help others as a missionary. While in the Marshall Islands, he was known as the always happy and helpful tall guy. Each time we catch up, Paul listens intently and shows genuine concern for my family. He is a wonderful father, husband, and friend. I have never known Paul to be in any legal trouble, or to even break rules.

Paul is a dedicated public servant, loyal friend, and mostly a good man. I value our friendship immensely and pray that he has the opportunity to be a father to his young children without an extended absence.

Thank you for your time and consideration,

Jeron Stokes, PharmD

Lesley Kratz
5411 E Lewis Ave
Phoenix, AZ 85008
602-472-3580


The Honorable Timothy L. Brooks
United State District Court
Western Division of Arkansas
35 E Mountain, Room 559
Fayetteville, AR 72701


The Honorable Timothy L. Brooks,

My name is Lesley Kratz and I have worked for Maricopa County for 30 years in various capacities. I have known Paul Petersen since 2006 when he joined the Assessor's Office as the Public Information Officer. Needless to say, I was quite surprised when the legal issues about Paul came out in the media. I respect the system but wanted to write this letter to offer my perspective on the Paul Petersen I know.

Over the years I have developed both a personal and working relationship with Paul Petersen. As my co-worker and boss, he took the time to understand the business and promoted the office within the community. He was readily available and spent time providing his insights and experience on the office activities. Paul is a very smart person who was able to use his law degree and professional experience to provide effective opinions on many complex issues. He brought innovation to the office with his expanded focus on technology and helped provide the citizens a webpage used by many.

I have enjoyed working with Paul and watching his family with his four beautiful children grow over the past 14 years. He loves and adores his kids which always showed on his face whenever he was talking about them, which was often. Paul would bring the children to the office so I had an opportunity to watch them grow over the years and see firsthand the strong family bonds they shared.

Thank you for this opportunity and your time. I truly hope this letter will be taken into account regarding the character of Paul Petersen during sentencing. While I understand the seriousness of the charges, my sincere hope is this letter will help you to better understand Paul Petersen the person. Please reach out if any clarification on items is needed.


Sincerely,

Lesley Kratz

**Brittney Hartley**                                        1244 North World Cup Lane  Eagle, ID  83616

November 10, 2020

Honorable Timothy L. Brooks
United States District Court
Western District of Arkansas
John Paul Hammerschmidt Federal Building
35 East Mountain, Room 559
Fayetteville, AR 72701

Dear Judge Brooks,

My name is Brittney Hartley and I adopted my three children with the help of Paul Petersen.
Plus, my brother and two other friends also adopted through Paul. I can confidently report
that Paul is an honorable man who truly blessed my family. I never heard a negative word
spoken about Paul or the way he handled an adoption. So, I was stunned to learn about his
legal case. It was heartbreaking to read the news story which did not reflect the man I know.
I am eager to share my thoughts with this Honorable Court.

I first learned about Paul through the Facebook page of one of his adoptive mothers. She
chronicled her positive experience adopting a Marshallese child through Paul's practice. I
was particularly touched by the close relationship between the adoptive family and the birth
mother. It was clear that they shared a healthy, loving, open connection. This is what I
wanted for my own growing family.

I adopted three children from two Marshallese birth mothers in 2016 and 2018. Paul
managed the process in a humane, professional manner. We communicated openly with the
birth mothers using translators. We made sure that everyone understood the process in the
same way. The birth mothers spoke highly of Paul and expressed no concerns about him
whatsoever. I am still in touch with the birth mothers who continue to praise him.

My brother lives in Arizona, so he attended pool parties at Paul's house along with other
families from Paul's practice. Paul created a wonderful community of families and children
who shared a special bond. For a long time, I participated in a Facebook group with mothers
from this community. We were all grateful for Paul's work, especially his ability to forge
healthy relationships between our families and the birth mothers. His work created families.
I can't think of anything more important or more beautiful.

I owe my family to Paul Petersen. It is devastating to see him in such serious legal trouble.
He has done so much good for so many people. While I am aware that he pleaded guilty to
violating the law in this case, my feelings for him have not changed. I saw firsthand his
profound commitment to the Marshallese people. I know that Paul cared deeply for each
and every birth mother and child. I hope this Honorable Court will consider his

extraordinary record of good works and long career of public service. I urge this court to show mercy to Paul Petersen.

Sincerely,

Brittney Hartley



Jeffrey R. Victorian

1179 N Naples Dr

Chandler, AZ 85226


November 13, 2020


The Honorable Timothy L. Brooks

United State District Court

Western District of Arkansas

35 East Mountain, Room 559

Fayetteville, AR 72701



Dear Judge Brooks,

I am writing on behalf of my very good friend Paul Petersen.


I have known Paul for more than 30 years. We became close friends in 1990 as sophomores at Westwood High School in Mesa, AZ where we both took part in the Advanced Placement academic program. Paul and the Petersen family were always welcoming to our peer group, especially during those late-night study sessions preparing for the SAT.


Paul is loved and respected by those that know him well. Watching him grow as a man through his church service, law school graduation, starting a family, opening his practice, and his election to county office have been a tremendous source of personal pride.


Paul is a loving and caring man of faith but is also often quick to trust and believe in others. He has **never** in 30 years shown me to be manipulative or any intention to do harm to another person. In fact, Paul has spent much of his life in service to others.

Paul has explained to me the gravity of his decision making and his current circumstances. During our conversations he has consistently expressed his concern about being away from his family. Specifically, Paul finds purpose in being a great father to his four young children.

It is my sincere hope the court takes this letter into consideration at the time of sentencing. I know Paul to be an honorable individual, a valuable member of my community, a loving father, and a wonderful friend for 30 years.

Sincerely,

Jeffrey R. Victorian

11/13/2020

To: The Honorable Timothy L. Brooks
From: Jason Stephens, President of Arizona Soaring Inc.

Re: Paul Petersen

Dear Mr. Brooks,

I write to you today on behalf to my friend Paul Petersen as you consider his sentencing. I have known Paul for many years and have both a professional and personal relationship with him. I first came to know Paul when my brother Mark married Paul's older sister Aubree. He has always been welcoming and kind to myself, my wife Lisa and our young son Max.

My brothers and I own a small business, Arizona Soaring Inc., which is a glider flying school in Maricopa. It has been in our family since 1987 and we've grown it to be the largest of its kind anywhere in North America. We work hard and are proud of what we have accomplished. Paul Petersen has been our company lawyer for several years and has been able to help us through challenges both big and small, often steadfastly refusing to take payment. He knows what a constant struggle a business can be and is genuinely happy to help us any way he can.

The most valued service Paul has every provided our family is when our father Bruce passed away suddenly in 2007 in a flying accident in Alaska. Our father was the central figure in our family and life was difficult to navigate after his loss. Paul Petersen saw our need and helped us through the many and lengthy estate challenges we faced in addition to guiding us through the complexities of changing the ownership of our family business. His time and generosity enabled us to keep the family business going.

When considering Paul's sentence, please consider that Paul is a good and generous person that cares about others and that he is truly a benefit to our society. I hope for your understanding, leniency and mercy.

Sincerely,
Jason Stephens

Edward Ableser
615 Flanders Road
Reno, NV 89511

---

November 2, 2020

Honorable Timothy L. Brooks
United States District Court
Western District of Arkansas
John Paul Hammerschmidt Federal Building
35 East Mountain, Room 559
Fayetteville, AR 72701

Dear Judge Brooks,

Thank you for considering this character reference letter in support of Paul Petersen.

Paul and I met in 1997 through the Arizona State University student government. I was his Chief of Staff during his term as Executive Student Body Vice President. Paul led important campus conversations about cultural diversity and sensitivity. He was a champion for under-represented voices, creating a positive, inclusive environment for all students. Paul did a fantastic job helping student organizations make connections, recruit new members, plan events, and draw up responsible budgets.

Paul's talent for leading these campus conversations was, in part, developed during his Mormon mission to the Marshall Islands. Paul took great pride in his experience there. He spoke the Marshallese language and felt a familial bond with the Marshallese people. Paul talked about how he served poor families in both temporal and spiritual ways. I saw many ASU community members benefit from Paul's wisdom and sensitivity to the needs of others.

Paul and I formed a close friendship at ASU. With his encouragement, I joined the Mormon Church and got married there. I met Paul's amazing family who welcomed me like one of their own family members. My children have known Paul for their entire lives. They look up to him and know how much he loves them. Paul is one of the kindest men I have ever met; at his core, he is a genuinely loving, decent human being who dedicated his life to service.

Two years ago, my wife and I adopted a baby from China. Paul was not our adoption attorney, but he did give us helpful advice as our friend. My respect for Paul's work grew after going through the process myself. Paul provided safe, loving homes to so many children. In my daughter's case, she was abandoned as an infant on a subway platform. In Paul's practice, birth mothers were given good care so that each child had the best possible start to their life. He built real connections between the birth mothers and the adoptive families. Paul's adoption practice did not feel like work to him. It was a true

labor of love and devotion. Over and over again, Paul spoke about the profound gift of uniting a child with a loving family.

I have turned to Paul many times for his good guidance as both a professional and a best friend. When I experienced a career disruption, he talked me through my fears and helped me plan my next move. His emotional support and practical advice made all the difference for me. When I decided to get married, he was a godsend. Paul talked me through everything I needed to do in order to put my family on a solid foundation. Paul is a very intelligent, talented, accomplished person. I am absolutely certain that he will find success in whatever he decides to do at the end of this legal journey.

Your Honor, Paul explained how he violated the law in this case. I know that he entered a guilty plea. I wish that he had been more careful. I am particularly heartbroken by the negative media attention he received. As his friend and as an adoptive father, I know that Paul's heart is genuine and that he cared deeply for every mother and child. I hope this court will review Paul's entire record of service. Please show Paul mercy at sentencing.

Sincerely,

Edward Ableser

To the Honorable Timothy L Brooks,

I write to you today your honor as a farm boy in Idaho. The reason I bring this up, if I am not mistaken, it's something we have in common. If I am mistaken my purpose is still the same, to inform you of the kind of person I know Paul Petersen to be and what my relationship with him for over the past decade has taught me about him.

Paul and I couldn't be more different in where and how we were raised or who we were raised by. The reason I bring this up is that despite this we have a great relationship and I believe similar values.

The farm boy in me learned how to trust my gut early in life and that honesty and integrity are worth more than anything else a man has. That taking care of your neighbor and being your brothers keeper is really all that matters at the end of the day. Paul has been my keeper and I have witnessed his kindness and compassion towards others time and again. I trusted my gut when I met Paul that he would be a blessing in my life and a true confidant and he has. My gut tells me Paul Petersen is still a kind, compassionate person who thrives when he is helping others.

Living in Idaho 1500 miles away from Paul one could say we live a world a part in miles and landscape and every day livelihood. A common experience I have is meeting people who I know who have adopted a child who know Paul. They only know Paul because he facilitated their adoption. In our rural part of Idaho I personally know 4 couples who Paul helped place children in their home through adoption. Each of these couples love Paul and have high praise of his professionalism toward them and the birth mothers of their now adopted children. Some of them still have contact with the birth mothers. Our son recently played against one of the adoptive couples sons in a flag football game. I knew that they had adopted two children with the help of Paul but did not know the parents well. They also must have known Paul was a mutual friend and went out of their way to approach my wife and tell of their love and admiration toward Paul even as he has been made a monster by national media and in the adoption world altogether. I have numerous experiences like this I can relate.

Another couple has since adopted another child in your beloved state of Arkansas. They were in the process with Paul when he was arrested. That adoption was not completed and they were able to recently adopt through another agency. They express a more difficult process that was more taxing on everyone involved not to mention more financially cumbersome.

What I am getting at is that when there is a fire you follow the smoke. If Paul was the figurative fire it would make sense to follow the trail of smoke and that would lead to these eye witnesses. Life experience has been by far my greatest teacher and I don't claim to know more than the next person about adoption or all that is involved. I have seen the good from being associated with Paul. It would be ignorant to ignore that there is a lesser side to it as well. My eye witness account of Paul Petersen to you is that he is a man that loves what he was able to do for these children and families. He like us all has made mistakes and like myself is guilty of a lapse of judgment. I have been with Paul on multiple occasions since his arrest and the subsequent implosion of his personal life. What I can see is he is broken, not from what he has lost physically, financially, or professionally it goes far beyond that loss. The loss that shows on his face is the loss of trust of those he served and loved for so long. That includes his family, friends, adoptive families both biological and those seeking his help. Paul Petersen has faced his grim reality and the truth is he is living his worst nightmare but he still goes out of his way to help those he has contact with and that is what I have seen as I have followed the smoke.

I believe with all my heart that we are all more alike than we think. Hard to believe if you look around or watch the news nowadays. Life has taught me that if I could have lunch with someone I don't understand and hear the story from their mouth I find most outrageous claims are actually less outrageous, majority of opinions fade and facts are left. Paul Petersen is a kind, genuine person. He has done much more good in the lives of those he has associated with through his profession than bad.

If you had the opportunity to sit down and share lunch with Paul I think you would see a much more human person than the grim story tells. A much more compassionate person, and for sure a much more loving and kind person than the character of the projected story could be. Your gut would tell you. Thank you for your time and consideration.

Respectfully,

Kolby Simmons

The Honorable Timothy L. Brooks United State District Court Western District of Arkansas 35 East Mountain, Room 559 Fayetteville, AR 72701

November 15, 2020

Your Honor,

On behalf of Paul Petersen I am writing to you. There has been a grave injustice done in the conviction of Mr. Petersen. I am petitioning for leniency.

Mr. Petersen and I have been friends for the better part of 35 years. We have shared many memories in serving in our community and in serving others in our community. Out of all the acquaintances from my youth Paul is the only friend I have retained. By my estimation most people only ever have a handful of real friends in life, the kind of friend that you know you can count on and who won't let you down. Paul is this type of friend. He has always been there for me and my family. In fact I would say he has done more for my family than anyone else that comes to mind. Whether it was just to advise them or help them with legal issues pro bono. Paul has always been someone who was willing to listen to what was being said and is always the 1st to offer his help.

I have had the pleasure of both a personal and a business relationship with Paul. I would describe his character in relation to these aspects as one with integrity. I have never known an attorney to do work in trade, barter, or in good faith, always willing to work with his clients to help them personally and with their businesses. Regardless of the sentencing passed down Paul will still be my friend.

When the news broke of the allegations against Paul there was a clear bias against him, the facts were greatly misconstrued in the media. There were

many overzealous prosecutors who were eager to put their name on this case that they might further their political careers. They turned it into a spectacle raiding his home, seizing his properties, and making countless unfounded claims to the media to tarnish his image before their investigation was even done. And for what purpose? Paul had been reaching out to work with any of these agencies. Paul has been involved in many adoptions throughout his career. There are few who can claim that they have helped create so many families. In a day in age where people would rather murder an unborn child and claim it is their legal right to do so, it is sickening to me to see the conviction of a truly good person who has deticated his life to the saving of these children that they might be born and have a chance to live a fulfilling life, one with loving parents who have the ability to meet their earthly needs. Yet if Mr Petersen had committed such grievous crimes where are his accusers? I am certain if all the families that adopted children through Paul were interviewed the vast majority of them would confess to a wonderful and joyous experience.

It is my firm belief that an extended sentence for Paul Petersen would serve only to destroy his family and is nothing more than an attempt to keep a father from being involved in the lives of his four children and that would be a tragedy.

Sincerely,

David Philbrick

The Honorable Timothy L. Brooks
United State District Court
Western District of Arkansas
35 East Mountain, Room 559
Fayetteville, AR 72701

Honorable Judge Brooks:

Paul Petersen hired me for a government relations position in January of 2014. Paul took a
chance on me, a recent graduate, after I had spent the prior six months applying to over a
hundred jobs, with no success. Paul did not have to give me a chance, but he gave a young
man like me the chance to start a meaningful career in local government.

I worked for Paul for approximately three years as his direct report, while he served as the
Maricopa County Assessor. In my time working for Paul, he was the consummate professional.
In his interactions with career staff he was always civil, professional, polite, and ran the
organization in a business like manner.

As the elected official working with the management team of the office, he was also a
professional. He worked evenhandedly with career staff and the management team. He
delegated authority to appropriate decision makers, and I never witnessed him apply any undue
influence on appraisal decisions. He was there during times of stress and struggle, in addition
he created a culture of celebration around office achievements and milestones.

Paul became a mentor to me over the course of my employment, and he taught me many
valuable lessons. In my time working for him at the Assessor's Office, I never witnessed Paul do
anything unethical, improper, or even overtly partisan. His leadership and management of the
Assessor's Office was not the scandal it has been made out to be.

His decision to hire me and the example he set for me as a professional has had a direct impact
on my life, and my career. I ask you to consider leniency for Paul, as Paul once considered, and
gave a life-changing chance to a young person like myself.

Respectfully,

Michael Combrink

# THE PIZORNO LAW FIRM, PLC

November 7, 2020

Honorable Timothy L. Brooks
United States District Court
Western District of Arkansas
John Paul Hammerschmidt Federal Building
35 East Mountain, Room 559
Fayetteville, AR 72701

Dear Judge Brooks,

Please accept this character reference letter in support of leniency for my friend, Paul Petersen.

I first met Paul in 2000, while I served as Chief of Staff for a member of the Maricopa County Board of Supervisors. Paul was an office intern and law student with another member of the board, and after just a few interactions, we discovered we had a lot in common and struck up a friendship. Shortly after meeting, I enrolled at the Arizona State University College of Law, where Paul was a third-year student. In addition to our desire to pursue careers in the law, we shared many other things, like our faith and politics. It was through Paul's encouragement that I sought a seat on the student government, where he was also serving as graduate student vice president. Our friendship continued from there.

Years later, my wife and I adopted my biological nephew. We were lucky that Paul handled the legal process for us. He did an excellent job helping us through this complicated situation. As a result of this adoption and the need to change the law in the State of Arizona in order to finalize it, Paul and I pursued legislative changes that has directly led to countless adoptions in Arizona to occur that otherwise would not have been possible. Thanks to Paul's hard work and determination, it is now much easier for people like me to adopt their own family members, and to further Paul's predominant desire of helping create forever families.

After the 2008 financial crisis, I started my own bankruptcy law practice. I frequently collaborated with Paul who provided legal services on the back end of Chapter 13 filings. Paul's work was outstanding. It was by-the-book, prompt, and professional in every case. Later, I worked for him in multiple capacities when he served as County Assessor. When he put me in charge of property tax exemptions division, I observed Paul fulfill his duties with precision and fairness. Paul never bowed to political pressure of any kind. When I made a mistake, Paul wrote me up and reprimanded me like anyone else. There were no games and no favoritism.

Paul often spoke about his Mormon Mission to the Marshall Islands. I know that he loved his experience and felt a deep connection with the Marshallese people. Paul dedicated years of his life to creating new families through legal adoption. It was both his profession and part of his spiritual journey. Paul loved his work and had a gift for handling the profound emotions of all parties involved. I know for certain that Paul cared deeply for the birth mothers and would never had knowingly caused harm.

Years ago, I endured moments of marital strife when I turned to Paul for support. Once, I let him know that I'd contemplated suicide. Paul was therefore me, shared his own struggles in life, in a way that showed not only did he hear me, but knew personally what I was going through. He listened patiently and helped me sort out my strong negative feelings. In my darkest hour, Paul was there for me and saved my life.

Your Honor, I know that Paul pleaded guilty to a federal crime. He is taking this case very seriously and has spoken at length about what he should have done differently. I can report that there is not a malicious bone in Paul's body. He is a wonderful father and friend who I will stand by in the future no matter what happens next. I hope this Honorable Court will keep my words in mind and hand down a lenient sentence to Paul Petersen.

Sincerely,

THE PIZORNO LAW FIRM, PLC

By

Robert N. Pizorno, Esq

# EXHIBIT D



**WOOD**
BUILDING & DEVELOPMENT

November 13, 2020

The Honorable Timothy L. Brooks
United State District Court
Western District of Arkansas
35 East Mountain, Room 559
Fayetteville, AR 72701

Dear Judge Brooks,

I am writing this letter on behalf of Paul Petersen. Paul is my ex son in law. I am writing because my relationship with him is unique in many ways and it is important that you are aware of it to better assess his situation as you prepare for his sentencing.

I met Paul when he was a Jr. at ASU. My daughter, Raquel, was a freshman there and they began dating part way through their second semester. It didn't work out for them to marry at that time. They both graduated, Paul went to law school, Raquel pursued her career and then they started dating again six years later when shortly thereafter they decided to wed.

As a member of our family for almost 15 years, Paul endeared himself to each of my other five children and their spouses. He was always the favorite uncle to my 24 grandchildren and he likewise developed close bonds with each of member of my family and extended family. He was a bridge builder and we have mourned the loss of him in that role greatly.

What is unique about my relationship with Paul is that he leased office space from me in the building which I owned and out of which my business operated. He was a model tenant always paying his rent ahead of time and working well with my employees. Each of us considered him a friend. He went out of his way to help others with legal issues and/or issues with the county through his assessor's office.

I often witnessed Paul meeting in our conference room with adoptive families and birth mothers. By my observation, his office was run in an organized and thoughtful manner. Clients and birth mothers were treated with upmost respect. I noted the many elated adoptive parents who came and went over the years that

we officed together. I witnessed many joyous meetings as he put families and children together.

Paul often spoke to me about his practice and was always contentious about the law and his need to work within it. I was shocked when he was arrested. The accusations against him were framed completely opposite of what I had witnessed taking place for years. It was devastating as the attorneys general in both Utah and Arizona and federal law enforcement out of Arkansas put together a narrative that destroyed his law practice, his reputation and his family life. If that wasn't enough, they took away his ability to defend himself through civil forfeiture acts that were oppressive and unfair.

As I watched he and my daughter suffer through the obstacles put in the way of mounting a defense through the multiple charges, the horrendous media onslaught leveled against him along with the aforementioned civil forfeiture action committed against him, both my wife and I were deeply saddened. The result of these events were the dissolution of a beautiful family and the destruction of a way of life.

As you approach the grave responsibility of handing down a fair sentence, I would plead that you take into account the honest and forthright way in which dealt with those around him not the least of which was me. Please consider the wonderful families that were formed due to his bringing together married couples and birth mothers who viewed the welfare of each child as sacred.

I would ask that you be lenient with him as you consider his role as a father to my grandchildren. This is a role which he has excelled at. He spends valuable time with them and is a loving and nurturing parent. They need their father with them during these formative years of their lives.

I am grateful to you for the time you have taken to read and contemplate my words and pray that you will be guided to make a just and fair decision concerning the future of this beloved father, son and friend.

Sincerely,

Walt Wood
Owner - Wood Building and Development

November 11, 2020

The Honorable Timothy L. Brooks
United State District Court
Western District of Arkansas
35 East Mountain, Room 559
Fayetteville, AR 72701

Re: Paul David Petersen

Dear Judge Brooks,

My name is Ann Burns and I am a retired Chief Operating Officer at Arizona Federal Credit Union. I am writing on behalf of my nephew, Paul Petersen to request mercy and leniency in the sentencing related to his case.

My association with Paul has been lifelong. He and I have always had a close relationship. Not only do we see each other frequently at family gatherings, but I have also had the pleasure to participate in events pertaining to Paul's childhood, his graduations as well as his political and legal professions. Each time I have interacted with Paul at any of these personal and professional events, I observe his genuine care and concern for others. Paul truly has a heart for those he serves or represents.

I regularly observe Paul in his role as a husband, father, and family member. His dedication and devotion to his children is evident. The impact of a long-term absence from his children as well as parents, brother and sisters, nephews and nieces and other family members will have devastating and long-lasting effects. You know and understand the importance of a father participating in the daily life and activities of his children and family members. He faithfully takes his children to church, supports their education, and consistently serves his community. He is committed and regularly present at his four children's and other family events. Family is Paul's priority. Therefore, I am pleading for the minimal possible sentence you can impose so his family and others can benefit from his future contributions and service.

As an Adoption Attorney, he worked diligently to represent and assist mothers placing beautiful children for adoption given to a family who desperately wants to love and care for them. Paul's passion, knowledge and expertise related to this work is where I saw and heard how much every individual taking part in the adoption process meant to him. Not all adoptions were routine or alike to Paul. He readily supported and adapted to the needs of the individual mother, child, and perspective parents. He genuinely cared and loved those he represented during the adoption process. The measure of success in his work can be found in children joining loving and happy families who regularly express their thanks and gratitude to Paul.

In closing, I want to express my admiration for Paul. I have always been proud to be his Aunt and I have personally benefited from his association and service to me and my family during both good and challenging times.

Respectfully,

Ann Burns

Ann Burns
Gilbert, AZ

11/13/2020

The Honorable Timothy L. Brooks
United State District Court
Western District of Arkansas
35 East Mountain, Room 559
Fayetteville, AR 72701

  First and foremost, thank you for your time in reading my letter. I met Paul when I was eight years old, when he first starting dating my sister. He immediately took the role as my big brother, he looked out for me, was so kind, and always included me. From that point on I felt like I have had a special connection with Paul. When he was about to propose to my sister she broke up with him. She came to get me from my friend's house to break the news that they would not be getting married. I collapsed on the grass walking home. I was so heart broken. My family still teases me. Looking back, I still don't quite understand the dramatics on my end, but I knew that they were meant for each other. He was supposed to be my brother. Time went on, and Paul would always come into the picture and the feeling was always the same. Finally, the timing was right and he officially became my brother, and all was right in the world. Since then, I have been nothing but proud to call him my brother. While legally he is no longer my brother n law through the turmoil and pain this last year has been, he will always be my brother in my heart. I have the opportunity to live in southeastern Idaho. My husband is a farmer and we live in a rural community. I work as a registered nurse in "town." I have ran into many families who have adopted babies through Paul. Some of the proudest moments have been making the connection that Paul is my brother n law. Without fail, when the mothers hear of my relation they become emotional. They always express their immense gratitude for Paul and his role in helping them create their forever family. To this day, I have not heard one negative thing about Paul from any of these families who I run into. It is the same story, "We love Paul," "He was nothing but good to us," "We still keep in touch with our birth mother." This last year they have been so confused when they talk to me. I always leave the conversation feeling such mixed emotions. I am so very happy for these families. I am so very happy for the love that has been brought into the lives of the parents and children, it truly is a beautiful thing to witness. On the other hand, I also feel very confused. Who are the victims here? I will admit I see things simply as they are in front of me, and it does not add up. I would consider myself a good judge of character. I am a Christian woman, I am raising four beautiful small children with a good, hard working husband. Paul is one of those people that came into my life, and changed it for the better. That is who he is. He has changed people's lives for the better, and I one hundred percent believe that with every fiber of my being. When the news broke of him being arrested, I felt like that eight year old girl again who collapsed on the grass. I plead with you today to get a glimpse of the man I know. The man I know to be good. A man who would do anything and give anything to anyone. He can sit and talk to anyone and make them feel like the most important person in the room. He truly cares about people and knowing their story. He is loyal and a friend to all who know him. Paul has made this world a better place, I promise you that. Again, I thank you for your time in reading my letter. I hope it has helped you in understanding a little better who Paul is, and what he means to me.

Sincerely, Lexis Simmons

United State District Court
Western District of Arkansas
35 East Mountain, Room 559
Fayetteville, AR 72701

November 13, 2020

To The Honorable Timothy L. Brooks,

I am writing in regards to my cousin, Paul Petersen. Paul is one of my oldest cousins and I have always looked up to him as a role model and example.

I distinctly remember the day he returned home from his mission from the Marshall Islands for The Church of Jesus Christ of Latter-day Saints. This was pre-9/11 and we were able to go all the way back to the gate to greet him after his two-year absence. I distinctly remember how happy he was as he was walking towards us and how loved he was by everyone there that he was finally home.

Paul took his experience serving in the Marshall Islands and realized there was a great need to continue serving the people there. The large majority of the population is Catholic, who have very large families due to not using birth control (as part of their religious beliefs). However, due to the poor economic nature of the country, there comes a time when the families are unable to provide for additional children and the mothers make the difficult and courageous decision to put their children up for adoption.

This is where Paul was able to serve the people by providing adoption services between these Marshallese women and American families, who are desperately wanting to have a child. Paul was well-known in the Marshall Islands because he took great care of the women during their pregnancies. This is why many women sought him out and shared the word about Paul to their friends in similar situations, instead of going to the other government-run agencies, which did not provide the same high level of care and treatment. These women only wanted the best for their children and time and time again they made that choice by choosing Paul. I personally know one of these American families who adopted their son through Paul and the boy is exuberant, thriving, and living in the most joy-filled home.

Paul is a family man, who dedicated his career to helping families. He loves his family and his only desire is to be with them; not through bars on the other side of a prison cell, but by their side, holding their hands as they learn and grow. He is a true asset to our community and his leadership is still needed here. As Paul is being sentenced, I ask that you have mercy and leniency in your sentencing.

Sincerely,

Morgan Stradling

Morgan Stradling
Cousin, Paul Petersen
2851 E. Temple Ct.
Gilbert, AZ 85296
(480) 415-2633

To whom it may concern,

I am writing this letter to attest to the good character of Paul Petersen. Paul is my first cousin. I have always known Paul to be a kind and caring person with a genuine concern for others. Over the last fifteen years, my interactions with Paul have been limited so I cannot attest to many specific examples that depict his character. However, I do have friends who have worked with Paul to facilitate adoptions and I have heard their first-hand experiences. I have also had the opportunity recently to hear Paul speak about his ongoing legal challenges and to observe his demeanor and obvious display of compassion for others.

Shortly after Paul's arrest, I was visiting with a friend of mine who I have observed to be an upstanding member of the community who gives of his time to serve in youth organizations and other charitable causes. I trust his word with certainty. He asked me if I was related to Paul. When I told him that I was, he related to me that all four of his children were adopted through Paul's business. Some of the children were adopted from the same birth mother, years apart. When he told me about his experiences with Paul, he described him as a true friend who had brought so much joy to his life through facilitating the adoptions. He related that Paul had encouraged and facilitated their family keeping in contact with the birth mothers of their children. This was in stark contrast to allegations I had heard of mistreatment towards the women who Paul had helped place babies for adoption. The description my friend gave of Paul being helpful, generous and a true friend, is consistent with the Paul Petersen I know.

In my recent interactions with Paul, I have heard him describe the hardships he and his family are facing. I have also heard him talk about former employees (not by name) and the fact that some of them have given testimony that could prove harmful to him. While Paul certainly finds this hurtful and feels there may have been pressure for these individuals to say certain things, he displayed a genuine empathy and compassion for these people. I was touched by the fact that although some of these people had said things that have made his life harder and that he feels are genuinely false, Paul did not once express any anger towards them. Instead, I feel he has considered their situations and how he would have felt in their position. And he has chosen to be merciful and forgiving towards them.

It is my hope and plea that Paul will be shown the same mercy he has freely given to others. I truly believe that whatever is decided in court, Paul's intentions have always been noble and good. I believe that the most important role Paul can play in this life is as a father to his children. I know that he

has the character and ability to be a wonderful influence in their lives. I hope and pray that his sentence will be as merciful as the law permits so that he can be with his family as soon as possible.


Thank you for your consideration,

Dr. Aric Petersen

2755 S Jeffry St

Gilbert, AZ 85295