IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 5:19-CR-50079-001 |
| | ) | |
| | ) | |
| PAUL PETERSEN | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

Comes now the United States of America, by and through David Clay Fowlkes, First Assistant United States Attorney for the Western District of Arkansas, and for its Sentencing Memorandum states and alleges the following:

### BACKGROUND

The defendant, Paul Petersen, is facing sentencing after a guilty plea was entered to Count One of the Superseding Indictment charging him with Conspiracy to Smuggle Illegal Aliens for Commercial Advantage and Private Financial Gain. Sentencing in this matter is presently scheduled for December 1, 2020.

The Final Presentence Investigation Report (hereinafter referred to as "PSR") calculated a total offense level of 23 for the charged conduct. (PSR ¶ 87) Combined with the defendant's criminal history score of I, the guideline imprisonment range for that offense is 46 to 57 months. (PSR ¶ 122). As a part of the guidelines calculation, the PSR assessed the defendant a two-level increase pursuant to U.S.S.G. § 2L1.1(b)(8)(A) because the offense involved an alien who was involuntarily detained through coercion or threat, or in connection with a demand for payment, after the alien was smuggled into the United States. (PSR ¶ 78). The defendant raised a sole objection to this enhancement although he did not object to the facts contained in the PSR. (PSR

Addendum). The United States asserts that the Presentence Report properly applies the "involuntary detention" enhancement and respectfully requests that the Court deny the defendant's sole objection to the PSR.

At sentencing, in support (if necessary) of the guideline determinative objection and to introduce other relevant testimony regarding the facts and circumstances in this case, the Government anticipates calling one witness, an Agent from the United States Department of State. Said testimony should last less than 30 minutes.

As noted in more detail below, this is a case involving several different acts of criminal conduct, including making false statements to Arkansas State Circuit Court Judges, manipulating vulnerable foreign citizens, and taking advantage of hopeless, distressed people looking to become adoptive parents. As such, the Government asserts that an upward variance from the sentencing guidelines range to a sentence of 120 months in prison is necessary in this case.

## INTRODUCTION

The defendant is a formerly licensed attorney who practiced law in Arizona, Utah, and Arkansas. As outlined in detail in the Superseding Indictment (Doc. 14), the Plea Agreement (Doc. 53), and the Final Presentence Report (Doc. 68), the defendant ran an illegal adoption business for many years. During the course of this illegal adoption business, the defendant targeted pregnant Marshallese women living in the Republic of the Marshall Islands (hereinafter, the RMI). The defendant then exploited and violated the Compact of Free Association, a treaty between the United States and the RMI, and illegally smuggled, transported, and harbored pregnant Marshallese women until their babies were born and he finalized the adoptions he arranged. The defendant induced many Marshallese women to participate in his illegal adoption business. He did so by promising them large sums of United States Currency in exchange for their travel to the

United States and their consent to the adoptions. On the other side of the adoption business, the defendant took advantage of desperate people looking to become adoptive parents by promising them quick adoptions of Marshallese children. These adoptions were attractive to many unwitting people because of how quickly the defendant could arrange them in contrast to the years it typically takes to finalize an international adoption. The defendant maintained his scheme by informing the unwitting adoptive parents that the adoptions were legal. They trusted him because he was a licensed attorney. The defendant also charged the adoptive parents large sums of United States Currency. Essentially, the defendant circumvented the international adoption procedures and directly profited from nearly the entire adoption fee which was finalized at the state level. This is drastically different from the "pro bono" fashion used by many licensed attorneys in Arkansas to work on local adoptions. The adoption business was by far the largest part of the defendant's law practice. To be clear, the adoption business was a money-making practice for the defendant. As the Court can see from the Final Presentence Report, the defendant used these illegal adoptions to support a lavish lifestyle. This lifestyle included luxuries such as multiple residences, lavish expensive trips to New York and California, expensive luxury cars, and a large residence in an exclusive gated community in Arizona.

The defendant arranged for the adoptions to be approved in Arkansas State Circuit Courts by convincing the Marshallese birth mothers to tell the Circuit Court Judges exactly what was necessary to comply with the Arkansas State Adoption Statutes, whether the information was true or not (in most cases, the information provided by the defendant was not true). This false information included the defendant instructing the Marshallese birth mothers to tell the Judges that they were either not married to the father of the baby, (PSR ¶ 70(2)), or that the father of the baby did not want anything to do with the child. (PSR ¶ 38). In most cases, the birth mothers knew the

father and were, in fact, married to the father of the baby. The false information included the defendant instructing the birth mothers to lie to the judges about how long they had resided in Arkansas. (PSR ¶ 38). As noted in the Superseding Indictment, Plea Agreement, and Final Presentence Report, the birth mothers were often in Arkansas for just a few weeks prior to the birth and adoption. This length of time is a startling contrast from the one-year residency many Marshallese birth mothers asserted in Arkansas Courts at the defendant's insistence.

I. **THE ENHANCEMENT FOR "INVOLUNTARY DETENTION" IS PROPER**

According to U.S.S.G. § 2L1.1(b)(8)(A), a two level enhancement is added "If an alien was involuntarily detained through coercion or threat, or in connection with a demand for payment, (i) after the alien was smuggled into the United States; or (ii) while the alien was transported or harbored in the United States." The defendant has lodged an objection to this enhancement, stating, "The defense contends first that the activities committed by the defendant's employee, Lynwood Jennet, purported to be coercion of the aliens in the instant offense, do not rise to that level." The government contends that Jennet's actions do rise to the level of coercion. Additionally, the government also contends that the defendant's own conduct also rises to the level of coercion of the illegal aliens that are the subject of this case.

First, the uncontested offense conduct section in the PSR provides that Jennet reported to interviewing agents that she kept the passports of the women transported to the United States so that the pregnant women would "stay where they were." (PSR ¶¶ 63, 68). Although Marshallese citizens are not required to apply for a Visa to enter the United States, they are required to have a valid Passport to enter and exit the United States. Therefore, controlling a Marshallese citizen's Passport is the same as controlling that Marshallese citizen. Jennet illegally kept the birth mother's passports in an effort to control them and coerce them into staying in the United States and

consenting to the adoptions arranged by the defendant. This conduct clearly supports the two-level enhancement applied in this case.

In addition, the presentence report also properly attributed this conduct to the defendant. The defendant controlled every aspect of the adoption business. He paid for the passports for many of the Marshallese birth mothers. He offered to pay and did pay large sums of United States Currency to the Marshallese birth mothers. He also paid Jennet large sums of United States Currency. While he did perform some local adoptions, the criminal charges stems from the illegal adoptions from which he and his co-conspirators found expectant mothers within RMI and brought them here to give birth in the United States. He worked with Jennet, his co-conspirator Maki Takehisa, and others to recruit Marshallese birth mothers and convince them to travel to the United States and participate in his illegal adoption business. The defendant also paid for many of the places that the Marshallese birth mothers were "stashed" until the babies were born and the adoptions completed. In light of all of this conduct, the defendant is also clearly responsible for the coercion and involuntary detention of the Marshallese birth mothers.

The enhancement does not include a requirement that the illegal aliens smuggled and harbored be held in chains or under lock and key. Instead, the enhancement contemplates that there are other kinds of involuntary detention and coercion. The involuntary detention in this case involved circumstances that are as unique as this case itself. The Marshallese women in this case were brought 6,000 miles from their home islands, virtually halfway around the world, and brought to an unfamiliar country. An unfamiliar country that spoke a language they did not share the ability to speak. An unfamiliar country that was drastically different from their home islands in almost every way. When they arrived, they were, in many cases, placed in small houses with a number of other pregnant Marshallese women. The people who brought them to the United States seized

their passports. The people who brought them to the United States threatened to call the police and prosecute them if they attempted to back out of the adoption proceedings. These circumstances prevented their escape as securely as if they were chained to a wall. Where could a pregnant Marshallese woman go to under such circumstances? They had no money. They did not speak English. They had no Passports. They could not leave to go home even if they wanted to, just as the defendant intended. In fact, the only way home for the women in this case was to comply with the co-conspirators' demand that they go through with the adoptions. In this way, they would receive at least enough of a payment to return home. This is coercion and unlawful detention according to the United States Sentencing Guidelines.

The Court of Appeals for the Eighth Circuit has not ruled directly on this issue. There are also very few cases from other Courts that may provide some insight into this enhancement[1]. In *U.S. v. Reyes*, 772 F.3d 1152 (9th Cir. 2014), the Court of Appeals for the Ninth Circuit ruled that the District Court properly applied the enhancement under U.S.S.G. § 2L1.1(b)(8)(A) according to the facts of that case. In *Reyes*, the Ninth Circuit was faced with a case in which a group of defendants was involved in the smuggling of illegal aliens. In noting that the District Court properly applied the enhancement, the Court stated, "The investigation into this smuggling organization began after two women threw a note out of a barred window claiming they were being held captive. It is undisputed that the Compton stash house had bars on the windows, guards on watch, locks on the doors, an aggressive pitbull, and an unloaded rifle in plain sight." *Id.* at 1160. The Court also noted that other courts have recognized similar conditions as being coercive and threatening. Specifically, in *Reyes*, the Court noted:

---

[1] It should be noted that the undersigned Assistant United States Attorney was able to locate only 6 cases that cite directly to U.S.S.G. § 2L1.1(b)(8)(A). Many of those cases involve drastically different circumstances from the instant case and/or are unreported decisions.

6

As our sister circuits have recognized, these are coercive and threatening conditions. See, e.g., *United States v. Alapizco–Valenzuela*, 546 F.3d 1208, 1217–19 (10th Cir.2008) (involuntary detention enhancement properly applied where aliens forced at gunpoint to give up their personal belongings and phone family members and friends for additional money to pay the smugglers, had to remain hidden in the stash houses without food or drink, were not free to leave, and feared for their lives and physical safety); *United States v. DeLeon*, 484 Fed.Appx. 920, 934 (5th Cir.2012) (per curiam) (exits of stash house were boarded up and/or padlocked from the outside to prevent escape); *United States v. Gonzalez–Mendoza*, 401 Fed.Appx. 997, 998 (5th Cir.2010) (per curiam) (aliens detained in stash houses under armed guard, smugglers demanded additional payments, and firearms located in stash houses). *Id.*

However, the United States submits that *Reyes*, nor the cases cited in *Reyes*, nor the sentencing enhancement itself, nor the notes explaining the enhancement *require* the factors noted in *Reyes*. There is no requirement under the sentencing enhancement for bars to be present on doors, or for armed guards to be present. As noted above, the absence of *any* such listed factors in the text of the enhancement shows that the enhancement contemplates other ways in which a defendant may unlawfully detain illegal aliens through coercion. It is true that there were no barred windows, armed guards, or guard dogs present in this case. However, it also true that the defendant did not need those things to coerce the pregnant Marshallese women in this case to not only stay where he and his co-conspirators directed them to, but also to go forward with the adoptions. The defendant did not need armed guards because he coerced the women with something even more powerful: money and circumstances. The Marshallese women in this case had no choice but to remain in the United States and go through with the adoptions because they had no other pathways to get the large sums of money necessary to return to their home islands.

The defendant's scheme to limit the choices and freedoms of the Marshallese women is reflected very clearly in the interviews conducted by agents from the United States Department of State. The Presentence Report contains portions of some of these interviews. The interviews reflect that all four of the women whose initials appear in the Superseding Indictment, A.T., R.J.,

7

R.M.J., and D.J. had doubts about going through with the adoptions. All of them went through with the adoptions because the defendant and his co-conspirators' actions did not allow them the freedom to go home or choose not to go forward with the adoptions. For instance, the Presentence Report states, "D.J. further stated that while in Arkansas, she told Takehisa that she was having doubts as to the adoption, but Takehisa informed her that she had already given D.J. payments for the adoption, and as such, she could no longer change her mind." (PSR ¶ 40). Further, the Presentence Report also states, "When A.T. expressed doubts about the adoption, Jennet informed A.T. that she would have to pay back the money to Jennet, if she backed out of the adoption." (PSR ¶ 34) Finally, the Presentence Report also includes information from another person, Lisa Ebort, who was also a Marshallese birth mother who worked with the defendant. The Presentence Report states, "According to Ebort, Takehisa told them that because they broke the contract, the women would be arrested by the police, and that the police would kick open the door to the residence and arrest them." (PSR ¶ 42) All of these statements relate the tactics used by the defendant and his co-conspirators to coerce the Marshallese birth mothers into not only staying in the United States, but also into going forward with the adoptions, even though they had doubts.

Furthermore, not only do the facts in this case support the use of coercion, the facts support a finding that the coercive tactics of the co-conspirators was reasonably foreseeable to the defendant and in furtherance of the conspiracy. The facts here suggest that the defendant was in control of every individual working for him. He controlled all the money and gave money to the adoption facilitators in increments as they performed their roles in recruiting, housing and getting the RMI mothers to finalize the adoptions. In fact, the defendant was assessed an uncontested enhancement for leading the criminal activity. (PSR ¶ 81). For example, in a message between the defendant an individual regarding adoption referral fees, the defendant stated, "And if you want to

8

work with me you need to understand that I am ultimately in charge and make final decisions on these cases. All you girls work for me, not the other way around." (PSR ¶ 54a). Clearly, Jennet, Takehisa, and all the other adoption coordinators in this case acted under the defendant's direction and their coercive tactics were known to the defendant.

Therefore, for the reasons detailed above, the United States submits that the two-level enhancement for the "involuntary detention" used in the execution of the offense in this case in properly applied.

## II. APPLICATION OF THE 3553(a) FACTORS

### A. NATURE AND CIRCUMSTANCES OF OFFENSE

The defendant first came to the attention of the FBI in this case when an Arkansas State Circuit Court Judge reported to the FBI that he believed the defendant was operating an illegal adoption business in Washington County, Arkansas. Through the course of the lengthy investigation conducted by several federal law enforcement agencies, the agents discovered a sweeping, multi-state, complex scheme to smuggle illegal aliens, to defraud Arkansas State Court Judges, to defraud state medicare programs, and to take advantage of desperate people on both sides of the illegal adoptions. There are several important reasons why the nature and circumstances of the offense in this case demands an upward variance to a sentence of 120 months in prison. These reasons include the defendant's fraud perpetrated on Arkansas State Circuit Court Judges, the defendant's manipulation and fraud in dealing with adoptive parents, and the defendant's manipulation and fraud in dealing with the Marshallese birth mothers.

The first of these reasons is the fact that the defendant defrauded state court judges during the execution of this crime. Although the defendant entered a plea of guilty to one count of conspiracy to smuggle illegal aliens, the Court may also consider the facts of the remaining charges

on the Superseding Indictment in fashioning an appropriate sentence. Some of the remaining counts on the Superseding Indictment include counts of wire fraud and mail fraud committed by the defendant. These counts are based on conduct that included making false statements in court documents. Specifically, the Superseding Indictment alleges "It was further part of the scheme and artifice to defraud that PETERSEN knowingly caused adoption court documents containing material false statements to be filed in the Circuit Court for Polk County, Arkansas, and in the Circuit Court for Washington County, Arkansas, both of which are within the Western District of Arkansas." (Doc. 14, ¶ 12). These fraudulent statements to the state court judges occurred in several different ways.

First, the defendant filed documents in every adoption cases that listed the expenses associated with the adoptions. This is a requirement under Arkansas adoption laws. In all four of the named adoptions listed in the Superseding Indictment, the defendant personally filed these expense forms. With regard to D.J.'s proceedings, the defendant caused a statement of expenses to be filed that included his personal "legal facilitator" fee of $17,945. (PSR ¶ 41). On this same form, the defendant caused another expense to be listed as "D.J.'s[2] EXPENSES." This amount is listed on the form as "$10,800.00." This amount happens to correspond almost exactly with D.J.'s statement to agents, "Takehisa promised to give D.J. $10,000 if she agreed to the adoption of her baby." (PSR ¶ 40). The list of expenses goes on to itemize the $10,800 the defendant informed the state court that he gave to D.J. These "expenses" included $600 for "rent" for five months. This amount is patently false. D.J. arrived in the United States on March 2, 2015, the adoption was finalized on May 28, 2015. D.J. had been in the United States for only 87 days prior to the adoption, which is less than 3 months. In addition, the Presentence Report relates that D.J. lived

---

[2] Birth Mother's name redacted.

with Takehisa's relatives. In fact, instead of the defendant paying for her rent, D.J. was required to "pay" her own rent through deductions in the $10,000 payment promised to her. (PSR ¶ 40.) The expense list goes on to name other false expenses. These fake expenses included electricity, gas, water, groceries, gas for doctor's appointments, phone expenses, and assessed/estimated postnatal care expenses.

The defendant's statement to the state court judge that he paid D.J.'s living expenses in the amount of $10,800 is a false statement intended to induce the court into approving this illegal adoption. None of the listed expenses are true. (PSR ¶ 60). Instead, the defendant made these false statements to hide the truth from the state court: the defendant offered to pay and did pay a large sum of United States Currency to D.J. for her to consent to the adoption.

Another way in which the defendant made false statements to state court judges in this case is that he and his co-conspirators encouraged the Marshallese birth mothers to lie about how long they had resided in the United States, and specifically how long they had resided in Arkansas. The presentence report notes, "R.M.J. also reported that she had been instructed to tell the adoption attorney that she had been in the U.S. for 1 year, and that the father of the child had returned to the RMI, as he did not want anything to do with the child." (PSR ¶ 38). It should be noted that R.M.J. arrived in the United States on April 21, 2014 and the adoption was finalized on July 8, 2014. Instead of one year in the United States, R.M.J. was only in the United States for 78 days prior to the adoption. The defendant and his co-conspirators convinced and encouraged R.M.J. and others to lie about their length of residency in the United States in order to induce the Arkansas State Court Judges into approving their otherwise illegal adoptions.

Finally, during the investigation, the agents interviewed several Marshallese birth mothers who indicated that the defendant and his co-conspirators told them what to say during court

proceedings. This was corroborated by a document recovered by the FBI during the course of the investigation into the defendant's adoption business. The document appears to be a set of instructions for Marshallese women to follow while in court proceedings. The list includes the statement, "They mustn't act like we have told them what to say…ha ha." The list also includes the statement, "They must say that they are unmarried and call the birth father a boyfriend not a husband." It should be noted that by referring to the birth father as a boyfriend and not as a husband (whether true or not) facilitates a much faster adoption proceeding, as no other person would need to consent to the adoption. The list also includes a statement "The Judge wants to hear that you are getting money for BILLS (as reimbursement). Do NOT say that you get $1500 each month. Say that your bills range from about $1500 to $1700 each month and Paul (the defendant) reimburses you." As noted in detail above, this is a clear fabrication. The amounts of money the defendant paid to the Marshallese birth mothers in this case was not to pay bills or support them, but rather to pay them to consent to the adoptions. Finally, the list also includes the statement "The Judge may say "Have you been promised anything to give your consent"- say NO." (PSR ¶ 70)

It is not just the nature of the crime itself that demands a sentence of 120 months in this case. The circumstances in which the defendant committed the crime also demands a 120-month sentence. The defendant repeatedly lied to state court judges and encouraged others to do so as well. The state court judges in Arkansas necessarily relied on correct and true statements in Court and in the documents filed prior to Court in order to approve the adoptions. The defendant deprived them of critical information that surely would have influenced their decisions on some of the most important cases that go through our justice system. This conduct and the circumstances surrounding it demand a sentence of 120 months.

The justice system is not the only group of people improperly influenced by the defendant's false statements and fraud. The defendant also took advantage of a very sensitive class of people, those people who would seek to add to their families through the process of adoption. These adoptive families trusted the defendant to follow the law and inform them correctly of all the details regarding their adoptions. The defendant took advantage of these trusting, desperate people during the course of his commission of this offense. The defendant told them that the adoptions were legal, despite knowing that he had illegally transported the birth mothers to the United States in violation of Federal Law. The defendant also neglected to tell the adoptive parents that he improperly promised large sums of money to the birth mothers in exchange for their consent to the adoptions. The defendant circumvented international adoption laws to bring more profit to himself. These adoptive families will now have to live with the knowledge that their attorney committed fraud during the course of this important event in the lives of their families. The Court should consider these facts in fashioning a sentence including an upward variance from the guidelines range.

The adoptive parents were only one side affected by the defendant's fraud and misleading statements in this case. The other side is, of course, the Marshallese birth mothers that the defendant smuggled into the United States to participate in his illegal adoption scheme. These women agreed to accept large sums of United States Currency to consent to the adoptions in this case. However, the Court should consider that fact in the context of the imbalance of power and financial circumstances between the defendant and the Marshallese birth mothers. For example, the defendant is a licensed attorney who understands the law. The Marshallese birth mothers in this case are largely uneducated people who do not have access to the training and knowledge the defendant used to commit this crime. In addition, the RMI is a largely undeveloped, relatively

13

poor island nation. The defendant is a rich attorney from the wealthiest nation in the world. The balance of power and privileges between the two parties is startling. The $10,000 payment that the defendant offered the Marshallese birth mothers was essentially, an amount of money that they simply could not refuse for people that lived in poverty on a remote island. Notably, however, the birth mothers actually received far less than they were promised and had "living expenses" deducted from their promised payment, living expenses which consisted of them being housed in deplorable, crowded homes with other pregnant women. (PSR ¶¶ 34 – 42) The misleading promise of money from Peterson incentivized many of the birth mothers into an adoption they were not otherwise contemplating while in the RMI. Lisa Ebort stated that she would never have placed her child up for adoption if she had not been recruited. (PSR ¶ 42). The Marshallese birth mothers are not victims in the traditional sense, but they were victims of their circumstance and easily preyed upon. They were desperate to improve their living conditions. They were desperate to improve the rest of their family's chances for survival. They were looking for a way out of their difficult circumstances and the defendant offered it to them in the form of $10,000 to give away their baby. The defendant knew they were desperate and vulnerable. He preyed on their financial instability, desperation, and ignorance of the United States' laws and language. The defendant recruited these desperate expectant mothers from the RMI for one reason: profit. This type of conduct demands an increase in the guidelines range to the maximum possible sentence of 120 months.

### B. HISTORY AND CHARACTERISTICS OF DEFENDANT

At present, the defendant is a 45 year old male with a "zero" criminal history score. (PSR ¶ 96). The defendant was also a licensed attorney in at least two states during the time in which he committed the instant offenses. The defendant claims in his Sentencing Memorandum (Doc. 70) that he operated his adoption business "in the open" and that he was "never so much as asked

to modify or cease his practice- by regulators, law enforcement authorities, or prosecuting agencies." While this statement may technically be true, it is also true that the Arizona Court of Appeals put the defendant on notice years ago that two important practices that he used or engaged in could be construed as illegal. The Presentence Report notes in paragraph 31a that Petersen represented an adoptive family whose adoption of a Marshallese baby was denied by a Juvenile Court in Arizona. The case was heard by the Arizona Court of Appeals in 2007, who noted:

> In particular, the court opined that Petersen had violated RMI laws regulating adoptions as well as section 141(b) of the Compact of Free Association ("Compact"), 117 Stat. 2834, a federal treaty between RMI and the United States, by arranging for Jenny to come to the United States for the purpose of placing a child for adoption. Despite its concern with the legality of Petersen's methods, the court recognized it was "constrained to grant an adoption if [REDACTED- adoptive parents] have met the requirements of Title 8, Article I and if the adoption is in the best interest of the child." (CA-JV 06-0158)

The Arizona Court of Appeals also noted that the Juvenile Court "found violations of A.R.S. § 8-114(C) (Supp. 2006) (prohibiting compensation paid in exchange for consent for adoption placement without court approval)." Id. This is noteworthy because it seems to mirror the defendant's conduct in this case: as noted above, the defendant offered to pay $10,000 to induce pregnant Marshallese women to consent to adoptions in the United States.

Despite the Arizona Court of Appeals strong support for the Juvenile Court's reasoning in denying the adoption, the Court of Appeals remanded the cases for further proceedings. At no point in this opinion, however, does the Court of Appeals condone or support the legality of the defendant's actions. In contrast, the Arizona Court of Appeals strongly questioned the legality of the defendant's actions under Federal and RMI laws, but noted that it was unable to fashion a decision based on those laws. Rather, the Court of Appeals remanded the case back to the Juvenile

15

Court for further proceedings to establish an alternative to the suggested action of the Juvenile Court, which was to deny the adoption.

This opinion surely should have halted or paused the defendant's actions of transporting pregnant woman from the Marshall Islands to the United States for the sole purpose of completing adoptions in the United States. The opinion should have also caused the defendant to stop paying pregnant Marshallese women to consent to adoptions. However, despite the Court of Appeals admonitions and questions of legality, the defendant pressed on. The defendant eventually expanded his illegal operations to both Utah and Arkansas. The defendant continued to violate the Compact. The defendant continued to illegally pay Marshallese women to consent to adoptions. The defendant continued to defraud state court judges in all three states. The defendant's actions included many, many more illegal adoptions in three states for another 12 years. Despite notice in 2007 that he should not pay Marshallese women for their consent to adoptions, and despite a strong statement that his actions likely violated the United States' Treaty with the RMI, the defendant continued his disregard for the law for many more years. The defendant habitually and routinely violated the laws of three states and two countries to complete this scheme. This conduct shows that the history and characteristics of the defendant and his flagrant violation of the law for many years support a sentence of 120 months.

    C.    NEED FOR THE SENTENCE TO REFLECT THE SERIOUSNESS OF THE OFFENSE, TO PROMOTE RESPECT FOR THE LAW, AND TO PROVIDE JUST PUNISHMENT FOR THE OFFENSE

Adoption cases are some of the most important cases that go through our justice system. They are very serious matters. The courts and attorneys that deal with adoptions should treat them with the kind of respect and care that is equal to the seriousness of the litigation. The defendant completely disregarded the sanctity of this process.

As noted in the Presentence Report, A.T., R.J., R.M.J., and D.J. all stated that the defendant and/or his co-conspirators offered them $10,000 to consent to adoptions of their children. These payments were a fraud on the state court process and the adoptive parents. They were also a form of brutal manipulation of the Marshallese birth mothers.

The defendant's co-conspirators may have been the people who communicated these offers, but the defendant is ultimately responsible for these illegal payments. The Presentence Report notes that both Takehisa and Jennet stated that Petersen arranged for them to pay money to the birth mothers to facilitate their consent to the adoptions. For example, "Petersen reportedly instructed Jennet that each pregnancy was budgeted for $10,000, and that the longer a woman stayed in the U.S. after delivering the baby, the less money they would receive. The women also received less if they were flown back to the RMI or another location." (PSR ¶ 67). Also, "Takehisa further stated that the paperwork contained purported living expenses for the birth mothers, and that the amounts were fabricated or inflated by Petersen, Wolfe, and herself in order to convince the birth mothers to give their children up for adoption." (PSR ¶ 60). Finally, "Takehisa stated that Petersen would wire money into Takehisa's bank account so that Takehisa could pay the birth mothers. Takehisa would pay the birth mothers monthly while they resided in Arkansas, and then would issue the remaining lump sum a week after they had given birth. The lump sum payment was a tactic employed so as to ensure that the birth mother would not withdraw consent for the adoption." (PSR ¶ 61). Jennet was paid $1,500 for each RMI birth mother who was recruited, and an additional $2,000 payment after the adoption was finalized. (PSR ¶ 68). This information clearly show that the defendant was responsible for the offers of payments and payments to the pregnant Marshallese women in this case.

The evidence in this case shows that the defendant committed a series of very serious offenses. These offenses were part of a wide-ranging scheme that spanned over three states. The scheme manipulated everyone involved, including state courts, state medicare programs, adoptive families, and Marshallese birth mothers. These serious, wide-ranging offenses occurred over a span of more than 12 years. All of these facts show that the seriousness of these crimes requires a sentence of 120 months to reflect that seriousness, to promote respect for the law among others who would seek to replicate the defendant's illegal schemes, and to provide a just punishment for these serious offenses.

## **CONCLUSION**

Considering the sustained fraud and manipulation of innocent people involved in this case, the United States submits that the Court should impose a sentence of 120 months in prison in this case.

Respectfully submitted,

David Clay Fowlkes
First Assistant United States Attorney

*/s/ Clay Fowlkes*
Clay Fowlkes
First Assistant United States Attorney
Arkansas Bar No. 2003191
414 Parker Avenue
Fort Smith, AR 72901
479-249-9033
Email: Clay.Fowlkes@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of November, 2020 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which shall send notification of such filing to the following:

Kurt Altman and Scott Williams,
Attorneys for the Defendant

/s/ Clay Fowlkes
Clay Fowlkes
First Assistant United States Attorney