Scott C. Williams, Utah State Bar #6687
SCOTT C. WILLIAMS, LLC
43 East 400 South
Salt Lake City, UT 84111
Telephone: (801) 220-0700
Fax: (801) 364-3232
Email: scwlegal@gmail.com

Kurt M. Altman
Arizona Bar Number 015603
**KURT M. ALTMAN, P.L.C**.
4848 East Cactus Road, Suite 505-102
Scottsdale, Arizona 85254
attorneykaltman@yahoo.com
Phone: (602) 689-5100
Fax:    (602) 368-4512
Attorney for Defendant

Raymond L. Niblock, PA
The Niblock Law Firm, PLC
324 N. College Ave.
Fayetteville, AR 72704
479-521-5510 (voice)
479-444-7608 (facsimile)
Raymond@niblocklawfirm.com
Attorney for Defendant

Attorneys for Paul Petersen

**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS (FAYETTEVILLE)**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>vs.<br><br>**PAUL PETERSEN,**<br><br>**Defendant.** | **DEFENDANT'S MEMORANDUM IN RESPONSE TO GOVERNMENT'S SENTENCING MEMORANDUM**<br><br><br>Case No. 5:19-cr-50079-TLB<br><br><br>Honorable Timothy L. Brooks |

The Defendant, Paul Petersen, by and through his attorneys of record, provides the following memorandum in response to the Government's Sentencing Memorandum (Doc. 71) (cited to herein as "Govt. Memo"), filed on November 17, 2020.

The defense responds to the Government's arguments in support of the application of U.S.S.G. §2L1.1(b)(8)(A) for "involuntary detention." The facts of the present case are completely inapposite to any case law upholding application of the enhancement, and do not themselves support application of the enhancement. In no way did Mr. Petersen coerce the Marshallese birth mothers. They were not detained during the course of any adoption. Each Marshallese birth mother was an adult; voluntarily engaged in the adoption, some more than once, free of cost and with financial reward. They received commercial transportation to the United States where the vast majority of them remain today; housing and personal and medical care, and public professional representation by Mr. Petersen's adoption agency.

The defense also responds to the Government's arguments that this Court should vary upward from the presumptive sentence under the sentencing guidelines, and impose a staggering prison sentence that would be more than three times greater than the guidelines determination. The Government's presentation vilifies Mr. Petersen as a fraud and wholly self-interested in profit to the detriment of adoptive parents and Marshallese birth mothers with which he worked in his openly conducted adoption practice. The evidence simply does not support the Government's characterization. Mr. Petersen engaged in an adoption business spanning over 15 years, and involving approximately 500 adoptions. He engaged professionals, agencies, courts, and others throughout the period. He has now aknowledged responsibility for the fact that his practice violatedMarshallese COFA, has plead guilty and accepted responsibility for criminal conduct. The overwhelming evidence, provided by dozens of persons involved with Mr.

Petersen over the years, and many other people referenced in those testimonials, attest to the fact that, though he has admitted to criminal conduct, Mr. Petersen is a good person who operated with good intentions to create happy families, and did it with respect for and promotion of Marshallese culture, people, and the adoptive families.

The defense position is that a sentence that is at the low end of the Guidelines range is appropriate and reasonable. The facts do not support any upward departure considered in Application note 7 of the applicable sentencing guidelines. No traditional departure considerations favor varying from the guidelines sentence.

## ARGUMENT

### I. THE ENHANCEMENT UNDER U.S.S.G. §2L1.1(b)(8)(A) SHOULD NOT BE APPLIED

Applying the enhancement at U.S.S.G. §2L1.1(b)(8)(A) for "involuntary detention" would be outside anything to which the enhancement was intended to apply, and without any legal precedent—as the Government acknowledges. Even if the few references to alleged isolated instances of rogue conduct by persons employed by Mr. Petersen in fact occurred, they would not amount to detention or coercion under the enhancement provision. Everything about the over 15 year history of Mr. Petersen's adoption practice supports the conclusion that he would not have knowingly condoned or allowed such behavior, and it was therefore entirely unforeseeable.

It appears that the Government's primary assertion in support of applying the enhancement is a statement made a by a Lynwood Jennet, made in the course of trying to curry favor from the Government as an informant. Jennet apparently confessed to agents that she, and she alone, kept passports of some of the birthmothers, apparently so that she could keep them in line somehow. The Government mentions that these facts are "uncontested." Since Mr. Petersen

3

has no knowledge that Ms. Jennet did anything of the sort, and would have never countenanced her doing so, then he obviously cannot contest her own claims. It is noteworthy that, even under the circumstances that Jennet gave her statement, government interrogation with fulfilled promises of leniency, she never claimed Petersen knew anything about it, much less that he directed it or condoned it.

The Government appears to acknowledge that no appellate court has upheld application of the enhancement to any facts remotely similar to the present case. Yet it bears reviewing the few cases so as to appreciate the leap that the Government nonetheless urges this Court to make.

The Government acknowledges the opinion in *United States v. Reyes*, 772 F.3d 1152 (9th Cir. 2014), but glosses over the facts of the case with the sweetest of sugar coating. It is very worth noting that the case involved 2,000 aliens annually, people held unwillingly until extorted out of money from relatives, threats of death, beatings, attempts to extort sex acts, guns in plain sight, armed guards controlling access even to the bathroom, desperate notes being tossed from barred windows, 14 year old children fleeing and hiding, attacking dogs, etc.. *Id.* at 1154. Further, even under those facts, the United States—the same plaintiff as in the present action—agreed not to even seek an enhancement under U.S.S.G. §2L1.1(b)(8)(A), nor any other enhancement, and in fact argued *against* application of the enhancement at sentencing. *Id.* at 1156. (Had the Government achieved their wish in that case, the sentencing guidelines would apparently have been approximately in the exact range that is suggested by Mr. Petersen in the present case, where there have been no beatings, no guns, no threats of rape, no extortion, etc.)

Similarly, in *United States v. Alapizco-Valenzuela*, 546 F.3d 1208, 1213 (2008), 11 people were found lying on the floor of a minivan without shoes, and the history of their odyssey included being directed at gunpoint, threatened with physical harm, dismemberment and death.

They were directed at gunpoint, were deprived of food and water and had to urinate into plastic bottles. Even in light of those circumstances, the United States advocated for a 78 month sentence, even though it argued the circumstances were akin to a kidnapping case for ransom. *Id.* at 1214.

A *candid* comparison between these cases and the present case cannot be made. If this sentencing process is to comport with the basic analytical principles of jurisprudence, the present case must be considered in light of such precedence, despite the fact that the number of cases applying the guidelines section are sparse (most likely because it has only been applied to the harshest circumstances created by real human traffickers, and rarely appealed). It defies credulity that the present case is even remotely similar to the existing cases that have been considered on appeal (where the standards of review are particularly deferential to trial court rulings). The birthmothers in the present case did not pay money to be secretly smuggled under circumstances of threat, extortion, gunpoint, and deprivation. They were instead paid in relation to agreements that they brokered with Mr. Petersen's agency, flown under commercial circumstances, lived in various places and circumstances where people helped them understand the culture and obtain healthy nourishment and medical care. There is no evidence that *any* of the women, including the few to which the Government refers, could not leave their circumstance, seek assistance from law enforcement, or aid from others. (In fact some birthmothers did change their minds, discontinue the adoptions process, and remain in the United States, or chose to go back to the RMI. On some of those occasions Mr. Petersen paid all related costs at a loss.) If circumstances of implied coercion in relation to the adoptions actually occurred, they were isolated rogue incidents. But even if those facts were true, and it was true that some of the women therefore felt that they would be unable to return to the RMI, or felt

pressured to continue with their adoptions, it is a far cry from physical detention, threat, or harm such as represented in the only case law that exists.

Nor were any of the apparently isolated incidents of holding passports or referencing to a few of the birthmothers that they may have to repay money or would suffer consequences if they did not comply with the terms of their agreement, foreseeable to Mr. Petersen (assuming such things did in fact happen).[1] Mr. Petersen engaged in hundreds of open adoptions with RMI birthmothers under circumstances where the apparent overwhelming majority were satisfied. In fact many engaged in multiple adoptions, some with the same families. Most of the birthmothers, consistent with the principles of open adoptions, continue to communicate with the adoptive families to this very day. These are the circumstances that Mr. Petersen was aware of. He had no knowledge of the rogue acts described by the few birthmothers on whom the Government relies, and the Government cites no evidence to the contrary. It is also undisputed by the government that he was unaware that Lynwood Jennet, a cooperating witness that received extreme leniency in exchanged for cooperation, held onto the birthmothers' passports and only a few occasions. If Jennet's statements are factual, these isolated events were not foreseeable under the general circumstances of his adoption practice. Even the reports of the few birthmothers' interviews upon which the Government relies do not contain any claim that they felt "detained" or "coerced."

---

[1] Mr. Petersen is in the untenable position of having to be assessed by reports of things that he could not possibly know how to dispute, since there is no evidence whatsoever that he knew about them, nor any reference to any facts in support of the claims that he could independently investigate for truthfulness or accuracy. This is true for most of the information that the Government uses in its arguments. For instance, all of the recruitment that Lisa Ebort relates (at paragraph 42 of the PSR) was, according to her, by a person named "Bein." Mr. Petersen not only cannot confirm nor deny the truth of any of it, *he doesn't even know who "Bein" is*. And if Takehisa took issue with Ebort changing lawyers to Brenda Austin in the middle of a contract, Mr. Petersen never knew about it—in fact *he* never even asked Ebort to return any funds, despite the change in attorneys.

## II. NO 3553(a) FACTORS SUPPORT AN UPWARD VARIANCE

The Government begins its discussion of the 3553(a) factors by citing three main reasons to more than triple the Guidelines sentence: firsts, because the crime involved fraud upon courts; second, a claim that the crime took advantage of adoptive families; and, third, a claim that the crime took advantage of RMI birth mothers. (Govt. Memo at 9.) It is worth noting that all such factors are inherent in the overall activity which form the basis for the conviction, and are thus accounted for in the application of the Guidelines.[2] Also of note when considering the hyperbole and sensationalism of government's remarks in their memorandum, is that there has been no identification of any formal victim in the federal case, nor any restitution to be made. In the Arizona case, Mr. Petersen has already made the State whole for a restitution amount of hundreds of thousands of dollars. And though there is no restitution contemplated in the Utah case, Mr. Petersen nonetheless agreed to put $50,000 of the sale of property there in escrow to pay any costs associated with completing adoptions that had been interrupted by the Government's sudden arrest and jailing of Mr. Petersen. Adoptions that are apparently illegal for Mr. Petersen's agency to conduct but not for others. Since Mr. Petersen's arrest and subsequent prohibition from engaging in anything related to adoptions, numerous so called "coerced and vulnerable Marshallese birthmothers," according to the government, have completed adoptions initiated by Mr. Petersen's firm and remained in the United States. If they were so vulnerable and so fundamentally coerced, why then would they continue with the adoption of their child once the government freed them from their trafficking captor? The government's portrayal of Mr. Petersen is over the top fantasy and lacks credibility. The memorandum should be used to support the 78-month sentence imposed in *United States v. Reyes, supra.,* a case of real brutal

---

[2] *See*, e.g., *United States v. Oliveira*, 623 F.3d 593, 598 (8th Cir. 2010), finding error where the trial court considered immigrants to be a vulnerable class, since such considerations are inherent in the crime of conviction.

human trafficking, where the government requested a sentence far less than their request in the present case.

The fraud argument is inherent in what Mr. Petersen has plead guilty to in Arizona, and for which he will be sentenced for there (where he was in fact *not* charged with any human trafficking offenses.) He has paid full restitution, nearly $700,000.00 with regard to the Arizona charges. Assuming that false statements were made in the course of adoptions, as the Government asserts in pages 10 through 12 of its memorandum, it is not clear that any of the adoptions ultimately would have been denied on those bases.[3] Mr. Petersen has never been asked to repay any monies, or make other reparations for matters which happened within any of the adoptions. In fact, none of the approximately 500 adoptions facilitated by Mr. Petersen has ever been sought to be reversed or nullified. It is also important to keep in mind that, to the extent that Mr. Petersen omitted or falsified information with regard to adoptions or applications for medical and other services for the birth mothers, *he always did it for their benefit*.

It is disheartening that the Government asserts, without reference to *any* portion of the PSR, nor *any* other material source, that Mr. Petersen "took advantage of a very sensitive class of people" in the form of the "desperate" adoptive families that "will now have to live with the knowledge that their attorney committed fraud during the course of this important event in the lives of their families." (Govt Memo at 13.) While this passage itself stigmatizes the families that worked with Mr. Petersen,[4] the Government cites to *no* specific examples. On the other

---

[3] The 2007 Arizona case is such an example. The appeals court itself noted (in footnote 4, page 6 of Exhibit F), that despite supposed violations related to compensation and appropriate information, the adoption would nonetheless be granted.

[4] An unfortunate reality described by Brad and Callen Lewis in their letter, number 3 of Exhibit E: "we are personally aware of scores of other families who adopted through Paul and have described to us similar adoption experiences . . . but do not feel comfortable publicly expressing support for Paul for fear of backlash from friends, family, employers, co-workers, and the anonymous voices of online commentaters." Also, Brock Kassing describes

8

hand, the defense has attached to its memorandum a mere sampling of numerous accounts by adoptive families that detail a completely different narrative. (Exhibit B of Def. Memo.) Further testimonials have arrived since the previous filing, and are attached to this memorandum as Exhibit E. While the Government also vilifies Mr. Petersen for what they allege was "brutal manipulation of the Marshallese birth mothers" (Govt. Memo at 17), these testimonials also vouch for how Mr. Petersen in fact interacted with and cared for the Marshallese people and their culture:

    Consider, for example:

The letter of Brock Kassing on behalf of his family (second letter of Exhibit B), who relates that what Mr. Petersen did for his family during a "transparent" and "professional" process of adoption, brought "tears to his eyes" with a "continued show of genuine love and concern for the process and our families well being" over the months after the birth. Mr. Kassing reflects upon the care that was shown to an appreciative birth mother in the open adoption, with whom the family keeps in close contact with. "Mr. Petersen "has brought families together from across the world. He has helped complete families through the miracle of adoption." "No amount of allegations or accusations will ever be able to take the feelings we shared that day away from us."

The letter from Glen and Pamela Bachmann (third letter in Exhibit B), who enjoyed two adoption through Mr. Petersen, from different birth mothers: Paul explained open adoptions, and the "ongoing relationship with the birth family would be expected and important." He also provided information about how the US view of adoption (transactional) and the Marshallese view of adoption (expanding your circle and long term connections) were different." Paul "demonstrated a deep appreciation for the Marshallese culture and people." "Paul was more than just an attorney for us. He was sincere and caring. He took a personal interest in the adoptions and believed in the good he was doing to bring families together." He was "a huge blessing to our family."

Faith Lowe writes for her family, which includes two Marshallese biological brothers adopted through Mr. Petersen (letter 4 of Exhibit B). She describes knowing of the experiences of a "large group" of "many fellow adoptive families, and their birth families" who worked with Mr. Petersen. She describes how Mr. Petersen focused on "the Marshallese people, their culture, and how he loved building families through adoption." "He took great care to make sure I knew the importance of getting to know the Marshallese culture if I were to adopt through his firm." "Paul assured birth mothers that they would have contact with their birth children, and he made sure adoptive families knew that." "We LOVE our Marshallese family!" "I know the building of

---

in is letter number 2 of Exhibit B, that he "was scared" by the inflammatory nature of the Government's narrative and what it might mean to his adoption and his family.

families was special to him. . . . I know the Marshallese people are very special to him, and, that the Marshallese people love him back. He cares very much for both the adoptive families AND the birth families." "Because that's what this was all about, was family. Family is the core of happiness. My happy family, built through Paul, is proof of that."

Amber and Michael Brinson write (at letter 5 of Exhibit B) of their experience of adopting their two children with Mr. Petersen, as well as "four other families who adopted Marshallese children with Paul": Paul made special efforts to keep biological siblings geographically close to one another." "Paul clearly loves he Marshallese people and taught us a great deal about their culture. This work was a labor of love for Paul. His kind spirit will always be part of our family's story."

Natasha Taylor, on behalf of her family, writes (letter 6 of Exhibit B) of her adoptions through Mr. Petersen and how he genuinely cared for all parties: "He was so kind, knowledgeable, honest and deeply cared for the potential birth mothers that he worked with. We also admired how much he loved the Marshallese people and their culture." Their first birth mother "continually expresses how lucky she was to find Paul and how wonderful he was to her. He made her feel safe and taken care of in one of the hardest times of her life." With regard to their second adoption through Mr. Petersen, Natasha recalls that, even with communication challenges, Mr. Petersen provided tools which allowed her to "still felt a strong bond with her and her family. We have kept in close contact with her ever since and we only have Paul to thank for that." "The love he shows to his potential birth moms and future adoptive families is comparable to the love he has for his own family."

Patrick and Rachel Olsen also adopted two sons through Mr. Petersen (letter 7 of Exhibit B). They in fact had their first birth mother decide to place her child with another family through a different agency, and Mr. Petersen consoled them and took the expense upon himself. The successful adoptions were "nothing short of exceptional." "We immediately connected and fell in love with our birth family. This family communicates with us frequently and tells us that Paul was good to them and treated them with respect. As our bond with them was strong, Paul also made personal connections with them and other birth families whom he worked with. Years after placement, Paul was willing to help this family with some outstanding hospital bills. Through his actions, you can see and feel his love for the Marshallese people."

The experience expressed by Lisa McNiven on behalf of her family's experience (letter 8 of Exhibit B) reflects the poignant story of an adoption experience that included two lost children, but three other successful and beautiful adoptions. "I was immediately comforted by how he spoke about the expectant mothers." "He also explained to us how important is was foremost of the expectant mothers to maintain an open relationship with the adoptive families after placement, . . ." After the tragic miscarriage of the first placement, Mr. Petersen helped "navigate the expenses and complications regarding this loss." Thereafter, Mr. Petersen managed a double placement in the family, and navigate that challenging process "with patience and professionalism, also helping us to minimize costs as much as possible. Both placements were a positive experience, and we were able to spend precious time with the birth families after the birth of the babies and before we traveled home." Paul "made sure the expectant mother received all of the medical attention she needed during this time." After a stillbirth on the next

adoption attempt, Mr. Petersen was able to place a third child with the McNivens: "He contacted us first in an effort to honor the birth mother's wish to keep the biological siblings together if possible." Thereafter the was "a reunion with all three birth families over the next several days." "We remain in contact with all three birth families. We send messages, pictures, videos, and gifts. We will forever be grateful to Paul, Megan, and his team for the work they put into helping our family grow." "More importantly, we felt that our kids' birth families were treated with kindness and respect. The fact that all three families did multiple matches through Paul tells me that they felt comfortable with him and his firm, and that he was able to meet their needs as well."

Nichole Crawford writes on behalf of her family, which has adopted four children, three of which are Marshallese (letter 9 of Exhibit B): "The first thing that I really appreciated about Paul is his obvious love and respect for the Marshallese people and culture." "This truth has become more and more evident to me as the years have progressed, and as I have adopted three Marshallese babies with three different birth mothers, with Paul as the attorney. They have each expressed their confidence, appreciation and friendship that they have with Paul." During the adoption process, Nichole "never felt forgotten or abandoned by Paul, and from conversations I've had with our birth mom, I know that she feels the same." "I have had the opportunity to spend a lot of time with my birth families, and they have each expressed their trust, respect and love for Paul. I have asked my birth moms about their experiences with Paul, and they only have good things to say . . . . I have witnessed both on the islands and in my home, that the Marshallese culture is very different than American culture, in regards to living arrangements, families and adoptions. Paul knows and loves their culture more than most Americans would, which opens the door for the Marshallese people to love and accept him." "Paul has been an integral part in helping our family to come together. He genuinely cares for his families, both the adoptive family, the birth families, and the adoptees. He encouraged a continued relationship with our families, and them with us. He went above and beyond anything that was expected of him as legal counsel, for both our family and our birth families."

Paul and Jessica Egnew have provided a letter, number 1 of Exhibit E, attesting to the intentions of Mr. Petersen in the course of their experience adopting two different children. They state: "We believe strongly that his intentions are to help mothers and children." "Paul has spend his career helping others and assisting in a fundamental societal need. He has offered to the mothers and children involved a way to change theirs and their child's future." "We, and thousands of others, are forever grateful for the contribution of time and dedication Paul has given to these children, and the courageous women who create a brighter future for them."

Becky Reese and her family, at letter 2 in Exhibit E, hope that this Court "will recognize the overwhelming good [Paul] has done for hundreds of families like ours when considering his future." She describes how her family vetted many adoption attorneys working with Marshallese women, and found that Mr. Petersen was a lone example of integrity and concern for families and the Marshallese culture. "If it weren't for Paul, then we probably wouldn't have moved forward with the Marshallese adoption nor have the family we have today." Ms. Reese describes that Wanda, the birthmother of her first adoption, had adopted with Paul before, and "she gave us a glowing recommendation and expressed true affection and respect for him." Thereafter,

Wanda had triplets that the Reese family adopted. "There can never be a retelling of our adoption journey that doesn't start with Paul Peterson's love for the Marshallese people."

Brad and Callen Lewis, at letter 3 of Exhibit E, were "struck by Paul's love and respect for the Marshallese people and Marshallese culture." In fact, they describe his "commitment to placing the child's and birth parents' interests ahead of the adoptive parents' interests." They further indicated "that we are personally aware of scores of other families who adopted through Paul and have described to us similar adoption experiences . . . but do not feel comfortable publicly expressing support for Paul for fear of backlash from friends, family, employers, co-workers, and the anonymous voices of online commentaters."

These are but a few selections from the bevy of writings offered to give a true perspective to this Court of how Mr. Petersen respected and treated both the adoptive families that were his clients, and the Marshallese birth mothers who desired to present their children for adoption. The defense leaves it to this Court to determine whether these are the testimonials of adoptive families that, as the Government asserts, have been victimized by a craven criminal, obsessed only with personal profit, and who preyed upon "sensitive" and "desperate" people seeking adoptions, and a person who engaged in "brutal manipulation of the Marshallese birth mothers." (Govt Memo at 17.)

The reality is that there is a long history of RMI mothers engaging in adoption practices in connection with agencies all over the world.[5] Mr. Petersen was witness to this fact during his LDS mission to the Republic. Later, upon becoming an attorney, and deciding to engage in running an adoption practice, he naturally engaged women in the RMI. For many years Marshallese persons and officials, U.S. persons and officials, U.S. courts, U.S. attorneys and

---

[5] See, for instance, the case of Laurie Loomis, who in fact mirrored her practice on Mr. Petersen's, but apparently has never been formally investigated, or at least has never been charged. https://www.civilbeat.org/2019/11/this-honolulu-lawyer-has-run-a-marshallese-baby-business-with-impunity/

12

other professionals knew of it.[6] Even when it began to be aggressively investigated as a crime, nothing was done to request that Mr. Petersen cease and desist. Instead, the government waited and allowed many more adoptions facilitated by Mr. Petersen to take place.

Mr. Petersen engaged in his adoption practice openly—using his own bank accounts, and personal information with regard to all transactions. The Government cannot refute that no one ever so much as requested that Mr. Petersen consider the legality of his long-engaged adoption practices, or alter them, much less cease and desist in continuing them. (Govt. Memo at 15.) However, the Government offers the legally specious reference to the fact that, way back in 2007, an Arizona Court of Appeals decision offered, in *dicta*, that it had "concern" with adoption practices *vis a vis* Marshallese law. Far from supporting the Government's present argument that the decision should have put Mr. Petersen on notice that his adoption practices were illegal, the circumstances support a reasonable belief by a lawyer that what he was doing was in fact legal— he won. The Juvenile Court articulated concerns about application of Marshallese law. The case was appealed. The appellate court referenced the concerns, but did not rule upon them, and instead remanded the matter.[7] The lower court then approved the adoption, notwithstanding any

---

[6] Mr. Petersen's partner and office manager Megan Wolfe provided an affidavit in connection with other legal proceedings involving the Arkansas State Bar. That presentation provides the only perspective given by a person who was not being influenced or incentivized by law enforcement or by prosecutors. The final version of that affidavit (the defense continues to attempt to locate the signed and executed document) is attached hereto as Exhibit G.

[7] The Government's citation to the opinion, at page 15 of its memorandum, raises concerns of completeness for this Court. The quotation completely omits reference to a critical footnote contained therein. *See* page 4 of the opinion, attached hereto as Exhibit F. The actual opinion contains the footnote, after the sentence which ends with "placing a child for adoption." It is footnote 3. That footnote qualifies the very section of the opinion that the Government cites, and which the Government asks this Court to ingest in support of the Government's position. The footnote states, among other things, that there is "some support for [Mr. Petersen's] interpretation." In other words, it is in the footnote where the relevant details reside. The appellate court acknowledged that there is an argument that supports Mr. Petersen's position, and the appellate court, though it noted concern about the validity of the argument, referenced the fact that it existed, and did not disturb the argument in its ultimate ruling. Thus, any rational lawyer was free to interpret the situation as one in which the matter was undecided. All of this dynamic was omitted when the Government failed to inform this Court that a critical footnote was omitted from its quoted citation to the Appeals Court decision.

of the referenced concerns. Thereafter, no further challenge to Mr. Petersen's practices was ever brought to any court in the land.[8] Such a circumstance would actually put an attorney on notice that what he was doing was *legal*, not illegal.

This Court should also be concerned about the apparent disparity in sentencing that would occur if the Government's requested sentence were imposed. Sentencing disparity was the chief concern behind the creation and implementation of the federal Sentencing Guidelines. The United States Supreme Court opined in the sentinel case of *United States v. Koon*, 518 U.S. 81, 113 (1996) that: "The goal of the Sentencing Guidelines is, of course, to reduce unjustified disparities and so reach towards the evenhandedness and neutrality that are the distinguishing marks of any principled system of justice." The Government's present request for a sentence more than three times the Guidelines range, would amount to gross sentencing disparity, especially when considered the case law cited in relation to the enhancement issue *supra*. Under the terrible facts in *Reyes*, the Government *argued* for a sentence far less than they solicit for Mr. Petersen. 772 F.3d at 1154. Under the terrible facts of *Alapizco-Valenzuela*, the court imposed a 72 month sentence. In those cases people were charged money, not paid money. They were kidnapped, assaulted, deprived of basic necessities or worse. Each case is an incredibly far cry from the facts of the present case.

In fact, the defense finds virtually no cases sentenced under the statute of conviction that resulted in sentences even close to what the Government asks for in this case, even though most

---

[8] That is even true of the circumstances that apparently instigated the Arkansas investigation, according to paragraph 32 of the PSR. While Judge Martin apparently made a referral to the FBI, Mr. Petersen was never aware of it. Nor would the circumstances of that case have put him on notice that anything was amiss. It is not accurate that Judge Bryan did anything in court that would have signaled a belief that the adoption involved any illegality, nor that the "adoption was not allowed to go through." Judge Bryan's hearing was not in fact an "adoption hearing," but was a "consent hearing," which is not necessary under Arkansas law at any rate. The consent was ultimately accomplished by notary, and the adoption was completed thereafter, though in Indiana (to an adoptive family that fully supports Mr. Petersen).

14

cases involve egregious smuggling facts, including danger and/or injury and/or death. For instance, the defendant in *United States v. Ortiz*, 242 F.3d 1078, 1079-79 (8th Cir. 2001) drove 23 people in a van that had only 14 seatbelts, crashed the van, and injured most of the occupants, including a child. Ortiz was sentenced to 41 months in prison. *Id.* In *United States v. Moe*, 65 F.3d 245, 247 (2nd Cir. 1995) the defendants were responsible for smuggling hundreds of people from Thailand under inhumane conditions in the hold of a boat, without sufficient food or toilette. They were sentenced to 48 and 54 months respectively. *Id.* at 246. In *United States v. Sanchez-Ramirez*, 497 F.3d 531, 535 (5th Cir. 2007) the defendant treated the 20 people he smuggled "like torturing these people and leaving them to die," while refusing them food and water and basic necessities. Some of the victims had to be hospitalized, and one died. Sanchez-Ramirez' guidelines range was 46-71, but the judge varied upward to 80 months based upon the particularly heinous nature of the case. 18 U.S.C. §3553(a)(6) requires this Court to fashion a sentence to "avoid unwarranted sentence disparities. . ." The government's requested sentence of 120 months would create, not avoid, "unwarranted sentence disparities."

## CONCLUSION

A sentence of 120 months would be patently unreasonable. A sentence at the low end of the guidelines range would be reasonable, and is warranted by consideration of the totality of the circumstances. The enhancement at U.S.S.G. §2L1.1(b)(8)(A) is inapplicable. Therefore, the appropriate guidelines range is 37-46 months in prison. All of the sentencing factors at 18 U.S.C. §3553(a) support a sentencing at the low end of this range. Therefore, Mr. Peterson respectfully requests that this Court sentence him accordingly.

ESPECTFULLY SUBMITTED this 24th day of November 2020.

                                    /s/ Scott C. Williams
                                    SCOTT C. WILLIAMS
                                    KURTM. ALTMAN
                                    RAYMOND L. NIBLOCK
                                    Attorneys for Defendant

**CERTIFICATE OF SERVICE**

     I certify that, on November 24, 2020, I electronically filed this Sentencing Memorandum with the Clerk of the Court, to be served by operation of the Court's electronic filing system on the attorneys of record.
    *s/ Scott C. Williams*